Nos. 15-1038, 15-1044

# In the United States Court of Appeals for the Federal Circuit

WBIP, LLC,

*Plaintiff-Cross-Appellant,*

— v. —

KOHLER CO.,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS, CASE NO. 1:11-CV-10374-NMG
HON. NATHANIEL M. GORTON

## OPENING BRIEF AND ADDENDUM OF DEFENDANT-APPELLANT

Steven M. Bauer
Safraz W. Ishmael
Proskauer Rose LLP
One International Place
Boston, MA 02110
(617) 526-9600

Eric A. Shumsky
T. Vann Pearce Jr.
Katherine M. Kopp
Orrick, Herrington & Sutcliffe LLP
1152 15th Street NW
Washington, D.C. 20005
(202) 339-8400

E. Joshua Rosenkranz
Rachel Wainer Apter
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
(212) 506-5000
jrosenkranz@orrick.com

Brian P. Goldman
Orrick, Herrington & Sutcliffe LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
(415) 773-5700

*Attorneys for Defendant-Appellant*

'044 patent (claim 1)

1. A marine engine comprising:
    an exhaust system including
        a catalyst cooled by a flow of coolant, the catalyst arranged to
           intercept a flow of exhaust;
        a coolant injector that injects coolant into the flow of exhaust at
           a point downstream of the catalyst; and
        a sensor arranged to sense a characteristic of the flow of
           exhaust; and
    an engine controller configured to control an air/fuel ratio of the
        engine as a function of the sensed exhaust flow characteristic;
    wherein the engine controller is also configured to govern engine
        speed with respect to a constant speed while maintain the
        air/fuel ratio.
A107, col. 7:4-17.

# CERTIFICATE OF INTEREST

Counsel for appellant certifies the following:

1.     We represent Kohler Co.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented: N/A.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented: None.

4.     The names of all law firms and the partners or associates that appeared for party or amicus now represented in trial court or agency or are expected to appear in this court are:

<u>PROSKAUER ROSE LLP</u>

Steven M. Bauer
William D. Dalsen
Sharada Deverasetty
Thomas Hoehner
Safraz W. Ishmael
Micah W. Miller
Jinnie Reed

<u>ORRICK, HERRINGTON & SUTCLIFFE LLP</u>

E. Joshua Rosenkranz
Karen Johnson-McKewan
Eric A. Shumsky
T. Vann Pearce

Rachel Wainer Apter
Brian P. Goldman
Katherine M. Kopp


Date:  February 9, 2015    /s/ E. Joshua Rosenkranz
                            E. Joshua Rosenkranz
                            Orrick, Herrington & Sutcliffe LLP
                            51 West 52nd Street
                            New York, NY  10019
                            Telephone:  (212) 506-5000
                            Facsimile:  (212) 506-5151
                            jrosenkranz@orrick.com

                            *Counsel for Defendant-Appellant Kohler Co.*

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .................................................................. i

STATEMENT OF RELATED CASES ...................................................... x

INTRODUCTION.................................................................................... 1

JURISDICTION ..................................................................................... 3

STATEMENT OF ISSUES..................................................................... 3

STATEMENT OF THE CASE ............................................................... 4

    Engines, Engines On Boats, And Controlling Emissions .............. 4

    The PTO Repeatedly Rejects WBIP's Patents, But
    Ultimately Issues Them With An Amended Disclosure................. 8

    WBIP Sues Kohler................................................................... 13

SUMMARY OF ARGUMENT .............................................................. 18

ARGUMENT ....................................................................................... 21

I.   THE ASSERTED CLAIMS ARE OBVIOUS AS A MATTER
    OF LAW...................................................................................... 21

    A.   The Prima Facie Case Of Obviousness Is
       Overwhelming. ................................................................. 22

         1.   Phipps discloses every element of the asserted
            claims except the coolant elements. ........................... 23

         2.   It would have been obvious to a skilled engineer
            to adapt Phipps to a boat by adding the standard
            coolant elements......................................................... 27

    B.   Secondary Considerations Do Not Overcome The
       Strong Prima Facie Case Of Obviousness. ........................... 37

II.  THE ASSERTED CLAIMS LACK ADEQUATE WRITTEN
    DESCRIPTION AS A MATTER OF LAW. ................................... 51

    A.   The Original Application Did Not Disclose The Claimed
       "Compound Control Scheme." .............................................. 52

    B.   There Is No Sufficient Disclosure Of The Compound
       Control Scheme. ................................................................. 57

C.    The District Court's Rationale On Written Description
      Was Flawed. ...................................................................... 61

III.  THE JUDGMENT OF WILLFUL INFRINGEMENT
      SHOULD BE REVERSED. ......................................................... 64

      A.    Kohler's Defenses, Even If Not Correct, Are At A
            Minimum Objectively Reasonable. ..................................... 65

      B.    There Was No Evidence Before The Jury That Kohler
            Knew Of WBIP's Patents. ................................................. 70

CONCLUSION ...................................................................... 72

ADDENDUM

Order, Dated May 21, 2013 (DKT 212) ................................... A48

Memorandum and Order, Dated August 12, 2013
(DKT 257) ................................................................... A10,381-83

Memorandum and Order, Dated February 12, 2014
(DKT 274) ................................................................... A10,653-75

Memorandum and Order, Dated September 8, 2014 (DKT 295) ... A49-57

Final Amended Judgment, Dated September 8, 2014 (DKT 296) ...... A58

Patent No. 7,314,044 ..................................................... A97-107

Patent No. 7,832,196 ..................................................... A108-119

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE
UNDER FEDERAL RULES OF APPELLATE PROCEDURE
32(a)(7) AND FEDERAL CIRCUIT RULE 32

# TABLE OF AUTHORITIES

**Page(s)**

## FEDERAL CASES

*AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*,
  759 F.3d 1285 (Fed. Cir. 2014) ...................................................... 58, 59

*Allergan, Inc. v. Apotex Inc.*,
  754 F.3d 952 (Fed. Cir. 2014) ........................................................... 38

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) (en banc) ................... 53, 58, 59, 60, 62

*Asyst Techs., Inc. v. Emtrak, Inc.*,
  544 F.3d 1310 (Fed. Cir. 2008) ........................................ 38, 40, 45, 46

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
  682 F.3d 1003 (Fed. Cir. 2012) .................................................... 65, 69

*Bilstad v. Wakalopulos*,
  386 F.3d 1116 (Fed. Cir. 2004) ........................................................... 61

*Boston Scientific Scimed, Inc. v. Cordis Corp.*,
  554 F.3d 982 (Fed. Cir. 2009) ........................................................... 34

*Chiron Corp. v. Genentech, Inc.*,
  363 F.3d 1247 (Fed. Cir. 2004) .......................................................... 57

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*,
  807 F.2d 955 (Fed. Cir. 1986) ........................................................... 69

*In re DBC*,
  545 F.3d 1373 (Fed. Cir. 2008) .......................................................... 50

*In re GPAC Inc.*,
  57 F.3d 1573 (Fed. Cir. 1995) ........................................................... 37

*Graham v. John Deere Co. of Kansas City*,
  383 U.S. 1 (1966) ....................................................................... 22, 23

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    769 F.3d 1371 (Fed. Cir. 2014) .............................................. 64, 65, 67

*In re Huai-Hung Kao*,
    639 F.3d 1057 (Fed. Cir. 2011) ........................................................ 38

*i4i Ltd. P'ship v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010), *aff'd on other grounds*,
    131 S. Ct. 2238 (2011) ................................................................. 65, 70

*iLOR, LLC v. Google, Inc.*,
    631 F.3d 1372 (Fed. Cir. 2011) ........................................................ 65

*InTouch Techs., Inc. v. VGO Commc'ns, Inc.*,
    751 F.3d 1327 (Fed. Cir. 2014) ........................................................ 39

*KSR Int'l Co. v. Teleflex, Inc.*,
    550 U.S. 398 (2007) .................................... 22, 28, 31, 32, 34, 35, 36, 68

*La Plante v. Am. Honda Motor Co.*,
    27 F.3d 731 (1st Cir. 1994) .............................................................. 44

*Lee v. Mike's Novelties, Inc.*,
    543 F. App'x 1010 (Fed. Cir. 2013) .................................................... 69

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*
    424 F.3d 1336 (Fed. Cir. 2005) .................................................... 60, 61

*Lynch v. City of Boston*,
    180 F.3d 1 (1st Cir. 1999) ................................................................ 39

*Media Techs. Licensing, LLC, v. Upper Deck Co.*
    596 F.3d 1334 (Fed. Cir. 2010) ........................................................ 40

*In re Mouttet*,
    686 F.3d 1322 (Fed. Cir. 2012) ........................................................ 36

*Muniauction, Inc. v. Thomson Corp.*,
    532 F.3d 1318 (Fed. Cir. 2008) .................................................... 39, 48

*Ormco Corp. v. Align Tech., Inc.*,
    463 F.3d 1299 (Fed. Cir. 2006) ........................................................ 51

vi

*In re Paulsen*,
    30 F.3d 1475 (Fed. Cir. 1994) ........................................... 37

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
    587 F.3d 1324 (Fed. Cir. 2009) ......................................... 39

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
    491 F.3d 1342 (Fed. Cir. 2007) ............................... 22, 36, 48

*PIN/NIP, Inc. v. Platte Chem. Co.*,
    304 F.3d 1235 (Fed. Cir. 2002) ............................... 52, 62, 63

*Power-One, Inc. v. Artesyn Techs., Inc.*,
    599 F.3d 1343 (Fed. Cir. 2010) ......................................... 45

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008) ......................................... 56

*In re Seagate Tech., LLC*,
    497 F.3d 1360 (Fed. Cir. 2007) (en banc) ......................... 65

*Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*,
    620 F.3d 1305 (Fed. Cir. 2010) ............................... 66, 71, 72

*Standard Oil Co. v. Am. Cyanamid Co.*,
    774 F.2d 448 (Fed. Cir. 1985) ........................................... 69

*Star Scientific, Inc.* v. *R.J. Reynolds Tobacco Co.*,
    655 F.3d 1364 (Fed. Cir. 2011) ......................................... 41

*Stryker Corp. v. Zimmer, Inc.*
    ___ F.3d ___ , No. 2013-1668, 2014 WL 7210311
    (Fed. Cir. Dec. 19, 2014) ................................................. 66

*Therasense, Inc.* v. *Becton, Dickinson & Co.*,
    593 F.3d 1289 (Fed. Cir. 2010) ......................................... 50

*Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.*,
    ___ F.3d ___ , Nos. 2013-1324, 2013-1381, 2014 WL 6845191
    (Fed. Cir. Dec. 4, 2014) ................................................... 31

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ........................................................ 69

*United States v. Varoudakis*,
  233 F.3d 113 (1st Cir. 2000) ..................................................... 44, 45

*Univ. of Rochester v. G.D. Searle & Co., Inc.*,
  358 F.3d 916 (Fed. Cir. 2004) .................................................... 62, 63

*Wyers v. Master Lock Co.*,
  616 F.3d 1231 (Fed. Cir. 2010) ............................................ 23, 32, 37

## FEDERAL STATUTES

28 U.S.C. § 1295(a)(1) ....................................................................... 3

28 U.S.C. § 1331 ............................................................................... 3

28 U.S.C. § 1338(a) ........................................................................... 3

35 U.S.C. § 112 ................................................................... 52, 56, 62

35 U.S.C. § 284 ............................................................................... 18

35 U.S.C. § 285 ............................................................................... 18

## RULES

Fed. R. Evid. 403 ........................................................................... 43

Fed. R. Civ. P. 58(e) ......................................................................... 3

## OTHER AUTHORITIES*

Applicant Argument/Remarks Made in an Amendment,
  Reexamination Control No. 90/013,089 (June 12, 2014),
  *available through* http://portal.uspto.gov/pair/PublicPair ................ 36

---

* All web sites last visited Feb. 6, 2015.

Applicant Argument/Remarks Made in an Amendment,
    Reexamination Control No. 90/013,090 (June 12, 2014),
    *available through* http://portal.uspto.gov/pair/PublicPair ................ 36

*History*, Kohler, http://kohlerpower.com/aboutus/
    history.htm?contentNumber=501 ...................................................... 14

Vaclav Smil, *Two Prime Movers of Globalization: The History and
    Impact of Diesel Engines and Gas Turbines* (2010) ............................ 4

U.S. Dep't of Commerce, *Manual of Patent Examining Procedure*
    § 2163 (9th ed. 2014),
    http://www.uspto.gov/web/offices/pac/mpep/index/htm .................... 62

## STATEMENT OF RELATED CASES

No other appeal involving this civil action was previously before this or any other appellate court.  There are no pending cases known to counsel that would directly affect or be directly affected by this Court's decision in the pending appeal.

## INTRODUCTION

Plaintiff-Appellee WBIP, Inc.[1] won a multi-million-dollar infringement judgment based on two patents that invented nothing. WBIP's patents merely adapted a known emission-control system from a land-based engine to a marine one by adding to it standard coolant features that engineers had been using for years.

WBIP concedes that a single prior-art reference—the Phipps patent (U.S. Patent No. 5,832,896)—disclosed *every* element of the claimed invention except the coolant elements.  Not only was it obvious to add coolant to put a land engine on a boat, it was legally required: Coast Guard regulations mandated that marine engines had to be designed to keep surface temperatures below specified thresholds.

Worse yet, WBIP did not even have the know-how necessary to implement what it told the PTO it invented.  To overcome prior art rejections (not Phipps), WBIP amended its proposed claims to combine two separate elements ("governing" engine speed *and* "maintaining" an

---

[1] WBIP is a patent-holding company created by Mr. Jack Westerbeke, the named inventor and CEO of Westerbeke Corporation. For simplicity, we refer to the owner of the patents-in-suit as WBIP, to Westerbeke Corporation as Westerbeke, and to Jack Westerbeke as Mr. Westerbeke.

air/fuel ratio) into one (governing *while* maintaining). But in its effort to escape other prior art, WBIP vaulted headlong into a written description violation: Its so-called "compound control scheme" appeared nowhere in the original application that WBIP filed four years earlier.

How, then, did the jury reach such an inexplicable verdict? WBIP turned the trial into a contest over which party cared more about saving its customers' lives. In the guise of proving secondary considerations of non-obviousness, WBIP introduced evidence (over objection) that Kohler paid tens of millions to settle product-liability lawsuits over 12 deaths allegedly caused by old Kohler marine generators. Then, to portray itself as the angel to Kohler's devil, WBIP introduced evidence of praise that its products—although not the asserted claims or the claimed features—would "save lives." The result was a jury that went off the rails. It awarded damages using a sales base nearly *three times* the figure to which both parties agreed and found willfulness despite evidence that Kohler had no knowledge of the patents and despite defenses that were not just objectively reasonable, but correct.

The asserted patents are invalid twice over, and this Court should so hold as a matter of law, or at a minimum vacate and remand for a

properly conducted trial.  But in all events, the determination of willfulness must be reversed, as Kohler's defenses were not merely reasonable, but compelling.

## JURISDICTION

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).  Pursuant to Federal Rule of Civil Procedure 58(e), the court extended Kohler's time to file its appeal.  A10,682.  It entered an amended final judgment on September 8, 2014.  A58.  Kohler timely noticed its appeal on October 7, 2014.  A11,019-21.  WBIP noticed its cross-appeal the next day.  A11,022-23.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(1).

## STATEMENT OF ISSUES

1.  The Phipps reference undisputedly discloses a generator having an internal combustion engine that meets every element of the asserted claims, except those pertaining to cooling the engine.  Putting such engines on boats was well known and commercially common, and cooling such engines when placed on a boat is required by government regulation.  Did the district court err in denying judgment as a matter of law that the asserted claims are obvious?

2.  WBIP did not disclose the compound control scheme in its patent application—governing engine speed while maintaining an air/fuel ratio—until an amendment four years after the effective filing date.  Even that amendment says nothing about how to perform these functions.  Did the district court err in denying judgment as a matter of law that the asserted claims lack sufficient written description?

3.  Must the judgment of willful infringement be reversed because Kohler's defenses are at a minimum objectively reasonable, and there was no evidence before the jury of subjective willfulness?

## STATEMENT OF THE CASE

### *Engines, Engines On Boats, And Controlling Emissions*

Internal combustion engines are ubiquitous.  They power cars and boats, snowmobiles and snow blowers, generators and washers.  Conceived in the 18th century, they have been commercially available since before the Civil War.  *See* Vaclav Smil, *Two Prime Movers of Globalization: The History and Impact of Diesel Engines and Gas Turbines* 24 (2010).  These engines operate by combusting a compressed air/fuel mixture within a chamber, which causes a gas to expand at a high temperature and at high pressure.  That expansion applies force to

an engine component (like a piston), thereby providing mechanical energy.  A15,188-89.

This case concerns emission controls for such engines. Combustion yields certain emissions, some of which can be toxic. A15,189.  Most modern-day gasoline engines deal with toxic emissions by converting them into benign gases using a chemical catalyst. A15,191-92, 15,289.  Such "catalytic converters" have been known for over 60 years.  *E.g.*, U.S. Patent No. 2,674,521, "Catalytic converter for exhaust gases" (issued April 6, 1954).  Particularly relevant here, automobiles have long used catalysts to reduce carbon monoxide emissions.  A15,436-40.

As is "typical[]," the marine industry let the (much larger) "automotive industry … develop the product," then adopted the technology when the price dropped.  A15,439-40.  In this case, the technology is used in a "generator-set" ("gen-set," for short): an engine/generator combination that converts an engine's mechanical power into electrical power, which can be used for purposes like running small appliances on houseboats.  A15,186-87.

Hot engines on boats are fire hazards. Thus, it has long been known that, when placed on a boat, the engine's surface must be cooled. A16,038-39. The point is so fundamental to marine engines that government regulation has long mandated it. A16,003-04. Indeed, the "Background" sections of the asserted patents discuss these regulations, noting marine engines typically have complied with them by using seawater to cool engine components:

> Marine engines and generators are subjected to specific regulations, both for emissions and for safety concerns. For example, exposed engine surface temperatures (including exhaust system surface temperatures) must be kept low to avoid increased risk of fire hazard. Seawater is injected into many marine engine exhaust flows so as to cool exiting exhaust gases, and seawater is also frequently circulated through exhaust system components so as to maintain low surface temperatures.

A104, col. 1:31-40. Mr. Westerbeke understood he had to comply with these requirements, and that it was "obvious" to do so: "[T]he surface of marine engines has to be kept at a maximum temperature. I think it's 200 degrees Fahrenheit according to Coast Guard requirements. So that's one fairly obvious thing that had to be accomplished." A15,479-80.

One gas emitted by internal combustion engines is carbon monoxide (CO). Internal combustion engines have long been known to

present dangers of carbon monoxide poisoning. A15,478. Until recently, however, the CO danger from marine gen-sets was believed to be limited to gases that escaped into the boat through product defects, such as exhaust-system leaks, A15,190, 15,499, 15,992, 17,204, or from the "station wagon effect," where CO from a gen-set circulates back into the boat's cabin, A15,993-95, 17,204. But in 2000, two young boys died from CO poisoning while swimming under the rear platform of a houseboat. A15,478-79. Experiments by the Coast Guard and the National Institute of Occupational Safety and Health ("NIOSH") revealed that "[w]hen gasoline generators are in operation, the [outside] area under the swim deck"—where the generator's exhaust is discharged—is "extremely hazardous." A18,861; *see* A18,862-63. Thus, government researchers discovered, even when engines functioned properly, CO posed a poisoning risk outdoors. As a result, in May 2001, the government directed marine engine manufacturers to "evaluate the efficacy of using catalytic converters" to reduce CO at the source. A18,897.

That same year, the California Air Resources Board and the Coast Guard hired the Southwest Research Institute to test "using [a]

7

catalytic reduction system" on a marine engine, A16,010—and, in particular, to use one similar to what had made "[a]utomotive engine[s] … successfully emission controlled," A19,445.  Southwest "found that [these systems] were very efficient in reducing some CO."  A16,010.  The Report concluded that "[t]he use of catalytic exhaust after treatment, exhaust gas recirculation, and engine closed-loop control was shown to effectively reduce marine gasoline engine emissions."  A19,447.  Similarly, a NIOSH report concluded that a system using even an off-the-shelf commercial catalyst "produced extremely low CO concentrations."  A15,430-31; *see* A18,930.

### *The PTO Repeatedly Rejects WBIP's Patents, But Ultimately Issues Them With An Amended Disclosure*

The Westerbeke Corporation produces gen-sets.  After the deaths of the two boys in 2000, its president and CEO, Jack Westerbeke, sought to develop a gasoline-powered marine gen-set that would produce "safe" CO levels.  A15,478-79.

In October 2003, WBIP filed a provisional patent application entitled "Electronic Emissions Control" (the "Provisional Application").  A18,053; *see* A18,053-74.  This application was not, on its face, limited to marine engines; it identified WBIP's invention as "relat[ing] to

8

controlling emissions from internal combustion engines" generally, and explained that "engine-generator sets are designed for installation on-board moving vehicles, either on land or in water." A18,055. But "one embodiment" "configured [the engines] for marine applications." A18,056. Of the two original independent claims, one specified "marine application," while the other applied to engines generally. A18,064, 18,066.

The Provisional Application describes using off-the-shelf catalysts configured using "various methods known in the art" to reduce carbon monoxide. A18,059-61. The catalyst "may be of any preferred composition," A18,059; acceptable catalysts were available from "ASEC/Delphi Exhaust and Engine Management of Flint, Michigan," A18,060, or "Miratech of Tulsa, Oklahoma, for example," A18,061.

A year after submitting the Provisional Application, WBIP filed a utility application (the "2004 Application") with the same specification and claims. A18,186-200. The 2004 Application eventually became one of the two patents-in-suit, U.S. Patent No. 7,832,196 ("the '196 patent"). A108-19.

The PTO rejected the 2004 Application six times over the course of six years.  A18,249-57, 18,277-86, 18,304-13, 18,330-39, 18,391-400, 18,421-30.  The examiner repeatedly found that adapting existing emission control methods in land engines "for use in a marine engine would be well within the level of ordinary skill in the art" and hence obvious.  A18,253-54.  Several times, the examiner rejected the claims over a single base reference that taught all the then-present independent claim elements except the "coolant" elements necessary for marine use (liquid coolant injected into the exhaust gas and cooling water circulated around the exhaust manifold), reasoning that adding those elements "would have been obvious," *id.*, and "conventional" to cool the exhaust system.  A18,279-80; *see* A18,306-07 (same rationale); A18,332-33 (same rationale applied to different prior art); A18,393-34 (same rationale applied to yet another prior art reference); A18,423-24 (same rationale applied to yet another prior art reference); A18,119 (similar rejection, by another examiner, during the prosecution of the other asserted patent).  WBIP initially responded by arguing that one skilled in the art would not be motivated to "apply[] the exhaust feedback systems known for engines having dry exhaust to applications

10

having wet exhaust" by adding coolant, A18,270, but this argument never swayed the examiner.

Switching gears, WBIP then sought to overcome the examiner's rejections by amending the claims to require a more sophisticated engine-control scheme. In 2007, WBIP combined two previously separate claim limitations. Originally, the claims recited that the device performs two separate steps: (1) "governing engine speed with respect to a selected constant speed" and (2) "maintaining an air/fuel ratio of the engine." A18,197-200. All that mattered was that the engine perform both of these functions, regardless of precisely when each step occurred. WBIP amended the claims to conjoin the steps so now they required "governing engine speed with respect to a constant speed *while* maintaining an air/fuel ratio of the engine." A18,318-21 (emphasis added).

Conjoining the two steps, WBIP insisted, made the difference. The claimed inventions covered "speed-controlled engines" employed "to drive generators." A18,292. "Modulating one input (either fuel or air) to maintain a precise speed can significantly affect the air/fuel ratio, and *vice versa....* Therefore, governing engine speed with respect to a

constant speed **and** maintaining a certain air/fuel ratio of the engine together is neither trivial, nor obvious to implement." A18,293. The examiner eventually allowed the application; all issued claims in the '196 patent include the conjoined "governing while maintaining" limitation. A118-19.

Shortly before making this argument to the examiner of the '196 patent, WBIP filed a second patent application ("the 2007 Application") that eventually issued as the second patent-in-suit, U.S. Patent No. 7,314,044 ("the '044 patent"). A18,075-183. Although WBIP styled the 2007 Application as a "continuation" of the 2004 Application, A18,096, it added a new disclosure that appeared nowhere in the Provisional Application or in the 2004 Application: "In some instances, the engine controller is *also* configured to govern engine speed with respect to a constant speed *while* maintaining the air/fuel ratio." A104, col. 1:55-58 (patent) (emphasis added); A18,097 (same statement in patent file). This new disclosure replaced language that, as in the 2004 Application, listed "governing" and "maintaining" as separate steps. *Compare* A18,188 *with* A18,097. Identical language appeared in the 2007 Application's dependent claim 2. A18,106.

The second examiner rejected the claims as obvious over two references teaching marine engine controllers. A18,118-21. WBIP argued that this concept of a "compound control scheme" overcame the rejection:

> Governing engine speed with respect to a constant speed requires a closed-loop control system that controls air and/or fuel intake. Similarly, maintaining a certain air/fuel ratio of the engine requires a closed-loop control system controlling air and/or fuel intake. Both control systems regulate the same two variables, air and/or fuel, to maintain different output parameters. Governing engine speed with respect to a constant speed **and** maintaining a certain air/fuel ratio of the engine together require a compound control scheme that is neither trivial nor obvious.

A18,135.

WBIP eventually amended all pending claims to require "governing" *while* "maintaining." A18,156-59. This change was what finally persuaded the examiner, who, like the examiner of the first WBIP patent, was unaware of Phipps, to issue the asserted claims of the '044 patent. A18,170-72.

### WBIP Sues Kohler

Kohler Co., the defendant and appellant here, is a Wisconsin company that was founded in 1873, and remains family-owned to this day. Kohler may be best known for its market-leading plumbing fixtures, but since the 1920s it has produced generators. Originally

these were small, engine-powered electric generators aimed at rural markets.  Today, Kohler produces numerous generators and engines for a variety of purposes.  *See History*, Kohler, http://kohlerpower.com/aboutus/history.htm?contentNumber=501.

Relevant here, Kohler manufactures gen-sets (the engine/generator combinations noted above), for the marine market.  Specifically at issue here are Kohler's "Low-CO" marine gen-sets.  Kohler began developing these products in late 2003 and early 2004.  A15,684-85, 20,097-98.  Westerbeke and Kohler both introduced their low-CO products in 2005.  A17,915.  Kohler's products quickly garnered most of the market share.  A15,493-94, 15,569-70.  It was not until two years later that WBIP first amended the patent application to claim a "compound control scheme," as described above.

WBIP sued Kohler in March 2011, alleging infringement of the '044 and '196 patents.  A120-24.  At trial, WBIP asserted claims 1-6, 8, and 10-12 of the '044 patent, and claims 26 and 28 of the '196 patent.  A8097-100.  All the asserted claims include claim elements concerning a coolant, which is specific to marine applications.

The case was tried over six days in May 2013.  In addition to testimony about Westerbeke, the patents, and the operation of the accused products, WBIP was permitted to introduce (over vigorous objection) significant "evidence regard[ing] product liability suits that third parties had brought against Kohler." A15,447.  WBIP put an actor on the stand, who reenacted for the jury the deposition testimony of Brian Christensen, Kohler's head of risk management, A15,446, regarding "[l]awsuits in which Kohler was a defendant and the plaintiff alleged carbon monoxide poisoning in connection with a gasoline-powered Kohler marine generator," A15,448.  Specifically, the jury heard that Kohler paid $22 million to the families of 12 people who died between 1995 and 2007, allegedly due to CO poisoning from six Kohler marine generators manufactured as far back as 1976.  A15,449-452, 17,935.

WBIP then used a different actor to read testimony of James Sember, a former Kohler employee, at a "products liability trial that took place in March of 2003 between Kohler and a third party" in state court.  A15,452-53.  That case centered on the claim that gen-sets with black-iron exhaust pipes—which Kohler stopped selling in the late

1980s—were defective because the pipe corroded from the inside out.
A15,456-57, 15,460-61; *see* A15,678.

By the time of closing argument, WBIP had turned the patent case into a morality tale about how WBIP valued human life more than Kohler.  For instance:

> This is Exhibit 178, the sheet that Mr. Christensen prepared, the risk manager from Kohler.…  He told you in his testimony that each one of these was a fatality.  Mr. Bauer said one death is too many.  How about all of these?  …  Kohler understood that this was a problem.

A16,099.  And again:

> People were dying from CO poisoning for two decades.  Kohler was facing lawsuits.  One death was too many.  How about a whole list of them?  Paying large sums of money to settle—does it matter that most of that money came in the form of four people who died in a single lawsuit?  The point is it was on their mind for years.

A16,121-22.

The message was unmistakable, and the jury returned a verdict for WBIP, answering every question in its favor.  It found direct and induced infringement of the asserted claims and that the infringement had been willful.  A8097-100.  The jury further found that Kohler had not proved the patents were invalid for obviousness and lack of written description.  A8098-99.  The jury then issued a damages award that threw the book at Kohler in a way that was, quite literally,

16

inexplicable—no one could explain it. The parties and their experts had all agreed that sales of the accused products totaled about $26.9 million, A10,654, 15,622, 15,789, but the jury assessed damages using base sales of nearly three times that amount, $71.4 million, A8100. The jury also selected a 13.5% royalty rate, for a total of about $9.6 million in damages. *Id*.

Kohler moved for a new trial, in light of the excessive damages award, and for judgment as a matter of law on validity, infringement, and willfulness. A8134-35, 8161-63. The district court denied Kohler's JMOL motions in a single sentence. A10,382. The court found that the jury's $71.4 million royalty base was "not supported by substantial evidence," and granted a new trial on damages unless WBIP agreed to remit damages to $3.6 million, commensurate with the previously agreed-upon base sales. A10,657-59. The court upheld the jury's 13.5% royalty rate and set that as an ongoing royalty rate as well, A10,658, 10,673, notwithstanding its earlier view that "plaintiff's requested royalty rate of 13.5% is too high," A10,382. WBIP accepted the remittitur to $3.6 million. A10,689-90.

17

Based on its finding that Kohler's infringement was willful, the court enhanced damages by 50% under 35 U.S.C. § 284, and awarded attorneys' fees under § 285. A10,661-71. The court ultimately awarded $1.66 million in fees, A57, as part of a final judgment of $8.29 million, A58.

## SUMMARY OF ARGUMENT

I.    WBIP's patents are invalid because they are obvious. A single base reference, Phipps, undisputedly discloses the complete engine and emission control system that they claim. Phipps comes from the same field of endeavor, addresses the same implementation, identifies the same need in the art, and discloses the same solution, as the asserted claims. The asserted claims merely adapt Phipps's system from land to water, but WBIP's own witnesses testified that the marine industry regularly adapts technology from automobiles. The specific adaptation—introducing coolant to the exhaust system as a fire-prevention safeguard—is required by the government and described as conventional in the Background of the asserted patents. The patents could hardly have said otherwise—the coolant elements not present in

Phipps are present in numerous prior-art references. This is a quintessential case of obviousness.

In the face of this overwhelming prima facie case, WBIP bombarded the jury with evidence purportedly tied to secondary considerations—with lawyers' arguments suggesting that Kohler needed to fix its products because it was killing people, and that Westerbeke was the savior. But the evidence introduced by WBIP does not satisfy this Court's rigorous "nexus" requirement, and much of the evidence was so overwhelmingly prejudicial that it should not have been admitted in the first place. The secondary considerations asserted by WBIP were uniformly directed to ultra-low carbon-monoxide levels purportedly achieved by Westerbeke's products. But the asserted *claims* contained no such limitation, and in fact, WBIP chose not to assert the one claim that does recite a specific level of CO emissions. Moreover, none of the evidence of secondary considerations was connected to the feature of WBIP's "invention" that was not already disclosed in Phipps, i.e., the coolant elements necessary to adapt Phipps to a marine environment. In short, the secondary considerations became a thin veil for telling the jury a story that had nothing to do

with the claimed inventions and everything to do with prejudicing and distracting the jury.

II.    The asserted patents also are invalid for lack of written description.  WBIP's original application, filed in 2003, disclosed two separate embodiments, each teaching well-known engine control functions: governing engine speed in one, maintaining an air/fuel ratio in the other.  Four years into prosecution—and long after Kohler was selling the products WBIP ultimately accused of infringement—WBIP amended to claim a controller that performed both functions *at once*, and relied on this "compound control scheme" to obtain allowance over invalidating prior art (from a patent examiner who was unaware of Phipps).  The original specification simply fails to disclose this essential element.  This is a classic written description problem.

In addition, WBIP's too-late disclosure was a statement of ends bereft of means—the amendment contained no flow chart, algorithm, structure, or indeed any description whatsoever of how to implement this controller.  WBIP's own expert acknowledged that one skilled in the art would have needed "years" of effort to achieve these goals from the

patents' bare disclosure.  Claiming a function without a known or disclosed structure fails to meet the written description standard.

III.   Finally, the district court erred as a matter of law in finding willful infringement.  Although the defenses of obviousness and written description ultimately were unsuccessful at trial, they were at least objectively reasonable.   In addition, there was no evidence before the jury—none—that Kohler was aware of WBIP's patents.  For both of those reasons, the willfulness determination should be reversed.

## ARGUMENT

## I.    THE ASSERTED CLAIMS ARE OBVIOUS AS A MATTER OF LAW.

This is a textbook case of obviousness.  WBIP concedes that a single preexisting base reference, Phipps, teaches every element of the claims except adding coolant.  Undisputed trial evidence showed that if a skilled artisan were asked, "How would you convert Phipps to a marine engine?" he would know that the law required him to add coolant, and that the way to start is by adding the coolant features the WBIP patents describe as standard in the prior art.  With respect to the prima facie case of obviousness, this is *KSR* on steroids.  § I.A.  And the

secondary factors do not come close to overcoming the prima facie case. § I.B.

These are exactly the circumstances in which judgment as a matter of law is appropriate. Obviousness is a legal determination, reviewed de novo, that relies on factual matters reviewed for substantial evidence: the level of ordinary skill in the art, the scope and content of the prior art, the differences between the prior art and the claims at issue, and the various secondary considerations. *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 406-07 (2007) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)). When, as here, "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors," judgment as a matter of law is appropriate. *KSR*, 550 U.S. at 427; *see PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1359 (Fed. Cir. 2007).

## A.    The Prima Facie Case Of Obviousness Is Overwhelming.

The claimed invention is a compound control scheme that simultaneously governs engine speed and maintains a certain air/fuel

22

ratio. *Supra* at 11-13. Phipps—issued almost five years before WBIP's priority date—does exactly that. Everyone agrees it discloses the critical element that WBIP singled out as inventive during prosecution—and every other claimed element except those concerning coolant. Phipps omitted the coolant features only because it disclosed a land-based engine. But once Phipps solved the hard puzzle, it was obvious that adapting the Phipps engine to the marine context would entail adding the conventional cooling techniques claimed in the asserted patents.

### 1. Phipps discloses every element of the asserted claims except the coolant elements.

As a threshold matter, Phipps is "analogous" art within the meaning of *Graham*, 383 U.S. at 35; *see Wyers v. Master Lock Co.*, 616 F.3d 1231, 1237 (Fed. Cir. 2010). Phipps comes from the same field of endeavor as the asserted patents, which the parties agreed was "internal combustion engines and engine controls," A16,162-63—specifically, Phipps discloses a "Governor and Control System for Internal Combustion Engines," A19,040. The match is even more specific. The "Technical Field" of WBIP's Provisional Application and the "Technical Field" of Phipps define the endeavor in almost identical

23

terms: "controlling emissions from internal combustion engines," A18,055, versus "a control system for governing speed and emission control of an engine," A19,045, col. 1:11-13.  Phipps emphasizes that its invention is "particularly useful" in "low-emission" engines which must "meet emissions standards," A19,049, col. 9:42-46, which is exactly what Mr. Westerbeke was after.

In fact, Phipps is more analogous still:  It identifies the same need in the art.  Like the asserted claims (and the Kohler and Westerbeke products at issue), Phipps focuses on a problem specific to engines in "gen-sets."  While it is acceptable for engine speeds to change with conventional control systems, Phipps explains, "in many applications speed variations are undesirable[,] [f]or example, when driving an alternating current generator …."  A19,045, col. 2:4-6; *see* A19,049, col. 9:32-36 ("Applications for such a governed engine implementation include … generator sets, pumps, and other such equipment which desirably operate at a predetermined speed or set of speeds.").  Those are almost exactly the same words WBIP used to explain the need it was trying to address.  *Supra* at 11-12 (discussing A18,292-93).

Turning to the claim elements, Phipps meets this need in the same way as the asserted claims. Representative of the asserted claims is claim 1 of the '044 patent:

A marine engine comprising:

[A] an exhaust system including

[B] a catalyst cooled by a flow of coolant, [C] the catalyst arranged to intercept a flow of exhaust;

[D] a coolant injector that injects coolant into the flow of exhaust at a point downstream of the catalyst; and

[E] a sensor arranged to sense a characteristic of the flow of exhaust; and

[F] an engine controller configured to control an air/fuel ratio of the engine as a function of the sensed exhaust flow characteristic;

[G] wherein the engine controller is also configured to govern engine speed with respect to a constant speed while maintaining the air/fuel ratio.

A107, col. 7:4-17 (bracketed letters added).

Both sides and their experts agreed that Phipps discloses every element of WBIP's claims except elements [B] and [D], which represent the coolant needed for marine applications. A15,846-47, 16,027-28, 16,038. To start with the supposedly novel element [G], the "compound control scheme" added to avoid prior art during prosecution, Phipps identifies a particular "need" for controlling engines: "The method

25

should provide a stable speed control, *while at the same time* allowing for emission control through control of the fuel/air ratio delivered to the engine." A19,045, col. 2:14-19 (emphasis added); A19,048, cols. 8:48-10:15; A15,857-58. This is the very same "compound control scheme" that WBIP touted during prosecution as the advance over the prior art, and which was the key to persuading two examiners to issue those patents. *Supra* at 11-13.

Beyond that, Phipps also discloses all the other non-coolant elements:

[A] "an exhaust system," *see* A19,043 (Fig. 4); A19,048, col. 8:61-63;

[C] a "catalyst arranged to intercept a flow of exhaust," *see* A15,845-46, 15,856, 19,045, col. 1:24-30; A19,049, col. 9:64-10:5;

[E] "a sensor arranged to sense a characteristic of the flow of exhaust," *see* A15,856-57, 19,043 (Fig. 4); A19,046, col. 4:55-60; A19,048-49, cols. 7:43-8:5, 8:61-65, 9:7-20; and

[F] "an engine controller configured to control an air/fuel ratio of the engine as a function of the sensed exhaust flow characteristic," *see* A15,856-57, 19,043 (Fig. 4); A19,046, col. 4:55-60; A19,048-49, cols. 7:43-8:5, 8:61-65, 9:7-20.

Don't take our word for it. WBIP's expert Glenn Amber (moonlighting from his day job as Westerbeke's chief engineer) readily agreed that Phipps discloses each of these elements. He ticked off this

exact checklist, element by element, and conceded Phipps discloses each. A16,036-37. He wrapped up the checklist with the concession:

Q. … Phipps discloses all of those elements, right?

A. All the pieces are there.

A16,037. For the other asserted claims, too, there was no dispute about any additional missing element. A15,865-70.[2]

### 2. It would have been obvious to a skilled engineer to adapt Phipps to a boat by adding the standard coolant elements.

There is also no dispute that the remaining elements (the coolant elements [B] and [D]) also existed in the prior art—and indeed were ubiquitous. *See infra* at 30-31 (discussing specific prior art references introduced at trial). WBIP's expert/chief engineer confirmed that "water-jacketing" engine components (element [B]), and injecting coolant into exhaust (element [D]), were common at the time, and not invented by Mr. Westerbeke. A15,275-76, 15,285-86, 15,290.

---

[2] Dependent claim 5 of the '044 patent recites a carbon monoxide sensor, the only other element of any asserted claims missing from Phipps besides the coolant elements. Kohler's expert testified, and WBIP did not dispute, that the claimed carbon monoxide sensors (such as those found in homes or other enclosed areas like boats to warn of high carbon monoxide levels) were commonly known at the time and would have been an obvious modification. A15,866-67.

Consequently, WBIP was forced to concede in closing argument, "[w]e don't dispute that the various elements in the patent claims are in the prior art." A16,119.

Because every element of WBIP's claimed invention was known in the prior art, "[t]he consequent legal question … is whether a [person] of ordinary skill starting with [Phipps] would have found it obvious to" add the conventional coolant features to Phipps to produce the claimed invention. *KSR*, 550 U.S. at 424. Under *KSR*, the clear answer is yes.

Any engineer with skill in the relevant art would have known three basic points. First, the typical way to begin solving an engine-design problem on a boat is to see how engineers solved the same problem on a land-based engine. Westerbeke's chief engineer at the time, Erik Larson, agreed that "typically" the marine engine industry "lets the automotive industry … develop the product; and then, when the price is down, you adapt it." A15,439-40. Westerbeke's own "Low-CO" engine products were adapted from automobile and forklift engines. A15,436-37. And WBIP's expert, Amber, confirmed that Westerbeke uses automotive engines in its marine products. A16,044.

Second, when starting with a land engine, not only is it obvious to add coolant, but it is legally required. The "Background" sections of the patents-in-suit acknowledge that "[m]arine engines and generators are subjected to specific regulations." A104, col. 1:31-32. Witnesses on both sides explained that U.S. Coast Guard regulations limit surface temperatures to 200°F. A15,192, 15,479-80, 15,858. This is for basic safety reasons: The temperature of exposed systems on engines and exhaust systems "must be kept low to avoid increased risk of fire hazard." A104, col. 1:31-35. WBIP expert Amber specifically conceded that even in 1995 (eight years before the priority date), it was "really well-known" that to put an engine on a boat required flowing coolant around the catalyst and injecting coolant into the exhaust. A16,038-39.

Third, a skilled artisan also would have known what to do with coolant—i.e., that boat engines conventionally meet these legal standards through the very two "coolant elements" claimed here. As to element [B], "a catalyst cooled by a flow of coolant," the WBIP patents acknowledge that "seawater is also frequently circulated through exhaust system components." A104, col. 1:35-39. Same for [D], "a coolant injector that injects coolant into the flow of exhaust at a point

29

downstream of the catalyst." The patents acknowledge that "[s]eawater is injected into many marine engine exhaust flows." A104, col. 1:35-39. Mr. Westerbeke himself conceded that encasing catalysts in a water-jacketed manifold was just "one fairly obvious thing that had to be accomplished." A15,479-80.

He could hardly have suggested otherwise. It was a given that "the major differences between an on-road engine and a marine engine are found in their cooling and exhaust systems." A19,450 (2001 Southwest Research Institute Report). Specifically, "marine engines use water-cooled exhaust manifolds, and mix all the sea pump's water with the exhaust gases." *Id.* By 1996, Westerbeke itself was selling a marine gen-set called the "BCG generator," which included a water-cooled catalyst in its exhaust flow for reducing engine emissions. A19,267-68; *see* A15,287-89. Citing the Fujimoto patent (U.S. Patent No. 5,911,609; *see* A19,051-63), the Patent Office found time after time during prosecution that it was "conventional" and obvious to modify land-based engines with the claimed marine cooling elements. A18,119, 18,253-54, 18,279-80. And the Southwest Research Institute tests showed in 2001 that "using [a] catalytic reduction system," A16,010,

similar to what had made "automotive engine[s] … successfully emission controlled," "effectively reduce[d] marine gasoline engine emissions," A19,445-47.

This, then, is the classic scenario where obviousness is established as a matter of law through "a combination of familiar elements that yield predictable results." *Tyco Healthcare Group LP v. Ethicon Endo-Surgery, Inc.*, ___ F.3d ___ , Nos. 2013-1324, 2013-1381, 2014 WL 6845191, at *6 (Fed. Cir. Dec. 4, 2014); *see KSR*, 550 U.S. at 417 (obviousness is established by a "predictable use of prior art elements according to their established functions" or the "mere application of a known technique to a piece of prior art ready for the improvement"). Kohler's expert, industry veteran Robert Brooks, testified without contradiction that one skilled in the art would have recognized that upon combining Phipps' s inventions with the coolant elements, one would be "very confident that you would get predictable results." A15,873; *see* A15,874-75.

Thus, in the language of *KSR*, adding "water-jacketing" and coolant in the exhaust was a "technique [that] has been used to improve" land-based engines, "and a person of ordinary skill in the art

would recognize that it would improve similar devices"—the Phipps system—"in the same way." 550 U.S. at 417. Indeed, far from professing an unpredictable result or benefit from applying the marine elements to the disclosed engine control system, the WBIP patents teach that the disclosed emission-control system is "designed for installation on-board [any] moving vehicles, either on land or in water." A18,055; *see* A18,058, 18,064, 18,066.

The result here, therefore, must be the same as in both *KSR* and this Court's more recent opinion in *Wyers*, where this Court reversed a jury verdict of non-obviousness. 616 F.3d at 1246. In *KSR*, the prior art reference "provided an obvious example of an adjustable pedal with a fixed pivot point; and the prior art was replete with patents indicating that a fixed pivot point was an ideal mount for a sensor." 550 U.S. at 420. In *Wyers*, this Court held that taking a "common and widely used" design option for protecting one type of lock and applying it to another type of lock, in the same way, for the same purpose, was not an invention worthy of a patent. 616 F.3d at 1245. So, too, here. Phipps provided an obvious example of an engine emission control system meeting all but the "coolant" elements, and the prior art was "replete"

with examples indicating that land engines could easily be adapted to marine environments in the same "common and widely used" ways that the WBIP patents applied.

This case presents not just known elements combined in a way that yielded predictable results, but also ample and explicit "design incentives and other market forces" prompting one skilled in the art to adapt Phipps to boats. The government and the market both provided the push. The government encouraged marine engineers to look at catalytic converters like Phipps. The Coast Guard and NIOSH raised the stakes when they announced, in late 2001, that "[w]hen gasoline generators are in operation, the area under the swim deck"—where the generator exhaust is discharged—is "extremely hazardous." A18,861. And they had issued a clarion call for a solution along the lines of the WBIP patents by May 2001, when they urged "marine engine manufacturers" to perform "[a]dditional research and development work … to evaluate the efficacy of using catalytic converters" on boats to reduce CO at the source. A18,896-97. Both Kohler and Westerbeke did exactly what NIOSH urged, during the same time period. A15,418, 15,569-70, 15,684-85, 17,899, 17,901. This "design incentive" to adapt

emission-cutting engines like Phipps for boats could scarcely have been more explicit.  A15,289, 15,684-86, 15,990-92, 16,013-15.

The market incentives arose from the fact that modifying the prior art would broaden the market to include marine applications.  *See KSR*, 550 U.S. at 417.  As noted above (at 28), Westerbeke typically started with land-based engines and adapted them to marine environments. Kohler's expert testified without contradiction that during his 30 years in the industry, every engine he designed was required to work in car, drive train, and marine applications.  A15,874.  That was exactly what the '196 patent indicated when it noted that its "engine-generator sets are designed for installation on-board moving vehicles, either on land or in water," A115, col. 1:34-36, and accordingly added coolant elements for one embodiment.  *See Boston Scientific Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 991 (Fed. Cir. 2009) (reversing a jury verdict of non-obviousness because modifying one stent in the same beneficial way as another stent "does not require a leap of inventiveness").

With all the concessions WBIP made about the prima facie case of obviousness, WBIP's only contrary evidence was Amber's assertion that the invention was not obvious because Phipps was an unconventional

"reverse" control scheme. A16,026-28, 16,030. Amber colorfully analogized Phipps to building furniture by hitting a hammer with a board. A16,027. And thus, he opined, Phipps was "totally backwards from what I believe one of skill in the art would even attempt to make an engine run." *Id.* This argument provided a lovely visual for the jury, but nothing more. It merely explains why Phipps was such a breakthrough. Because Phipps disclosed a solution, whether or not it seemed "backwards," the question is whether a skilled engineer would think to add standard coolant elements to put Phipps on a boat. Amber never answered this question, except to admit that Phipps's controller was within the scope of the claimed inventions, and that it taught every element other than "coolant." He made the very mistake *KSR* cautioned against: "in effect, asking whether a … designer writing on a blank slate would have chosen" Phipps as a starting point. *KSR*, 550 U.S. at 424.

Instead, "[t]he proper question to have asked was whether [a person] of ordinary skill" who was looking to reduce engine emissions "would have seen a benefit to" adapting Phipps to a boat by using standard marine coolant techniques. *Id.* Because the answer is yes, the

35

prima facie case of obviousness is overwhelming.  The patents-in-suit

are the quintessential "patent[s] for a combination which only unite[]

old elements with no change in their respective functions." *Id.* at 415-

16 (internal quotation mark omitted).[3]

Although Kohler's obviousness defense was the central trial issue,

the district court said not one word about the prima facie case of

---

[3] Similarly flawed was the Patent Office's basis for confirming the claims in a post-trial ex parte reexamination.  *See Pharmastem*, 491 F.3d at 1366 (reversing denial of JMOL of obviousness even though the PTO had confirmed claims following reexamination over some of the same references cited at trial).  WBIP presented new evidence and arguments, not before the district court, that convinced the reexamination panel to uphold the claims based on a perceived incompatibility between the specific embodiments taught in Phipps and Fujimoto, A11,008-09, 11,016-17; Applicant Argument/Remarks Made in an Amendment, Reexamination Control No. 90/013,089 at 7-12 (June 12, 2014), http://portal.uspto.gov/pair/PublicPair (search by control no., select image file wrapper, select document code REM); Applicant Argument/Remarks Made in an Amendment, Reexamination Control No. 90/013,090 at 7-13 (June 12, 2014), http://portal.uspto.gov/pair/PublicPair (search by control no., select image file wrapper, select document code REM).  This rationale, however, does not address whether it would have been obvious to modify Phipps for a boat in light of the prior art discussed above that taught the coolant elements.  In any case, the examiner's rationale was flawed. *E.g.*, *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012) (it "is well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements").

obviousness.  It denied JMOL in a sentence, and cited only the

testimony from James Sember in mistakenly ruling that obviousness

was not an objectively reasonable defense.  *See infra* at 67; A10,382.

### B. Secondary Considerations Do Not Overcome The Strong Prima Facie Case Of Obviousness.

WBIP put almost all its obviousness eggs in the secondary

considerations basket.  Because the prima facie case of obviousness is so

strong, however, secondary considerations "simply cannot overcome" it.

*Wyers*, 616 F.3d at 1246.  But even if especially compelling evidence of

secondary considerations could conceivably overcome the prima facie

case, WBIP's evidence did not move the needle here.  All its purported

evidence of secondary considerations shared the same fundamental

flaw:  None of it bears any relationship to the asserted novelty of the

claims.

WBIP's objective evidence is worthless unless it sustained its

burden of proving "a nexus between the evidence and the merits of the

claimed invention."  *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir.

1995); *see In re Paulsen*, 30 F.3d 1475, 1482 (Fed. Cir. 1994) (burden on

patentee to show nexus).  WBIP must demonstrate that the evidence is

attributable not just to the asserted patent claims, but specifically "to

37

the features of its invention that were not disclosed in" the art it purports to have improved. *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310, 1316 (Fed. Cir. 2008). "Where the offered secondary consideration actually results from something other than what is both claimed and *novel* in the claim, there is no nexus to the merits of the claimed invention." *In re Huai-Hung Kao*, 639 F.3d 1057, 1068 (Fed. Cir. 2011).

To be clear, for nexus purposes, what is "novel in the claim" was not the concept of a control scheme that simultaneously governs engine speed and maintains a certain air/fuel ratio. Phipps had already done that. Rather, for nexus purposes, what matters are "the features of [the] invention that were not disclosed in" Phipps, *see Asyst Techs.*, 544 F.3d at 1316—i.e., using standard coolant features to make Phipps work in a boat. WBIP distracted the jury with evidence of a supposed long-felt need (to stop CO poisonings on boats), praise for Westerbeke's Safe-CO gen-sets, industry skepticism, and commercial success. But it failed to tie *any* of this evidence to the asserted patent claims, much less to the patents' very marginal improvement over Phipps. Because the evidence was not "commensurate in scope with the claims which the evidence [was] offered to support," *Allergan, Inc. v. Apotex Inc.*, 754 F.3d

38

952, 965 (Fed. Cir. 2014) (internal quotation mark omitted), it was "simply inadequate to overcome a final conclusion that [the claims] are obvious as a matter of law," *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1328 (Fed. Cir. 2008).

Not only was this evidence irrelevant to proving secondary considerations; it also was grossly prejudicial.  WBIP used this evidence to paint Kohler as a corporate killer.  WBIP pointed to product-liability lawsuits that had nothing to do with the novelty of the claimed invention—while making out WBIP to be the avenging angel based on features that also had nothing to do with the patented improvement in the asserted claims.[4]  For these reasons, this Court should enter a judgment of obviousness, or at a minimum vacate the judgment of nonobviousness and remand for a new trial.

***Long-felt need.***  WBIP's main secondary consideration was "a long-felt and unmet need," *Perfect Web Techs., Inc. v. InfoUSA, Inc.*, 587

---

[4] The First Circuit, whose law governs evidentiary rulings, *InTouch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1338 (Fed. Cir. 2014), reviews evidentiary rulings for abuse of discretion, and will grant a new trial if the evidentiary ruling affected a party's substantial rights, *Lynch v. City of Boston*, 180 F.3d 1, 15 (1st Cir. 1999).

F.3d 1324, 1332 (Fed. Cir. 2009)—specifically a need to reduce deadly carbon monoxide poisonings "caused by gasoline-powered generators on … boats." A15,143; *see* A9845 ("People were dying from CO poisoning from gas-powered generators on boats."). In support of that assertion, WBIP introduced extensive "evidence regard[ing] product liability suits that third parties had brought against Kohler." A15,447; *see* A15,320-21. This evidence is legally insufficient because it has no nexus to the novel feature of the asserted claims—the addition of coolant elements to Phipps. *See Asyst Techs.*, 544 F.3d at 1316; *Media Techs. Licensing, LLC*, v. *Upper Deck Co.* 596 F.3d 1334, 1338-39 (Fed. Cir. 2010) (to be probative of a long-felt need, there must be evidence not only that the patents-in-suit actually satisfied that need, but also that the need "correspond[s] to the asserted claims").

One category of evidence was the dramatic reading of deposition testimony about lawsuits alleging that Kohler marine generators had poisoned some customers, A15,446, 15,448, along with evidence that Kohler paid $22 million to the families of 12 people who died, allegedly due to carbon monoxide poisoning from six Kohler marine generators manufactured as far back as 1976. A15,451-52. WBIP did not

introduce evidence about the subject-matter of all of the lawsuits, but the ones it did were about black-iron exhaust pipes that Kohler used in generators manufactured between 1950 and the late 1980s.  Those pipes corroded from the inside out, and plaintiffs claimed they were defective.  A15,456-57, 15,460-61, 15,678.  In the late 1980s Kohler switched to stainless steel exhaust pipes.  A15,464, 15,678-79.

WBIP's patent has nothing to do with the relative merits of stainless-steel and black-iron exhaust pipes, or whether Kohler was negligent in using one or the other.  And the amount of money that Kohler paid to settle those lawsuits is utterly unrelated to whether it would have been obvious to add the coolant elements required to put Phipps on a boat.  None of the evidence has anything to do with coolant, the patents' only improvement over Phipps.  When WBIP introduced this evidence, it was not objective evidence of obviousness that could combat a hindsight reconstruction, *see Star Scientific*, *Inc.* v. *R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011)—it was evidence that painted Kohler as a corporate killer responsible for killing 12 people.  *See* A16,121-22 ("Kohler was facing lawsuits.  One death was

too many.  How about a whole list of them?  Paying large sums of money to settle… The point is it was on their mind for years.").

The other category of evidence involved the second dramatic reading—of the testimony of former Kohler employee James Sember—also concerning the black-iron exhaust pipes.  A15,452-53, 15,456-57, 15,460-61.  In that context, Sember was asked whether,"[i]n designing a marine generator in the '60s or in design and manufacture of marine generators in the '60s, '70s '80s, in that time period, could those generators be produced in a way that would not produce carbon monoxide?"  A15,455.  He answered, "No," A15,456, and explained that "there is no possible way" those generators "could be designed not to fail" because "any material that could be selected" would eventually corrode or wear out.  A15,456; *see id.* (only way to ensure that the exhaust system will "remain leakproof" is through inspection, maintenance and replacement).  In order to address the possible danger *from those old generators*, which were no longer sold but still in use, Sember testified that Kohler was taking or considering several steps: warning owners to have their "exhaust system[s] inspected frequently to ensure components are tight and maintained in good condition to

42

prevent leakage of carbon monoxide," A15,459; selling stainless-steel replacement pipes, A15,464-65; and publicizing to boat owners to inspect the "exhaust system components for cracks and corrosion," A15,462, 15,466-67.

This evidence, too, was devoid of the requisite nexus. None of Sember's reenacted testimony about decades-old engines had anything to do with how generators could be or were built in 2003, or how Kohler was trying to address CO in its new generators. Manufacturing a new generator that solved the CO problem "at the source," A15,502, would have done nothing to help owners of old generators built with cast-iron pipes. Moreover, Sember's testimony had nothing to do with coolant, so there was no connection between that testimony and how the asserted claims improved over Phipps.

Even if any of this evidence could have been minimally sufficient to qualify as evidence of secondary considerations, its minimal probative value was substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 403. While denying Kohler's motion in limine to exclude this evidence, A5361-62, the district court acknowledged the "risk of undue prejudice," A15,005. That risk materialized—as

43

evidenced by the runaway damages verdict.  WBIP did everything it could to enhance the prejudice, all but transforming this case from a standard patent infringement suit into a morality tale about which company values life more.  WBIP depicted Kohler as a corporate killer responsible for 12 fatalities.  A15,452, 17,935.  And no juror could have missed the contemptuous argument that Kohler "said one death is too many.  How about all of these?"  A16,099; *see* A16,121-22.

Such unfairly prejudicial evidence "invites the jury to render a verdict on an improper emotional basis."  *United States v. Varoudakis*, 233 F.3d 113, 122 (1st Cir. 2000); *see La Plante v. Am. Honda Motor Co.*, 27 F.3d 731, 740 (1st Cir. 1994) (although evidence of Honda's profits from sales of its ATVs was relevant to a product-liability claim, the evidence should have been excluded because "the risk that the jury would be prejudiced by this reference to the enormous profitability of Honda's ATVs was almost inescapable").  The prejudice was especially "unfair" because there was a "lack of need for the evidence." *Varoudakis*, 233 F.3d at 122-23.  WBIP did not "need" to introduce evidence that *Kohler* was responsible for any deaths, much less a dozen of them, or that it paid $22 million to settle product liability suits, in

order to prove that it was not obvious to adapt Phipps to a marine environment by adding traditional coolant elements, or even just to prove that the industry felt a need to reduce CO poisonings.  This is "the exceptional case that requires [this Court] to intervene."  *Id.* at 124.  Therefore, if this Court does not conclude that the asserted patent claims are invalid as obvious, it should remand for a new trial not tainted by this unfairly prejudicial evidence.

    ***Praise***.  WBIP rounded out the prejudice with evidence of praise it purportedly received for having solved the life-threatening problem.  But WBIP's evidence of praise suffered the same flaws as its evidence of long-felt need:  The most WBIP showed was that an "overall system drew praise," which is not enough.  *Asyst Techs.*, 544 F.3d at 1316.  WBIP had to present evidence of "praise in the industry that specifically related to features of the patented invention, linking that industry praise with the patented invention," *Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010)—and, again, specifically, with the improvement over Phipps.

    WBIP's few snippets of praise fell far off target.  WBIP introduced evidence that Westerbeke's "Safe-CO" line of generators won an award

from Houseboating Adventures Magazine for "their superior design and innovation, as well as … quality craftsmanship," A17,252, and was written up in Popular Mechanics as a technology that "can cut dangerous CO emissions by 99 percent," A17,254. Westerbeke also received an email from an Industrial Hygienist at the Department of the Interior thanking Westerbeke for "investing the resources and developing the Safe-CO line of generators," which, this individual predicted, "will save lives." A17,255; *see* A15,568.

None of this established the requisite nexus between this praise of its *products* and the novel aspect of the claimed *inventions*. None of the praise even mentions the coolant elements, which is the patents' only improvement over Phipps. Because all the claim elements relevant to reducing emissions (the catalyst, air/fuel ratio control, and oxygen sensor, *see* A15,195-200) are also present in Phipps, any CO reduction inherent in the claimed inventions likewise would have been inherent in Phipps. WBIP cannot claim benefit for praise directed to features squarely present in the prior art. *See Asyst Techs.*, 544 F.3d at 1316.

Furthermore, all of the praise pertains to a "Safe-CO" generator with very low CO emissions, which bears no relation to the asserted

claims—much less to the ways in which the claims improve over Phipps. As WBIP conceded, it "did *not* argue that the claims required a particular level of CO reduction." A9859 (emphasis in original). Of the 12 claims asserted by WBIP, 11 do not even mention carbon monoxide. A107, col. 7:4-28; A107, col. 7:31-33; A107, cols. 7-8:37-5; A118, col. 8:36-52; A118, col. 8:55-56. The one that does, claim 8 of the '044 patent, says nothing about how much CO will be reduced, and certainly nothing about "low" or "safe" levels of CO. Instead, it claims, in full, "[t]he marine engine of claim 1, where the catalyst is configured to simultaneously reduce oxides of nitrogen, carbon monoxide and hydrocarbons." A107, col. 7:31-33.

By contrast, *unasserted* dependent claims 9 and 18 of the '044 patent and claim 18 of the '196 patent do actually recite a catalyst configured to obtain a "safe level" of CO: "between about 9 parts per million and 30 parts per million." A107, col. 7:34-36; A107, col. 8:31-33; A118, col. 8:16-18. WBIP has admitted that it did not assert these claims because it was not sure that it could prove infringement. A9859.

Absent the requisite nexus to what is novel about the asserted claims, this praise is not probative of non-obviousness, and certainly not

47

sufficiently so to overcome the strong prima facie case.  This is clear from cases like *PharmaStem*, in which the patent holders "were widely recognized as pioneers" in their field, including by the defendants themselves, for their work related to the asserted patents.  491 F.3d at 1365.  One defendant praised the patentees as "trailblazers," while the founder of another defendant told the patentee that "no one will ever dispute that you, as the pioneers in the medical technology … will be the frontrunners in the field."  *Id.*  Yet even this glowing praise was not probative of obviousness because there was no indication that it was based on an "inventive contribution" the patent holders made, rather than work that was related to the asserted patents but non-patentable.  *Id.; see, e.g.*, *Muniauction*, 532 F.3d at 1328 (an Innovations in American Government award for using of the patent holder's system "lack[ed] the required nexus with the scope of the claims" because press coverage of the award did not focus on the particular patent claims at issue in the case).

**Skepticism**.  WBIP's evidence of skepticism was even sparser and further afield from the inventive features of the asserted claims.  It all revolved around testimony of reactions to Mr. Westerbeke's

predictions about his ability to develop a product that would eliminate CO emissions. Erik Larson, Westerbeke's director of engineering from 2000 to 2006, testified that Mr. Westerbeke declared, at a 2003 CO workshop, that Westerbeke Corp. would have "zero percentage PPM CO generators within one to two years." A15,374.[5] Larson testified that the room was "mostly shocked at [t]his statement," *id.*, and two unidentified Kohler employees said "[t]hat it was impossible to produce a generator with zero PPM of CO," *id.* Similarly, a Kohler employee himself testified that, at a boat show in 2004, a Westerbeke employee told him, "we can achieve zero ppm CO" and he responded, "Really? I don't think so. That[] sounds to me to be impossible." A15,690.

But none of this helps WBIP for the same reasons already noted. First, there is no evidence that anyone has ever achieved zero parts per million of CO; certainly, WBIP does not claim to have gotten there. So the evidence of skepticism proves that experts were correctly skeptical of WBIP's ability to achieve something that to this day it has never achieved. Second, just as no asserted claim purports to reduce CO to

---

[5] Mr. Westerbeke did not remember his exact words, but thought he might have predicted "single digits." A15,489; *see* A15,488, 15,490.

"safe" levels, no claim purports to reduce CO to zero parts per million or single digits. Third, none of this shows skepticism regarding the only point of novelty of the invention over Phipps—adding coolant. The comments are not about what it would take to put a land generator on a boat, or how one would achieve the required cooling.

***Commercial success***. As with each of the other features, in order to be relevant, the "commercial success of the product must be due to the merits of the claimed invention beyond what was readily available in the prior art." *Therasense, Inc.* v. *Becton, Dickinson & Co.*, 593 F.3d 1289, 1299 (Fed. Cir. 2010) (internal quotation mark omitted). And here, again, there is simply no evidence that the "driving force" behind Kohler's sales was any asserted claim of WBIP's patents, and certainly no evidence that it was the patents' novelty over Phipps. *In re DBC*, 545 F.3d 1373, 1384 (Fed. Cir. 2008).

WBIP argued at trial that the driving force behind Kohler's sales was "low-CO." A16,123. But the evidence at trial showed that while Kohler's sale of low-CO generators quickly overtook its sale of non-low-CO generators, the opposite was true for Westerbeke. Between 2005 and 2012, Westerbeke sold more than three times as many old non-low-

50

CO generators as new low-CO generators. A17,780, 17,782. Moreover, none of that has anything to do with the point of novelty over Phipps, as Phipps was also about reducing emissions. Further, the asserted claims admittedly do not require a particular low level of CO emissions. *Supra* at 47. The commercial success of WBIP and Kohler "low-CO" products "was due to unclaimed or non-novel features" of these products and so not probative of non-obviousness. *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1312-13 (Fed. Cir. 2006) (granting judgment that claims were invalid as obvious).

\* \* \*

For all these reasons, this Court should enter judgment of invalidity on obviousness grounds, or at a minimum should vacate the judgment below and remand for retrial.

## II. THE ASSERTED CLAIMS LACK ADEQUATE WRITTEN DESCRIPTION AS A MATTER OF LAW.

WBIP's claims are invalid for a second reason: The specification does not reflect that WBIP had possession of the invention at the relevant time. When WBIP filed its original patent application in 2003, it did not possess the key aspect of what ultimately became the claimed invention: a "compound control scheme" in which two output variables

51

(engine speed and air/fuel ratio) are controlled "simultaneously." Simultaneous control did not even appear in its disclosure until four years later, far too late to satisfy the written description requirement. Even then, WBIP never disclosed more than a bare statement of the functions to be performed. This would not satisfy the written description requirement even if it had been timely.

Notwithstanding the clarity of the written documents, the district court erroneously denied summary judgment on the theory that there were factual disputes to be resolved, A7826-27, then ultimately issued a cursory denial of Kohler's post-verdict motion for judgment as a matter of law, A10,382. Written description is treated as a question of fact, and therefore reviewed for substantial evidence. *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1243 (Fed. Cir. 2002). It is unclear why that is so, however, given that the doctrine focuses so intensely on the meaning of the patent. Accordingly, Kohler reserves the right to seek further review on this issue if necessary.

## A.    The Original Application Did Not Disclose The Claimed "Compound Control Scheme."

To satisfy the written description requirement of 35 U.S.C. § 112, ¶ 1, a patentee must submit an application that "reasonably conveys to

those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). "[T]he hallmark of written description is disclosure" in "the four corners of the specification," *id.*, and the relevant "filing date" is the effective date sought by the patentee, *id.* at 1355. Here, WBIP's claimed effective date was the filing date of the Provisional Application, so it is the Provisional Application that must contain the requisite description.[6] A3270-71, 16,107; *see Ariad*, 598 F.3d at 1355-56 (written description added after the effective date could not support the claims).

An essential feature of the asserted claims was the compound control scheme—the combination of "governing engine speed … *while*" simultaneously "maintaining the air/fuel ratio." *E.g.*, A107, col. 8:3-16 (claim 12 of the '044 patent) (emphasis added); *accord* A107, col. 7:4-17 (representative system claim 1 of the '044 patent); A118, col. 7:62-63 (method claim 8 of the '196 patent). As discussed above (at 11-13), this

---

[6] The analysis would be the same if the 2004 Application were the relevant one, as its disclosure is identical to the Provisional Application's. *Supra* at 9.

feature was essential to the issuance of the patents—WBIP combined these originally separate elements into a single step to avoid an obviousness rejection.

This gave rise to a written description problem that is as simple as it is fatal:  The specification of the Provisional Application does not disclose the compound control scheme.  Instead, it discloses the elements of "governing" and "maintaining" in *different embodiments*. First, the specification describes "embodiments" where "controller 24 provides controls [*sic*] the air fuel ratio of the engine."  A18,058; *accord, e.g.*, A116, col. 3:36-44 (corresponding language in the issued '196 patent).[7]  This passage says nothing about governing engine speed. Separately and subsequently, the specification describes "an *alternative* embodiment" that "controls engine inputs (such as fuel and/or air flow) to maintain engine speed at or near a desired set point."  A18,190-91 (emphasis added); *accord* A116, col. 3:58-4:15 ('196 patent).  And, just as the earlier passage says nothing about governing engine speed, this passage says nothing about maintaining an air/fuel ratio.  Similarly,

---

[7] For ease of reference, we provide parallel citations to the Provisional Application and the '196 patent.

the *claims* recited in the Provisional Application disclose separate steps of "governing" and "maintaining." A18,197-200.

A device that can simultaneously "govern" *while* "maintaining" is different and more complex than a device that can "govern" and separately "maintain" at different times—just as a juggler who is also able to ride a unicycle is apt to have a spill if he tries to do both simultaneously. WBIP only emphasized the point when it explained that "[g]overning engine speed with respect to a constant speed **and** maintaining a certain air/fuel ratio of the engine together require a compound control scheme that is neither trivial nor obvious." A18,135; *supra* at 11-13 (discussing the prosecution history). As WBIP explained, this "compound control scheme" required changing the same inputs, air and fuel, to maintain the two different outputs. Changing these inputs to maintain speed could "significantly affect the air/fuel ratio, and vice versa." A18,293.

But WBIP did not introduce the simultaneous "compound control scheme" until 2007, four years *after* the effective filing date, when it sought to amend the claims. *Supra* at 11-13. As support, it cited two passages from the originally filed Provisional Application, but neither

comes close to disclosing the new subject matter. *See* A18,323 (citing A18,190-91 and A18,193-95). The first passage is the "alternative embodiment" discussed above (at 54), which discusses "maintain[ing] engine speed at or near a desired set point" alone, but not in combination with maintaining an air/fuel ratio. A18,190-91. The second discusses injecting air into the exhaust stream as a function of engine load (or other measured parameters, such as CO in the exhaust). A18,193-95. This is just an unclaimed design option. A18,191 (the specification explains that "no air flow injection is required); A107, cols. 7-8:4-36; A118-19, cols. 7-10:35-14. This passage mentions that "the engine speed is substantially fixed in the primary embodiments," but again says nothing about simultaneously maintaining an air/fuel ratio. A117, col. 6:34-37.

This late-filed amendment, unsupported by the specification, is precisely the sort of "manipulation of [the amendment] process" that the written description requirement guards against. *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1306 (Fed. Cir. 2008). Section 112 "prevents applicants from using the amendment process to update their disclosures (claims or specifications) during their pendency before the

patent office. Otherwise applicants could add new matter to their disclosures and date them back to their original filing date." *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1255 (Fed. Cir. 2004). This case illustrates precisely why this requirement is necessary. WBIP's 2007 amendments came *after* Kohler had introduced its own "Low-CO" product line, in 2005. *Supra* at 14. But for WBIP's impermissible backdating of the amended claims to the filing date of the Provisional Application, the accused products would themselves be invalidating prior art. Because the original specification did not disclose the compound control scheme contained in the amended claims, the WBIP patents are invalid.

### B. There Is No Sufficient Disclosure Of The Compound Control Scheme.

Even if WBIP's Provisional Application had stated that the engine controller simultaneously "governs" while "maintaining," the patent would still violate the written description requirement because the disclosed controller is a black box. The patent fails entirely to disclose *how* it performs those two functions. The method claims do not specify any particular structure that performs "governing" while "maintaining." A107, col. 8:3-16; A118, col. 7:62-63. In the system claims, the specified

functions are to be performed by an "engine controller," but the claims impose no structural limitations on that controller.  A107, col. 7:4-17; *see AbbVie Deutschland GmbH & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1292 (Fed. Cir. 2014) (claim was defined by its functions, not structure, even though it recited a generic "antibody").

These claims suffer all the worst features of functional claim limitations in that they "merely recite a description of the problem to be solved while claiming all solutions to it." *Ariad*, 598 F.3d at 1353.  They therefore threaten to impede progress:  The inventor "leav[es] it to the … industry to complete an unfinished invention" while enjoying the benefit of patent protection over whatever solutions actual inventors later devise.  *Id.*  That is why functional claim limitations like these generally fail the written description requirement.  *AbbVie*, 759 F.3d at 1301.  To be sure, sometimes the patentee has "actually perform[ed] the difficult work of 'invention'" and disclosed the complete invention to the public even using functional claim limitations.  *Ariad*, 598 F.3d at 1353. To cover these situations, this Court has crafted two exceptions to the rule that functional claim limitations fail the written description rule. But neither applies here.

First, functionally defined claim limitations can pass muster when the specification describes a "reasonable structure-function correlation." *AbbVie*, 759 F.3d at 1301.  That exception does not apply here, because the specification merely discloses a "controller," depicted in Figure 1 as a box attached to other components with wires.  A18,069.  No flow chart, figure, or textual description explains how this black-box "controller" operates, at even the most general level, much less with any detail.  A18,057-65.  WBIP's own expert was forced to acknowledge that the patent merely "describes to do it, but it doesn't tell you the details of how to do it."  A15,330.

Second, "functional claim language can meet the written description requirement when the art has established a correlation between structure and function."  *Ariad*, 598 F.3d at 1350.  There is, for example, no harm in claiming the function of "turning a screw" without expressly disclosing what everyone knows—that you slot in a screwdriver and twist it.  This exception also does not apply here, because WBIP only obtained these patents by arguing just the opposite: that the "compound control scheme" necessary to perform these functions was "neither trivial nor obvious" to implement.  A18,135,

18,293; *see supra* at 11-13. WBIP's expert testified that it would take one skilled in the art "probably a number of years and many, many man-hours to create" a "compound control scheme" if presented with the patent's specification and asked to program one. A15,364-65; *see* A15,196-97 (Amber characterizing the claimed compound control scheme as "very, very difficult"). This is a quintessential example of "leaving it to the … industry to complete an unfinished invention." *Ariad*, 598 F.3d at 1353.

This Court has found written description lacking as a matter of law in situations with more description than this. In *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, for example, this Court affirmed summary judgment of no written description because the specification described one method for creating a type of mathematical transform, which, the Court held, was insufficient to support functional claims covering any and every means for achieving that objective. 424 F.3d 1336, 1346 (Fed. Cir. 2005). In reaching this conclusion, the Court explained that an inventor who created and disclosed "a particular fuel-efficient automobile engine" could generically claim "every possible type of fuel-efficient engine" "only if the specification would 'reasonably

convey to a person skilled in the art that the inventor had possession of the claimed subject matter at the time of filing.'" *Id.* (quoting *Bilstad v. Wakalopulos*, 386 F.3d 1116, 1125 (Fed. Cir. 2004)). Here, the WBIP patents provide even less—they do not even disclose *one* way to achieve the claimed compound control scheme. Accordingly, the asserted claims are invalid.

### C.    The District Court's Rationale On Written Description Was Flawed.

Post-trial, the district court devoted a sentence to Kohler's written description defense, saying simply that "Kohler's Renewed Motion for Judgment as a Matter of Law will be denied." A10,382. The court gave no reasons for its ruling, nor did it even mention Kohler's written description defense when it found willfulness. *Id.*; A10,664-65. The only glimpse into the court's thinking came in an earlier, two-page order denying summary judgment. That order did not even discuss the specification, but it did offer two reasons for denying summary judgment—both flawed.

First, the court reasoned that "the patent office did not raise any objections or reject the amended claim on written description grounds." A7826-27. But if that were sufficient basis to reject a written

description argument, no court could ever enter summary judgment, or judgment as a matter of law, on the basis of inadequate written description. After all, by the PTO's reckoning, every issued patent complies with 35 U.S.C. § 112 as well as every other statutory test for patentability. *See* U.S. Dep't of Commerce, *Manual of Patent Examining Procedure* § 2163 (9th ed. 2014), http://www.uspto.gov/web/offices/pac/mpep/index/htm ("Office personnel must complete the patentability determination under all the relevant statutory provisions of title 35 of the U.S. Code."). But this Court repeatedly has entered judgment of no written description. *E.g.*, *Ariad*, 598 F.3d at 1340; *Univ. of Rochester v. G.D. Searle & Co., Inc.*, 358 F.3d 916, 927 (Fed. Cir. 2004); *PIN/NIP*, 304 F.3d at 1247-48.

Second, the district court said the issue could not be resolved as a matter of law, because "the experts for both parties strongly disagree." A7825-26. But this purported dispute was only on the ultimate question; as to every material fact, the experts were in agreement. There was no dispute about where to find any relevant disclosure. WBIP's expert agreed that the patent's "entire disclosure" of how to control the engine is found in one paragraph. A15,330-31. But that is

the same paragraph we have discussed already (*supra* at 55-56), which discloses that the "controller" controls the air/fuel ratio based on a feedback sensor in the exhaust—with no disclosure whatsoever of that controller also governing engine speed. A18,190-91, col. 4:29-5:14. WBIP's expert never explained how one skilled in the art could have divined a "compound control scheme" from this passage. Kohler's expert also opined that this passage does not provide written description support. A15,890-91.

In short, this is precisely the sort of case in which it is appropriate to rely on the intrinsic record, and the specification in particular, to invalidate the patent. *See Univ. of Rochester*, 358 F.3d at 927 (patent may be invalid on its face for lack of written description). This case is particularly similar to *PIN/NIP*, in which this Court held that the district court erred when it failed to grant JMOL of no written description. That case involved a patent that disclosed a *mixture* of two chemicals. 304 F.3d at 1247-48. On its face, this Court held, that disclosure did not support a patent claim—added during prosecution, just as here—that covered *sequential* application of the chemicals. *See id.* WBIP's patents have just the same mismatch between the

specification and claims, but with the roles reversed:  The specification only separately discloses "maintaining" an air/fuel ratio and "governing" speed, whereas the patents claim the "mixture" of both at once.  So here, just as there, a legal judgment of invalidity is warranted.

## III.  THE JUDGMENT OF WILLFUL INFRINGEMENT SHOULD BE REVERSED.

A substantial proportion of the verdict—some $3.5 million—was attributable to the court's finding of willful infringement, which led the court to enhance damages and to award attorneys' fees.  At a bare minimum, this portion of the judgment must be reversed, both because Kohler's defenses are objectively reasonable (even if not ultimately successful), and because this is the rare case in which there was a complete absence of evidence before the jury that Kohler knew of the asserted patents.

To establish willful infringement, WBIP had to "show by clear and convincing evidence that [Kohler] acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 769 F.3d 1371, 1382 (Fed. Cir. 2014) (internal quotation mark omitted).  Then, "if the 'threshold objective standard is satisfied, the patentee must also demonstrate that

this objectively-defined risk … was either known or so obvious that it should have been known to the accused infringer.'" *Id.* (quoting *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc)). This Court reviews the objective determination de novo, *id.*, and the subjective prong, a question of fact, for substantial evidence, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 860 (Fed. Cir. 2010), *aff'd on other grounds*, 131 S. Ct. 2238 (2011).

## A.    Kohler's Defenses, Even If Not Correct, Are At A Minimum Objectively Reasonable.

Even if the two validity defenses presented above are "ultimately unsuccessful," each at least "raise[s] a substantial question." *Halo Elecs.*,769 F.3d at 1382. And the "defense or noninfringement theory" is not unreasonable so long as "a 'reasonable litigant could realistically expect' those defenses to succeed." *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1006-08 (Fed. Cir. 2012) (quoting *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372 at 1378 (Fed. Cir. 2011)). This Court frequently reverses willfulness findings in identical situations. Mere months ago, this Court upheld jury findings that the patents were valid and infringed—but nonetheless held that "[a]n objective assessment of the case shows that Zimmer presented

reasonable defenses to all of the asserted claims of Stryker's patents." *Stryker Corp. v. Zimmer, Inc.* ___ F.3d ___ , No. 2013-1668, 2014 WL 7210311, at *9 (Fed. Cir. Dec. 19, 2014). Because Zimmer's defenses "were not objectively unreasonable," Zimmer "did not act recklessly," and the district court erred in determining willful infringement. *Id.*

In another case, the accused infringer demonstrated that the prior art "disclose[d] every element of [the asserted claim] except for" a single limitation, which several other references disclosed. *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1311 (Fed. Cir. 2010). On the merits, this Court held "that the record contains substantial evidence to support the jury's implicit finding that one of skill in the art would not have found the combination obvious." *Id.* at 1319. But the Court nevertheless held that "[t]he combination" relied upon by the defendant "raised a substantial question as to the obviousness of the [asserted] patent." *Id.* Consequently, the defendant "was not objectively reckless in relying on this defense." *Id.*

The same is equally true here. Kohler demonstrated that the combination of Phipps and well-known coolant techniques disclosed every element of the claimed invention. *Supra* at 23-28. And Kohler

66

presented substantial evidence supporting its defense that "it would have been predictable to combine and modify the prior art to create the claimed" invention. *Halo Elecs.*, 769 F.3d at 1382; *see supra* at 28-37.

The district court did not disagree with this argument. But it nevertheless held that "[o]bviousness was not a reasonable defense" because "Kohler's own chief engineer testified one year after [WBIP's] invention that it was impossible to design a marine generator that did not produce carbon monoxide." A10,664-65. This was the only rationale the court gave for finding this defense unreasonable, and it displays a marked misapprehension of the asserted claims and Kohler's defense in this case. As earlier noted (at 47), no patent claims actually asserted in this case even claim a "low" or "safe" level of CO, let alone a generator that "[does] not produce carbon monoxide" at all. *Id.* And no witness testified that it was possible in 2003, or is even possible today, to build a "no CO" generator, or a generator that produces zero ppm of carbon monoxide.

In any event, Sember did not testify that as of 2003 it was "impossible to design a marine generator that did not produce carbon monoxide." *Id.* As discussed above (at 42-43), he testified at a trial

about whether a Kohler generator manufactured in 1986 was defective because the exhaust pipe was made of black iron.  A15,456-57, 15,460. In that context, he was asked:  "In designing a marine generator in the '60s or in design and manufacture of marine generators in the '60s, '70s, '80s, in that time period, could those generators be produced in a way that would not produce carbon monoxide?"  His negative response was about what was possible during that earlier time period, in the context of litigation about black-iron exhaust pipes.  A15,455-56.  It had nothing to do with what was possible in 2003 (when the Provisional Application was filed), or in 2008 (when WBIP's patent eventually issued).  It says nothing about whether Sember had thought about the possibility of adding a catalytic converter into the exhaust flow to convert carbon monoxide emissions into carbon dioxide emissions, which had been done successfully in automobiles by 2003.  A16,010, 19,445.  And it says nothing about whether Sember knew that, in 2001, the government had encouraged marine generator manufacturers to consider such a system. A18,897.

    More fundamentally, the district court erred in relying on the Sember testimony at all because the "[t]he analysis is objective," *KSR*,

550 U.S. at 406, and "determined entirely with reference to a
*hypothetical* 'person having ordinary skill in the art,'" *Standard Oil Co.
v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985).  That
hypothetical person is "aware of all the pertinent prior art."  *Custom
Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed.
Cir. 1986).  WBIP presented no evidence that Mr. Sember knew of
Phipps or the other invalidating art; his testimony can shed no light on
what would have been obvious to the "person having ordinary skill."

Similarly, even if the WBIP patents are not ultimately held
invalid for lack of written description, that defense was at least
reasonable.  Kohler "could [have] realistically expect[ed]" its argument
"to succeed," even if ultimately it falls short.  *Bard*, 682 F.3d at 1008
(internal quotation mark omitted).  For even if "[t]he verdict was
supported by substantial evidence, … there was countervailing evidence
to support the defendant's theory as well."  *Lee v. Mike's Novelties, Inc.*,
543 F. App'x 1010, 1017 (Fed. Cir. 2013); *see supra* at 51-64.  In short,
"the facts here presented are hardly the stuff of which objectively
reckless unreasonable conduct is made."  *Uniloc USA, Inc. v. Microsoft*

*Corp.*, 632 F.3d 1292, 1311 (Fed. Cir. 2011) (internal quotation marks omitted).

### B. There Was No Evidence Before The Jury That Kohler Knew Of WBIP's Patents.

Completely apart from objective reasonableness, the willfulness verdict cannot stand unless WBIP proved that "the infringer was aware of the asserted patent." *i4i*, 598 F.3d at 860. In *i4i*, for instance, this Court concluded that the jury "could have reasonably inferred that Microsoft knew about" the asserted patent based on testimony that Microsoft employees attended demonstrations of software practicing the patent; testimony that "Microsoft employees received i4i's sales kit, which identified i4i's software as 'patented' technology and cited the … patent"; and evidence of "a series of emails between Microsoft employees discussing a marketing email sent by i4i," one of which "explained that the 'heart' of i4i's software was patented, again citing the … patent." *Id.*

That is classic evidence of knowledge—and it was entirely lacking here. This jury was presented with absolutely no evidence that Kohler was aware of WBIP's asserted patents, and so there was no basis to find—or even to infer—that Kohler knew or should have known of an

objectively high risk of patent infringement. The jury heard no

testimony that any Kohler employee ever saw marketing materials

referencing WBIP's patents or ever learned of the WBIP patents. The

closest WBIP came to establishing any kind of knowledge was

testimony that Kohler employees saw a demonstration of WBIP's Safe-

CO generator in 2004—but that was *four years before* the first patent

issued, so the generator obviously was not marked. A15,375-76. Nor

was there evidence that any Kohler employee ever saw a Westerbeke

Safe-CO generator that was marked after WBIP eventually obtained

the patent in 2008, at which point Kohler had already been producing

the accused products for three years.

Simply put, the jury heard no evidence of the knowledge that is

required to make out subjective willfulness.

\* \* \*

The district court's errors as to the objective and subjective prongs

of willfulness provide two separate bases for reversing the denial of

Kohler's motion for judgment as a matter of law. Accordingly, this

Court should "vacate the award of enhanced damages." *Spine

Solutions*, 620 F.3d at 1320. "Further, as the court's finding of

exceptionality was based solely on" its finding of willful infringement, this Court should "also vacate the award of attorney fees under 35 U.S.C. § 285." *Id.*; *see* A10,670-71.

## CONCLUSION

For the foregoing reasons, the judgment should be reversed, or at a minimum vacated and remanded for a properly conducted retrial.

February 9, 2015              Respectfully submitted,

/s/ E. Joshua Rosenkranz
E. Joshua Rosenkranz
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 506-5000
Facsimile:  (212) 506-5151
jrosenkranz@orrick.com

*Counsel for Defendant-Appellant*

## TABLE OF CONTENTS

Order, Dated May 21, 2013 (DKT 212) ................................................ A48

Memorandum and Order, Dated August 12, 2013
(DKT 257) ................................................................... A10,381-83

Memorandum and Order, Dated February 12, 2014
(DKT 274) ................................................................... A10,653-75

Memorandum and Order, Dated September 8, 2014 (DKT 295) ... A49-57

Final Amended Judgment, Dated September 8, 2014 (DKT 296) ...... A58

Patent No. 7,314,044 ..................................................... A97-107

Patent No. 7,832,196 ................................................... A108-119

Order, Dated May 21, 2013 (DKT 212)

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

 WBIP, LLC
　　　　　　　　Plaintiff(s)

　　　　　　v.　　　　　　　　　　　CIVIL ACTION NO.　 11-10374-**NMG** 

 Kohler Co.
　　　　　　　　Defendant(s)

## JUDGMENT IN A CIVIL CASE

 GORTON　　　　　, D.J.

**X**　　**Jury Verdict.**  This action came before the court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☐　　**Decision by the Court**.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

**IT IS  ORDERED AND ADJUDGED**

　　**Judgment is hereby entered in favor of the Plaintiff, WBIP, LLC.**

　　　　　　　　　　　　　　　　SARAH A. THORNTON,
　　　　　　　　　　　　　　　　CLERK OF COURT

Dated: 5/21/13　　　　　　　　　　By  /s/ Christine M. Patch　　　　　　
　　　　　　　　　　　　　　　　Deputy Clerk

NOTE:  The post judgment interest rate effective this date is  .12     %.

(WBIP judgment.wpd - 3/7/2005)

**A48**

Memorandum and Order, Dated August 12, 2013
(DKT 257)

**United States District Court**
**District of Massachusetts**

|                       |   |              |
|-----------------------|---|--------------|
| **WBIP, LLC,**        | ) |              |
|        **Plaintiff,** | ) |              |
|                       | ) |              |
|        **v.**         | ) | **Civil No.** |
|                       | ) | **11-10374-NMG** |
| **KOHLER CO.,**       | ) |              |
|        **Defendant.** | ) |              |
|                       | ) |              |

**MEMORANDUM & ORDER**

**GORTON, J.**

On May 15, 2013, a jury found defendant liable for patent
infringement. Plaintiff now requests that the Court enter a
permanent injunction prohibiting defendant from making or selling
the infringing products.

A plaintiff seeking a permanent injunction must satisfy a
four-factor test before a court may grant such relief. The
plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2)
> that remedies available at law, such as monetary
> damages, are inadequate to compensate for that injury;
> (3) that, considering the balance of hardships between
> the plaintiff and defendant, a remedy in equity is
> warranted; and (4) that the public interest would not
> be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S. Ct.
1837, 1839, 164 L. Ed. 2d 641 (2006).

In this case the Court finds that a permanent injunction
would be contrary to the public interest. Westerbeke Corp. and

-1-

Kohler are the only two producers of low-CO marine gas generators. If Kohler were permanently enjoined from producing or selling its generators Westerbeke would be left as the sole supplier of a product that is important to public health and safety. Particularly given that Kohler is a much larger producer, with a manufacturing capacity almost 14 times greater than that of Westerbeke, an injunction would deprive the consuming public of access to a potentially life saving product. Therefore, the permanent injunction will be denied and the Court need not address the remaining three factors.

In the alternative, plaintiff requests that the Court award to it an ongoing royalty. The Court believes that plaintiff's requested royalty rate of 13.5% is too high, but the Court will impose an appropriate royalty rate unless the parties can agree on one. The parties are to meet and confer promptly to reach an agreement on an appropriate royalty rate. If they fail to reach such an agreement, the parties shall submit memoranda, not to exceed ten pages, on or before September 13, 2013, as to their respective proposals.

Furthermore, Kohler's Renewed Motion for Judgment as a Matter of Law will be denied and the Court continues to hold the remaining pending motions under advisement.

-2-

**A10382**

**ORDER**

In accordance with the foregoing,

1) Plaintiffs motion for a preliminary injunction or in the alternative an ongoing royalty (Docket No. 223) is, with respect to plaintiff's request for a preliminary injunction, **DENIED**, but otherwise remains under advisement.

2) Defendant's Renewed Motion for Judgment as a Matter of Law (Docket No. 227) is **DENIED**.

**So ordered.**

*Nathaniel M. Gorton*

Nathaniel M. Gorton
United States District Judge

Dated August /2, 2013

-3-

A10383

Memorandum and Order, Dated February 12, 2014
(DKT 274)

# United States District Court
## District of Massachusetts

| | |
|---|---|
| WBIP, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Civil Action No. |
| v. | ) 11-10374-NMG |
| | ) |
| KOHLER CO., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM & ORDER

**GORTON, J.**

In this patent infringement action plaintiff WBIP, LLC ("WBIP") alleges that defendant Kohler Co. ("Kohler") infringes WBIP's patents directed to marine power generators that include a catalyst component in their exhaust systems to reduce emissions. In May, 2013, a jury found that the subject patents were valid and willfully infringed by Kohler and awarded $9,641,206 in damages to WBIP.

After the verdict, Kohler moved for a new trial or, in the alternative, a remittitur and renewed its previous motion for judgment as a matter of law. WBIP moved for a permanent injunction or in the alternative an ongoing royalty, enhanced damages and attorneys' fees and an accounting and pre- and post-judgment interest.

-1-

A10653

In an August, 2013 Memorandum and Order, the Court denied Kohler's motion for judgment as a matter of law and WBIP's motion for a permanent injunction but otherwise took WBIP's motion for an ongoing royalty and the other pending motions under advisement. WBIP moved for the Court to reconsider its denial of a preliminary injunction and both parties submitted supplemental briefs with respect to an impending royalty.

The Court held a hearing on the pending motions on January 14, 2014 and took the matters under advisement.

## I.  Kohler's Motion for a New Trial or Remittitur

At trial, both parties presented evidence that damages for infringement should be based on $26,858,470 in sales of infringing products by Kohler. Kohler argued for a royalty rate of 2% to be awarded on the basis of those sales while WBIP suggested a 14.7% rate. Nevertheless, on the special verdict form provided, the jury applied a royalty rate of 13.5% to sales of $71,416,345 for a total damages award of $9,641,206.

Kohler maintains that the damages award is not supported by the evidence because neither the sales figure of $71,416,345 nor the royalty rate of 13.5% is supported by the evidence. It contends that those errors warrant a new trial or at the very least remittitur. Kohler also asserts that a new trial is warranted because WBIP's damages expert improperly aggregated WBIP and Westerbeke Corporation for the purposes of calculating

-2-

A10654

damages and Kohler was unfairly prejudiced by WBIP's introduction of evidence pertaining to prior carbon monoxide lawsuits.

### A.   Legal Standard

A jury's award of damages is a factual finding that is reviewed to determine whether it is supported by substantial evidence. Powell v. Home Depot U.S.A., 663 F.3d 1221, 1228-29 (Fed. Cir. 2011). A verdict is supported by substantial evidence if

> reasonable jurors viewing the evidence as a whole
> could have found the facts needed to support the
> verdict in light of the applicable law.

Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1582-83 (Fed. Cir. 1995) (internal citation and quotation marks omitted). Furthermore, a jury's verdict with respect to an award of damages must be upheld unless it is

> grossly excessive or monstrous, clearly not supported
> by the evidence, or based on speculation or guesswork.

Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1580 (Fed. Cir. 1992) (internal citations and quotation marks omitted).

If the reviewing court finds that the jury's verdict was excessive in light of the evidence, it may in some instances grant a remittitur. The decision to do so is generally

-3-

discretionary but the First Circuit Court of Appeals has held that

> [i]n exercising this discretion, the court is obliged to impose a remittitur "only when the award exceeds any rational appraisal or estimate of the damages that could be based upon the evidence before it."

Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 29 (1st Cir. 2012) (quoting Kelley v. Airborne Freight Corp., 140 F.3d 335, 355 (1st Cir. 1998)).  Courts in the First Circuit follow the "maximum recovery rule" which holds that any remittitur must represent the "highest reasonable total of damages for which there is adequate evidentiary support." Marchant v. Dayton Tire & Rubber Co., 836 F.2d 695, 704 (1st Cir. 1988).

In the context of a reasonable royalty in a patent infringement case, the maximum recovery rule does not require that both the sales upon which the royalty is based and the royalty rate be adjusted to the maximum amount supported by evidence at trial when the jury makes specific findings as to both but only one of them is unsupported by substantial evidence.  For example, Judge Rader of the Federal Circuit Court of Appeals has reasoned that a rule requiring district court judges to change both the royalty base and royalty rate when only the royalty base lacked evidentiary support would undermine the purpose of the maximum recovery rule to minimize interference with the jury's damages award. See Cornell Univ. v.

-4-

Hewlett-Packard Co., 609 F. Supp. 2d 279, 292-93 (N.D.N.Y. 2009) (Rader, J., sitting by designation), amended on other grounds, No. 01-1974, 2009 WL 1405208 (N.D.N.Y. May 15, 2009).

In the alternative, the Court has broad discretion to order a new trial when the verdict is against the clear weight of the evidence or to prevent injustice. Jennings v. Jones, 587 F.3d 430, 436 (1st Cir. 2009). Moreover, a second trial limited to damages is proper when there is no "substantial indication that the liability and damages issues are inextricably interwoven." Phav v. Trueblood, Inc., 915 F.2d 764, 767 (1st Cir. 1990) (quoting Spell v. McDaniel, 824 F.2d 1380, 1400 (4th Cir. 1987), cert. denied, 484 U.S. 1027 (1988)).

### B. Application

The Court finds, initially, that the royalty base used by the jury, i.e., the amount of sales to be subject to royalty payment, $71,416,345, is not supported by substantial evidence. Damages experts for both parties testified that damages should be based on sales amounting to $26,858,470, and the jury was asked to find a sales amount as part of its damages calculation on the special verdict form. Furthermore, there is insufficient evidence to support WBIP's theory that the jury inflated the sales figure in order to add an "upfront royalty" of nearly double that which is otherwise due on the basis of actual sales. As a result, the Court finds that the largest royalty base

-5-

supported by the evidence is $26,858,470, the amount of infringing sales as agreed to by the parties.

On the other hand, the 13.5% royalty rate is supported by substantial evidence. The jury was charged on the <u>Georgia-Pacific</u> factors and it selected a rate that fell between the rates of 2% and 14.7% proffered by the parties' experts. The Federal Circuit has upheld royalty rates that fall between the figures advanced by the parties even when they are not clearly derived from figures advanced at trial. <u>See</u> <u>Fuji Photo Film Co. v. Jazz Photo Corp.</u>, 394 F.3d 1368, 1378 (Fed. Cir. 2005) ("[T]he jury is not bound to accept a rate proffered by one party's expert but rather may choose an intermediate royalty rate."); <u>Smithkline Diagnostics, Inc.</u> v. <u>Helena Labs. Corp.</u>, 926 F.2d 1161, 1167-68 (Fed. Cir. 1991) (explaining that a reasonable royalty rate need not be supported by specific figures advanced by either party).

Moreover, evidence that Kohler was operating at a loss does not mandate Kohler's preferred 2% rate, especially in light of evidence that Kohler sold its infringing generators for 15% less than WBIP charged its customers. The Federal Circuit has held that

> an infringer's net profit margin is not the ceiling by which a reasonable royalty is capped. The infringer's selling price can be raised if necessary to accommodate a higher royalty rate, and indeed, requiring the infringer to do so may be the only way

A10658

to adequately compensate the patentee for the use of its technology.

Douglas Dynamics, LLC v. Buyers Prods. Co., 717 F.3d 1336, 1346 (Fed. Cir. 2013) (citing Golight, Inc. v. Wal-Mart Stores, Inc., 355 F.3d 1327, 1338 (Fed. Cir. 2004) (rejecting Wal-Mart's argument that it could not raise its prices to cover the cost of a royalty because it was already selling at a loss)). Moreover, WBIP's expert testified that a 14.7% royalty, which is higher than what the jury awarded, would allow Kohler to maintain the profit margin that it required to stay in business.

As a result, the Court proffers WBIP the choice between accepting a remittitur of $3,625,893, which is a 13.5% royalty on sales of $26,858,470, or a new trial on damages. It will not, however, order a new trial based on the other grounds offered by Kohler. Kohler argued before trial that WBIP should not be permitted to aggregate Westerbeke and WBIP for the purposes of damages or introduce evidence of prior carbon monoxide lawsuits. The Court rejected those contentions and Kohler has presented no new arguments to dissuade it.

## II.  **WBIP's Motion for an Accounting and for Pre- and Post-Judgment Interest**

WBIP has moved for the Court to amend its Judgment to add 1) reasonable royalties for Kohler's infringing sales made between September, 2012 and the date of entry of judgment, by way of an "accounting", 2) pre-judgment interest, preferably at

-7-

the Massachusetts statutory rate of 12% and 3) post-judgment
interest after resolving the post-trial motions at a rate of
0.12%.

The Court will amend the judgment to account for sales
totaling $1,107,586 between September, 2012 and the entry of
judgment in May, 2013, i.e., $149,524 in additional damages
based on a royalty of 13.5%.  As a result, the total
compensatory damages award, if WBIP accepts the remittitur, is
$3,775,418.

The Court will also award pre-judgment interest because
there is no evidence that Kohler was prejudiced by any delay of
WBIP in filing suit and, indeed, Kohler abandoned its defense of
laches before trial began. See Lummus Indus., Inc. v. D.M. & E.
Corp., 862 F.2d 267, 275 (Fed. Cir. 1988) (holding that delay
does not justify withholding pretrial interest absent
prejudice).

The Court declines, however, to award pre-judgment interest
at the Massachusetts statutory rate of 12% and will instead
apply the prime rate, compounded quarterly.  The Court is
persuaded that the prime rate is an appropriate compromise
between the Massachusetts statutory rate, which is excessive,
and the miniscule Treasury Bill rate, which will not adequately
compensate WBIP for the pre-judgment period of infringement. See
Uniroyal, Inc. v. Rudkin-Wiley Corp., 939 F.2d 1540, 1545 (Fed.

A10660

Cir. 1991) (explaining that it is not necessary for a plaintiff to show that it borrowed money at the prime rate to be awarded interest at that rate); NTP, Inc. v. Research in Motion, Ltd., 270 F. Supp. 2d 751, 763 (E.D. Va. 2003) (finding the prime rate compounded quarterly to be a "conservative, middle-of-the-road approach" that places the patent-holder in as good of a position as if the infringer had taken a license rather than infringed).

Finally, the Court will award post-judgment interest at the Treasury Bill rate of 0.12%, compounded annually, to be applied to the total money judgment, including pre-judgment interest, enhanced damages, attorneys' fees and ongoing royalties.

## III. WBIP's Motion for Enhanced Damages and Attorneys' Fees

WBIP submits that the Court would be justified in enhancing damages and awarding attorneys' fees based on a finding that Kohler's infringement was willful.

### A. Enhanced Damages

#### 1. Legal Standard

Under 35 U.S.C. § 284, a district court may increase damages up to three times the amount assessed as compensatory damages when the jury finds infringement of a valid patent. The Federal Circuit employs a two-step test to determine if enhanced damages are warranted:

> First, the fact-finder must determine if an accused
> infringer is guilty of conduct, such as willfulness,
> upon which increased damages may be based. If so, the

-9-

court then exercises its discretion to determine if
damages should be increased given the totality of the
circumstances.

Mentor H/S, Inc. v. Med. Device Alliance, Inc., 244 F.3d 1365,

1380 (Fed. Cir. 2001) (citing Jurgens v. CBK, Ltd., 80 F.3d

1566, 1570 (Fed. Cir. 1996)).

    2.  **Willfulness**

        a.  **The Seagate test**

In order to prove that Kohler willfully infringed its

patents at the first step of the test for enhanced damages, WBIP

must establish, by clear and convincing evidence, that 1) Kohler

acted despite an "objectively high likelihood" that its actions

infringed a valid patent and 2) Kohler either knew about that

objectively high likelihood or the likelihood was so obvious

that it should have known about it. In re Seagate Tech., LLC,

497 F.3d 1360, 1371 (Fed. Cir. 2007).  The Federal Circuit has

explained that the so-called "objective" prong of the test, i.e.

the objectively high likelihood of infringement, is a question

for the court to determine rather than the jury. Bard Peripheral

Vascular v. W.L. Gore & Assoc., 682 F.3d 1003, 1006-07 (Fed.

Cir. 2012).  The trial court must make a

        threshold determination of objective recklessness
        [which] entails an objective assessment of potential
        defenses based on the risk presented by the patent.

-10-

**A10662**

Id. at 1006.  The question of "subjective" recklessness, i.e. if the infringer knew or should have known about the objective risk, is a question of fact for the jury. Id.

The Federal Circuit has described the former question as a "threshold determination" which "entails an objective assessment of potential defenses based on the risk presented by the patent." Id.  It has explained that the objective prong "tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement." Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc., 620 F.3d 1305, 1319 (Fed. Cir. 2010) (citations omitted).  Moreover, it has cautioned that the fact that the jury rejected the defense is not dispositive when the evidence shows that the question was close. DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc., 567 F.3d 1314, 1337 (Fed. Cir. 2009).

### b.  Application

As an initial matter, the Court does not read Bard as foreclosing it from deciding the objective prong of willfulness after submitting the question of subjective willfulness to the jury, notwithstanding the fact that the Federal Circuit referred to the objective prong as a "threshold requirement". Bard, 682 F.3d at 1006.  This Court agrees with other district courts that it is appropriate to delay ruling on the objective prong until after the jury has reached a verdict with respect to defenses

-11-

involving questions of fact. See Ill. Tool Works, Inc. v. MOC Prods. Co., 946 F. Supp. 2d 1042, 1046-47 (S.D. Cal. 2012); Cook Inc. v. Endologix, Inc., No. 09-01248, 2012 WL 3779198, at *2 (S.D. Ind. Aug. 30, 2012); see also Powell, 663 F.3d at 1237 n.2 (acknowledging that district courts have broad discretion to set the order of trial and suggesting that such discretion extends to the order of consideration of the two prongs of willfulness).

In this case, Kohler relied upon defenses of obviousness and non-infringement. The jury found that WBIP had proved, by a preponderance of the evidence, that its patents were infringed. It also found that Kohler had failed to prove, by clear and convincing evidence, that WBIP's patents were obvious. Nevertheless, the "objective recklessness" prong is not met if either defense was reasonable or presented a close question. Spine Solutions, Inc., 620 F.3d at 1319; DePuy Spine, Inc., 567 F.3d at 1337.

The Court finds that Kohler was objectively reckless under the first prong of the Seagate test. As to obviousness, the fact that all of the claim limitations of WBIP's Low-CO marine generator patents were found in combination in the prior art Phipps and Fujimoto patents does not preclude the Court from finding the defense unreasonable. Instead, the fact that Kohler's own chief engineer testified one year after Westerbeke's invention that it was impossible to design a marine

-12-

**A10664**

generator that did not produce carbon monoxide severely undercuts Kohler's argument that combining those elements would have been obvious to a person having ordinary skill in the art. Obviousness was not a reasonable defense.

With respect to non-infringement, the Court disagrees with Kohler that it was objectively reasonable for Kohler to rely on the fact that Kohler and Westerbeke employed different vendors to manufacture their respective engine controllers. Infringement is assessed by comparing the accused product and the patent claims, not the accused product and a commercial embodiment of the patent, Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1346-47 (Fed. Cir. 2003), and therefore the source of Westerbeke's commercial embodiments is simply irrelevant to a defense of non-infringement.

Finally, the Court discounts the fact that the Patent Office allowed Kohler's requests to reexamine the infringed patents because the Federal Circuit has held that the occurrence of a reexamination is not probative on the issues of validity or willfulness. See Hoechst Celanese Corp. v. BP Chems. Ltd., 78 F.3d 1575, 1584 (Fed. Cir. 1996).

### 3. Circumstances justifying enhanced damages

#### a. Read factors

Kohler's willful infringement justifies enhanced damages. In determining the appropriate amount of enhancement, district

-13-

courts apply the Read factors, which include (1) whether the infringer deliberately copied the ideas or design of the patent-holder; (2) whether it investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior during the litigation; (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the infringer's misconduct; (7) any remedial actions taken by the infringer; (8) whether the infringer was motivated by a wish to harm the patent holder; and (9) whether the infringer attempted to conceal its misconduct. See Read Corp. v. Portec, Inc., 970 F.2d 816, 826-27 (Fed. Cir. 1992), abrogated in part on other grounds by Markman v. Westview Instruments, Inc., 52 F.3d 967, 975-78 (Fed. Cir. 1995) (en banc). The Federal Circuit has repeatedly explained that

> the paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances.

Spectralytics, Inc. v. Cordis Corp., 649 F.3d 1336, 1349 (Fed. Cir. 2011) (quoting Read, 970 F.2d at 826).

### b. Application

#### i. Factors favoring no enhancement

Read factors (2), (6), (7) and (8) weigh against enhancing damages. First, the relatively short duration of infringement

-14-

A10666

does not justify enhanced damages especially when WBIP will be compensated with an ongoing royalty for post-verdict infringement.

Second, the fact that this Court denied injunctive relief in favor of an ongoing royalty weighs against penalizing Kohler for failing to take remedial action post-verdict while pre-verdict infringement is adequately compensated by the royalties awarded by the jury. Moreover, Kohler's defenses, while unreasonable, were not "totally unsupportable" or "frivolous" such that it would be fair to enhance damages based on ongoing infringement during the course of the litigation. See Gustafson, Inc. v. Intersystems Indus. Prods., Inc., 897 F.2d 508, 511 (Fed. Cir. 1990).

Third, there is insufficient evidence that Kohler acted improperly upon learning of the patent. The absence of opinion letters from outside counsel is not persuasive evidence of bad faith or willful blindness as to infringement when there is evidence that Kohler at least consulted with in-house counsel.

Finally, the Court agrees with Kohler that its project manager's reference in an internal memorandum in 2007 to "shutting the door" on competition from Westerbeke is, at most, evidence of normal business competition rather than of an improper motive justifying enhanced damages. Cf. i4i Ltd. P'ship v. Microsoft Corp., 598 F.3d 831, 858 (Fed. Cir. 2010) (finding

-15-

enhanced damages justified when infringer was motivated to render patentee's products "obsolete"). Moreover, Kohler had substantial reasons to address its carbon monoxide problems aside from driving out a competitor.

### ii. Factors favoring enhancement

On the other hand, Read factors (1), (3), (4), (5) and (9) favor enhancing damages although a few of those factors present a close call. First, while there is no "smoking gun" evidence of copying, evidence that Kohler developed its Low-CO generators with catalytic converters and electronic fuel injection components after learning about Westerbeke's product at a trade show supports the inference that Kohler was at least reckless as to whether it copied. Cf. Va. Panel Corp. v. MAC Panel Co., 133 F.3d 860, 867 (Fed. Cir. 1997) (upholding 10% enhancement based on part on finding that any copying was merely reckless and not deliberate). Kohler adduces no authority in support of its argument at the hearing that its conduct before the subject patents issued cannot be considered under Read.

Second, Kohler's conduct as a party to the litigation justifies enhancement. WBIP overstates Kohler's misconduct but the Court agrees that on several occasions, Kohler's litigation strategy went beyond zealous advocacy and unnecessarily burdened the Court and its opponent. For instance, Kohler had a third party designate documents "for outside attorneys' eyes only"

-16-

thus prohibiting WBIP's expert from viewing them and then subsequently argued that the expert's opinion was unreliable because he did not address those "key" documents.

Third, for the reasons discussed above, the case was not particularly close because, while not frivolous or advanced in bad faith, Kohler's defenses were not objectively reasonable.

Fourth, a reasonable inference to draw from the fact that Kohler did not make available at trial current and recent employees is that Kohler was content to conceal the fact that its witnesses might have revealed that Kohler knew of WBIP's patent sooner than 2010. It is not a strong inference, however, because the decision not to call a witness has many ramifications, including compliance with time limits imposed by this Court. As a result, the Court applies only marginal weight to this factor in deciding whether to enhance damages.

Finally, there is no dispute that Kohler is a much larger company than Westerbeke and has significantly more resources.

### iii. Analysis

Based on the Read factors and all of the facts and circumstances in this case, the Court concludes that it is appropriate to enhance WBIP's damages award by 50%. Kohler's conduct was not so egregious as to warrant double or treble damages for willful infringement and, as noted above, about one-half of the Read factors weighed against enhancing damages.

-17-

Assuming that WBIP accepts the remittitur, the Court will award it $5,633,126 in damages.

### B. Attorneys' fees

#### 1. Legal standard

Under 35 U.S.C. § 285, district courts may award reasonable attorneys' fees to the prevailing party only in "exceptional" cases. The prevailing party must establish the "exceptional" nature of a case by clear and convincing evidence. Cambridge Prods., Ltd. v. Penn Nutrients, Inc., 962 F.2d 1048, 1050 (Fed. Cir. 1992). Many forms of misconduct can support finding a case exceptional, including

> litigation misconduct; vexatious, unjustified, and
> otherwise bad faith litigation; a frivolous suit; or
> willful infringement.

Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd., 726 F.3d 1359, 1366 (Fed. Cir. 2013). Even in exceptional cases, however, the decision to award attorneys' fees and the amount to be awarded are within the sound discretion of the district court. Brooks Furniture Mfg., Inc. v. Dutalier Int'l, Inc., 393 F.3d 1378, 1382 (Fed. Cir. 2005).

#### 2. Application

The Court finds that Kohler's willful infringement renders this case exceptional and justifies the award of reasonable attorneys' fees and costs. It will base the award on

-18-

submissions of the parties according to a supplemental briefing
schedule that will be issued forthwith.

## IV.   __WBIP's Motion to Reconsider Denial of Permanent Injunction__

With respect to post-trial relief, the Court will not
reconsider its denial of WBIP's motion for a permanent
injunction to prevent Kohler from selling its infringing
products.  A motion for reconsideration is an "extraordinary
remedy" granted only when the movant demonstrates that the court
committed a "manifest error of law" or that newly discovered
evidence that was not previously available has come to light.
Palmer v. Champion Mortg., 465 F.3d 24, 30 (1st Cir. 2006)
(internal citations omitted).  Even if the plaintiff has a
larger manufacturing capability than previously estimated, the
Court is persuaded that it is in the public interest to have
more than one company manufacture low-carbon monoxide generators
and a more appropriate solution than a permanent injunction is
to require Kohler to pay a fair, ongoing royalty for its use of
WBIP's patents.

## V.   __WBIP's Motion for an Ongoing Royalty__

The Court advised the parties in its Order denying WBIP's
motion for a preliminary injunction that it would determine the
rate of an ongoing royalty if the parties were unable to agree
upon one.  The parties failed to agree and therefore the issue
of an appropriate ongoing royalty is before the Court.  WBIP

-19-

urges the Court to set the rate at 13.5%, the same rate found by the jury.  Kohler argues that the rate should be set at 3% because a higher rate would be tantamount to injunctive relief.

**A.   Legal standard**

An ongoing royalty for patent infringement is an appropriate alternative to permanent injunctive relief but should not be awarded as a matter of course.  Paice LLC v. Toyota Motor Corp., 504 F.3d 1293, 1314-15 (Fed. Cir. 2007).  The Federal Circuit has explained that the amount awarded should reflect the "fundamental difference" between pre-verdict and post-verdict infringement due to changes in the relative bargaining positions of the patentee and the infringer:

> Prior to judgment, liability for infringement, as well as the validity of the patent, is uncertain, and damages are determined in the context of that uncertainty.  Once a judgment of validity and infringement has been entered, however, the calculus is markedly different because different economic factors are involved.

Amado v. Microsoft Corp., 517 F.3d 1353, 1361-62 (Fed. Cir. 2008) (citing Paice, 504 F.3d at 1315, 1317).  Many district courts have therefore set the post-verdict rate higher than the pre-verdict rate based on the fact that the post-verdict infringer knows that it is infringing and the post-verdict patentee has a strong claim to enhanced damages should it abandon the hypothetical royalty negotiations and pursue a patent infringement lawsuit.  See, e.g., Mondis Tech. Ltd. v.

-20-

Chimei InnoLux Corp., 822 F. Supp. 2d 639, 649 (E.D. Tex. 2011)
(increasing rate from 0.5% to 0.75%); Creative Internet Adver.
Corp. v. Yahoo! Inc., 674 F. Supp. 2d 847, 861 (E.D. Tex. 2009)
(increasing from 20% to 23%).  Paice, however, does not
foreclose setting an identical rate to that found by the jury.
See Paice, 504 F.3d at 1315.

### B.  Application

The Court agrees with WBIP that 13.5% is an appropriate
ongoing royalty rate.  It is not persuaded by Kohler's argument
that 13.5% is excessive because the damages award was not
supported by the evidence.  Kohler adduces no authority for the
proposition that the Court must conclude that all aspects of the
damages award are tainted merely because the jury erred in
setting the royalty base.  Moreover, the jury already presumably
considered and rejected Kohler's argument that it could not
afford to pay a higher royalty when it set the rate at 13.5% and
the Court gives the jury's finding, which was made after due
consideration and a comprehensive charge on the law,
considerable deference in setting the ongoing royalty.

**A10673**

**ORDER**

For the foregoing reasons,

1) Defendant's motion for a new trial or remittitur
   (Docket No. 225) is **ALLOWED**, in part, and **DENIED**, in
   part. If plaintiff agrees to a remittitur reducing
   the jury award of compensatory damages to $3,775,418,
   it will file written notice of its acceptance thereof
   on or before Wednesday, February 26, 2014. In default
   of such notice, the Court will schedule a new trial
   limited to the issue of damages.

2) Plaintiff's motion for an accounting and for pre- and
   post-judgment interest (Docket No. 232) is **ALLOWED**, in
   part, and **DENIED**, in part. The Court will amend the
   judgment to include royalties of $149,524 based upon
   infringing sales of $1,107,586 between September, 2012
   and the date of entry of judgment in May, 2013.
   Defendant will pay pre-judgment interest at the prime
   rate,[1] compounded quarterly, and post-judgment interest
   at the weekly average 1-year constant maturity
   Treasury rate of 0.12%, compounded annually. Post-
   judgment interest is to be applied to the total money
   judgment, including pre-judgment interest, enhanced
   damages, attorneys' fees and ongoing royalties.

3) Plaintiff's motion for enhanced damages and attorneys'
   fees and costs (Docket No. 230) is **ALLOWED**, in part,
   and otherwise taken under advisement. The Court will
   enhance compensatory damages by 50% for a total award
   of $5,663,126 and will award reasonable attorneys'
   fees and costs. The plaintiff is directed to submit a
   supplemental memorandum on or before Wednesday, March
   5, 2014 with respect to the amount of fees and costs
   to be awarded. Defendant's opposition, if any, is due
   by Wednesday, March 19, 2014.

4) Plaintiff's motion for reconsideration of its motion
   for a permanent injunction (Docket No. 259) is **DENIED**.

---

[1]See Average Majority Prime Rate Charged by Banks on Short-Term
Loans to Business (1956-2013), available at
http://www.federalreserve.gov/releases/h15/data.htm (last
updated Dec. 19, 2013).

**A10674**

5) Plaintiff's motion for an ongoing royalty (Docket No. 223) is **ALLOWED** and is set at a rate of 13.5%.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated February 12, 2014

Memorandum and Order, Dated September 8, 2014 (DKT 295)

**United States District Court**
**District of Massachusetts**

```
                                    )
WBIP, LLC,                          )
                                    )
          Plaintiff,                )
                                    )      Civil Action No.
          v.                        )      11-10374-NMG
                                    )
KOHLER CO.,                         )
                                    )
          Defendant.                )
                                    )
```

<u>MEMORANDUM AND ORDER</u>

GORTON, J.

Plaintiff WBIP, LLC ("WBIP") alleges that defendant Kohler Co. ("Kohler") infringes its patents directed to marine power generators. The Court has previously ruled that WBIP is entitled to reasonable attorneys' fees and costs pursuant to 35 U.S.C. § 285, which entitles the prevailing party in an exceptional patent infringement case to reasonable fees. The parties have submitted memoranda with respect to the reasonableness of WBIP's requested fees and Kohler has moved for the disallowance of certain costs claimed by WBIP. WBIP has also submitted a final, agreed-to accounting of pre-judgment interest.

For the reasons that follow, the Court will award to WBIP $1,660,444.69 in attorneys' fees, $20,882.14 in costs and $423,267 in pre-judgment interest.

-1-

I. **Attorneys' Fees**

WBIP seeks attorneys' fees totaling $2,288,050 for the work performed by three attorneys. Kohler responds that the request is excessive and that an award between $637,053 and $955,579 would be appropriate.

    A. **Legal Standard**

Courts generally apply the "lodestar approach" when awarding attorneys' fees pursuant to 35 U.S.C. § 285. Agfa Corp. v. Creo Prods., Inc., No. 00-10836, 2004 WL 2387288, at *1 (D. Mass. Oct. 5, 2004) (citing Codex Corp. v. Milgo Elec. Corp., 717 F.2d 622, 631-32 (1st Cir. 1983)). The lodestar figure is calculated by "multiplying the number of hours productively spent by a reasonable hourly rate." Torres-Rivera v. O'Neill-Cancel, 524 F.3d 331, 336 (1st Cir. 2008) (citing Hensley v. Eckerhart, 461 U.S. 424, 433 (1983)). After calculating the initial lodestar figure, Court has the discretion to adjust that figure upwards or downwards based on equitable factors such as the results obtained in the litigation. Id. (citing Hensley, 461 U.S. at 434).

    B. **Application**

        1. **Hours Expended**

The Court finds that the lodestar amount requested by WBIP reflects a reasonable number of hours worked on this complex, hard-fought patent litigation. Kohler's arguments for reducing

-2-

**A50**

the number of hours to be factored into the lodestar are, with one exception, unavailing.

First, with respect to fees incurred prior to May 15, 2013, WBIP has provided sufficient detail in its itemized statement and the hours it spent preparing for trial were, in the view of this Court, reasonable.  The Court will, however, reduce by 50% the hours billed as travel time for Attorney Zeliger because WBIP has not provided an account of how much of his travel time was allocated to billable tasks.  WBIP has requested $28,247.50 in fees for 41.7 hours of travel time and therefore the Court will subtract half of that amount from its lodestar calculation.

Next, WBIP has not waived its right to request fees incurred between May, 15, 2013 and June 17, 2013 merely because it did not include them in its motion for fees filed on June 18, 2013.  All of the work performed after May 15, 2013 concerned post-trial matters and it would have been presumptuous for WBIP to assume, as of June 18, 2013, that the Court would rule in its favor on those motions.

WBIP may recover fees incurred with respect to post-trial filings that were no successful.  While the Court has the discretion to subtract unreasonable or unproductive time from the lodestar, a party is not required to prevail on every disputed issue during the litigation to avoid a reduced fee award.  Thus, while WBIP was unsuccessful in persuading the

-3-

Court to reconsider its denial of a permanent injunction, it will nevertheless be reimbursed for the $14,590 in fees incurred in litigating that motion. The only reason that the Court gave for denying permanent injunctive relief was WBIP's limited manufacturing capacity and the Court acknowledged in its denial of the motion that it may have misapprehended the relevant facts. Thus, there was a colorable basis for the motion to reconsider even if it was ultimately unsuccessful. Similarly, WBIP is entitled to fees incurred in opposing the motion for a new trial or a remittitur, even though the Court ultimately gave WBIP a choice between accepting a remittitur or re-trying the case, because the remittitur still resulted in an award of significant damages and WBIP avoided a new trial with its attendant risks.

WBIP is also entitled to fees for time spent responding to pleadings filed by Kohler with respect to the reexamination of patents by the U.S. Patent and Trademark Office. WBIP has not sought fees incurred during the reexamination proceedings themselves and it was appropriate for counsel to respond to Kohler's argument that reexamination of the subject patents weighed against a finding of willfulness or that the proceedings were exceptional.

-4-

**A52**

## 2.  Hourly Rate

The hourly rates claimed by counsel are also reasonable. Although its counsel agreed to a contingency fee, WBIP has provided the hourly rates normally charged by counsel.  Michael Zeliger, a partner at K&L Gates who specializes in intellectual property litigation, billed at rates between $600 and $735 per hour and spent 1,054.4 hours on the case.  David Simons, who has worked in patent litigation since 1998, billed at rates ranging from $580 to $650 per hour and spent 2,027.9 hours.  Andrea Gates, an associate specializing in intellectual property litigation, charged between $345 and $425 an hour and spent 949.8 hours on the litigation.  The Court finds that those hourly rates are commensurate with those charged by equally experienced patent litigators in Boston.

## 3.  Discretionary Adjustment

After subtracting 50% of Attorney Zeliger's travel time, the lodestar figure is $2,213.926.[1]  The Court will exercise its discretion by reducing that amount by 25% such that the final award will be $1,660,445.  While this case was an "exceptional" case warranting an award of attorneys' fees, the Court previously declined to award double or treble damages for

---

[1] In the interest of brevity and common sense, the Court has rounded off all amounts to the nearest dollar.

willful infringement and it finds that a similar reduction is
warranted with respect to attorneys' fees.

## II.  Costs

WBIP seeks $23,251 in costs.[2]  Kohler agrees that $13,644 is
taxable to Kohler but objects to $7,238 spent to obtain
deposition transcripts which were not introduced into evidence
at trial.

### A.  Legal Standard

Fed. R. Civ. P. 54(d)(1) provides that

> [u]nless a federal statute, these rules, or a court
> order provides otherwise, costs ... should be allowed
> to the prevailing party.

Congress has also set boundaries for what costs of litigation
are taxable.  For instance, 28 U.S.C. § 1920 provides, in
relevant part, that a court may award to prevailing parties fees
imposed by the clerk of court, "[f]ees for printed or
electronically recorded transcripts necessarily obtained for use
in the case," and fees for obtaining copies of materials where
the copies are "necessarily obtained for use in the case."

Here, the dispute centers on whether the costs of obtaining
deposition transcripts are taxable to Kohler.  The First Circuit
has held that depositions introduced into evidence or used at

---

[2] WBIP has since acknowledged that its original request
erroneously included $2,369 in nontaxable costs and therefore
amended its request.  It now contends that it is entitled to
costs totaling $20,882.

trial are taxable. <u>Templeman</u> v. <u>Chris Craft Corp.</u>, 770 F.2d 245, 249 (1st Cir. 1985). A district court has the discretion to award costs for depositions not put into evidence or used at trial if "special circumstances warrant it." <u>Id.</u>

### B. Application

Kohler does not oppose awarding WBIP $13,644 in costs associated with filing its complaint ($350), certain deposition transcripts ($3,588) or copying fees ($9,706). The Court agrees and will tax those costs to Kohler.

Kohler does oppose awarding the costs of obtaining transcripts from the depositions of several witnesses.

WBIP acknowledged in its opposition to Kohler's Motion for Disallowance of Costs that it was not entitled to reimbursement of the $2,369 it spent to obtain deposition transcripts of two experts retained by Kohler because it had not used those transcripts at trial. The Court will therefore allow the motion by Kohler to disallow the $2,369 in costs to obtain the deposition transcripts of Robert Brooks and Christopher Barry.

Kohler opposes awarding the cost of obtaining the transcripts of the depositions of Greg Klompenheuver and Richard Locke, both of whom were Fed. R. Civ. P. 30(b)(6) witnesses designated by Kohler. WBIP did not call them as witnesses or seek to admit their deposition testimony into evidence but it did use the transcripts to impeach two witnesses for Kohler.

-7-

Kohler contends that the transcripts were not "necessarily obtained" for use at trial because, if they were necessary, WBIP would have read them into the record. The Court declines to adopt that narrow reading of 28 U.S.C. § 1920, which contemplates that a transcript may be "used" even if it is not offered into evidence. Here, it is sufficient that the transcripts of the depositions of two Kohler employees designated as Rule 30(b)(6) witnesses were used for impeachment purposes.

Second, Kohler opposes an award of costs for obtaining the transcripts of the depositions of Paul Wareham and James Carroll, third parties who were subpoenaed and deposed by Kohler. Kohler also designated portions of the testimony of those witnesses in its Fed. R. Civ. P. 26(a) pretrial submissions. Similarly, Kohler opposes the award of costs for obtaining transcripts of depositions of three employees of Westerbeke Corporation (an affiliate of WBIP) who were deposed by Kohler but were not called to testify at trial. Under the circumstances, it was appropriate for counsel for WBIP to obtain the transcripts as part of its preparation for trial. See Martinez v. Cui, No. 06-40029-FDS, 2009 WL 3298080, at *2 (D. Mass. Apr. 13, 2009) (explaining that depositions taken at request of opposing party may be taxable because they are not

taken for investigative or discovery purposes or purely for reasons of convenience).

In sum, the Court will award WBIP $20,882 in costs.

### III. **Pre-Judgment Interest**

In its February 12, 2014 Memorandum and Order, the Court ordered Kohler to pay prejudgment interest at the prime rate, compounded quarterly. The parties have conferred and they agree that Kohler should be ordered to pay $423,267 in pre-judgment interest. The final order will be amended accordingly.

### **ORDER**

For the foregoing reasons,

1) Kohler's motion for disallowance of costs (Docket No. 284) is, with respect to the expenses of obtaining the transcripts of the depositions of Christopher Barry and Robert Brooks, **ALLOWED,** but is otherwise **DENIED;**

2) Kohler is ordered to pay WBIP for $1,660,445 in attorneys' fees;

3) Kohler is taxed $20,882 in costs incurred by WBIP; and

4) Kohler is to pay $423,267 in pre-judgment interest to WBIP.

**So ordered.**

/s/ Nathaniel M. Gorton
Nathaniel M. Gorton
United States District Judge

Dated September 8, 2014

Final Amended Judgment, Dated September 8, 2014 (DKT 296)

**United States District Court**
**District of Massachusetts**

```
                                    )
WBIP, LLC,                          )
                                    )
            Plaintiff,              )
                                    )   Civil Action No.
            v.                      )   11-10374-NMG
                                    )
KOHLER CO.,                         )
                                    )
            Defendant.              )
                                    )
```

**FINAL AMENDED JUDGMENT**

This Order amends the Orders entered at Docket Nos. 212, 274 and 280 and constitutes the final judgment in this case. Judgment is entered as follows:

1) in favor of plaintiff WBIP, LLC and against defendant Kohler, Co.; and

2) defendant is ordered to pay plaintiff $8,285,087 based upon the following awards of damages, interest, fees and costs:

   a) $3,625,893 in compensatory damages;

   b) $494,436 in damages corresponding to infringing sales between September, 2012 and May, 2013;

   c) $2,060,164 in enhanced damages;

   d) $423,267 in pre-judgment interest;

   e) $20,882 in taxable costs; and

   f) $1,660,445 in attorneys' fees.

**So ordered.**

Nathaniel M. Gorton
United States District Judge

Dated September 8, 2014

**A58**

Patent No. 7,314,044

US007314044B2

(12) **United States Patent**    (10) **Patent No.:**    **US 7,314,044 B2**

Westerbeke    (45) **Date of Patent:**    **Jan. 1, 2008**

(54) **MARINE EMISSIONS CONTROL**

(75) Inventor: **John H. Westerbeke**, Milton, MA (US)

(73) Assignee: **WBIP, LLC**, Taunton, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **11/624,536**

(22) Filed: **Jan. 18, 2007**

(65) **Prior Publication Data**

US 2007/0113543 A1    May 24, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 10/974,380, filed on Oct. 27, 2004.

(60) Provisional application No. 60/515,166, filed on Oct. 27, 2003.

(51) **Int. Cl.**
**F02D 41/00**    (2006.01)
**F02D 41/02**    (2006.01)

(52) **U.S. Cl.** ......................... **123/672**; 60/274; 60/298; 440/89 B; 440/89 H

(58) **Field of Classification Search** ............... 123/672; 60/274, 298, 299, 320, 324; 440/89, 89 B, 440/89 C; 44/89 H
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,791,146 A | 2/1974 | Hayashi | |
| 4,707,984 A | 11/1987 | Katsuno et al. | |
| 4,884,066 A | 11/1989 | Miyata et al. | |
| 5,125,231 A | 6/1992 | Patil et al. | |
| 5,203,167 A | * | 4/1993 | Lassanske et al. ............ 60/298 |
| 5,359,853 A | 11/1994 | Shimizu | |
| 5,408,827 A | * | 4/1995 | Holtermann et al. ......... 60/298 |
| 5,536,477 A | 7/1996 | Cha et al. | |

| | | | |
|---|---|---|---|
| 5,609,023 A | 3/1997 | Katoh et al. | |
| 5,619,852 A | 4/1997 | Uchikawa | |
| 5,715,794 A | 2/1998 | Nakamura et al. | |
| 5,787,847 A | * | 8/1998 | Ozawa et al. ......... 123/73 AD |
| 5,788,547 A | * | 8/1998 | Ozawa et al. ............ 440/89 R |
| 5,797,775 A | * | 8/1998 | Ozawa et al. .................. 440/1 |
| 5,809,773 A | 9/1998 | Gottberg | |
| 5,813,222 A | 9/1998 | Appleby | |
| 5,902,158 A | 5/1999 | Nakase et al. | |
| 5,911,609 A | 6/1999 | Fujimoto et al. | |
| 5,911,610 A | * | 6/1999 | Fujimoto .................. 440/89 R |
| 5,921,076 A | 7/1999 | Krutzsch et al. | |
| 5,937,637 A | 8/1999 | Fujishita et al. | |
| 6,044,643 A | 4/2000 | Ittner et al. | |
| 6,047,542 A | 4/2000 | Kinugasa et al. | |
| 6,053,785 A | * | 4/2000 | Kato et al. ................ 440/89 R |
| 6,120,335 A | * | 9/2000 | Nakase et al. ............ 440/89 R |
| 6,122,909 A | 9/2000 | Murphy et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

WO    WO 97/47863    12/1997

*Primary Examiner*—Mahmoud Gimie
(74) *Attorney, Agent, or Firm*—Fish & Richardson P.C.

(57)    **ABSTRACT**

A marine engine has an exhaust system including a catalyst cooled by a flow of coolant, a coolant injector that injects coolant into the flow of exhaust at a point downstream of the catalyst, and a sensor arranged to sense a characteristic of the flow of exhaust, such as oxygen or carbon monoxide level. The engine controller is configured to control an air/fuel ratio of the engine as a function of the sensed exhaust flow characteristic.

**19 Claims, 5 Drawing Sheets**



## US 7,314,044 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 6,122,910 A | 9/2000 | Hoshi et al. |
| 6,309,268 B1 | 10/2001 | Mabru |
| 6,321,530 B1 | 11/2001 | Hoshi et al. |
| 6,432,368 B1 | 8/2002 | Feitelberg et al. |
| 6,435,925 B1 | 8/2002 | Mabru |
| 6,446,431 B1 | 9/2002 | Brück |
| 6,461,208 B2 * | 10/2002 | Suzuki et al. ............. 440/89 R |
| 6,511,355 B1 | 1/2003 | Woodward |
| 6,579,137 B2 | 6/2003 | Mabru |
| 6,655,341 B2 | 12/2003 | Westerbeke, Jr. |
| 6,799,422 B2 * | 10/2004 | Westerbeke et al. .......... 60/289 |

* cited by examiner



FIG. 1



FIG. 2



FIG. 3



FIG. 4

**A100**



FIG. 5



FIG. 6



FIG. 7

US 7,314,044 B2

1

# MARINE EMISSIONS CONTROL

## CLAIM OF PRIORITY

This application is a continuation of U.S. Ser. No. 10/974,380, filed Oct. 27, 2004, and claims priority under 35 U.S.C. § 119(e) to U.S. Provisional Patent Application Ser. No. 60/515,166, filed on Oct. 27, 2003, the entire contents of which are hereby incorporated by reference.

## TECHNICAL FIELD

This invent relates to controlling emissions from marine engines.

## BACKGROUND

Reducing combustion engine exhaust emissions is a continued object of research and development, driven both by awareness of environmental effects and increased government regulation. Some of the most effective and cost-efficient emissions controls involve the use of downstream chemical catalysts that further oxygenate incompletely combusted compounds. Sometimes exhaust is directed sequentially through multiple catalyst beds. It is generally understood that higher catalyst temperatures provide more effective emissions control. Much exhaust catalysis development has been focused on developing catalytic converters for automotive applications, in which engine speed varies substantially with vehicle speed and gear selection.

Marine engines and generators are subjected to specific regulations, both for emissions and for safety concerns. For example, exposed engine surface temperatures (including exhaust system surface temperatures) must be kept low to avoid increased risk of fire hazard. Seawater is injected into many marine engine exhaust flows so as to cool exiting exhaust gases, and seawater is also frequently circulated through exhaust system components so as to maintain low surface temperatures.

Further improvements in exhaust emissions controls for constant and variable speed engine applications are desired, particularly improvements suitable for marine use.

## SUMMARY

According to one aspect of the invention, a marine engine includes an exhaust system having a catalyst cooled by a flow of coolant and arranged to intercept a flow of exhaust, a coolant injector that injects coolant into the flow of exhaust at a point downstream of the catalyst, and a sensor arranged to sense a characteristic of the flow of exhaust (such as oxygen level). The engine also includes an engine controller configured to control an air/fuel ratio of the engine as a function of the sensed exhaust flow characteristic.

In some instances, the engine controller is also configured to govern engine speed with respect to a constant speed while maintaining the air/fuel ratio.

In some embodiments the sensor is disposed downstream of the coolant injector.

As mentioned, the sensor may be an oxygen sensor, such as a narrow-band oxygen sensor.

Some embodiments include a second sensor, such as a carbon monoxide sensor.

For some applications the engine controller maintains the air/fuel ratio at a stoichiometric level, or lightly leaner than stoichiometric.

2

In some cases the engine controller controls the air/fuel ratio by controlling an electronic fuel injection system.

Preferably, the catalyst is configured to simultaneously reduce oxides of nitrogen, carbon monoxide and hydrocarbons. In some instances the catalyst is configured to reduce carbon monoxide to between about 9 parts per million and 30 parts per million.

In some applications, the exhaust system further comprises a water-jacketed exhaust manifold.

Some such engines are coupled to drive an electronic generator.

Another aspect of the invention features a method of controlling emissions from an internal combustion engine configured for marine application. The method includes flowing a flow of coolant through an exhaust system of the engine to cool a catalyst positioned to intercept a flow of exhaust flowing along the exhaust system, injecting coolant into the flow of exhaust at a point downstream of the catalyst, sensing a characteristic of the flow of exhaust (such as oxygen level), and controlling an air/fuel ratio of the engine as a function of the sensed exhaust flow characteristic. In some embodiments the method also includes monitoring a second exhaust flow characteristic, such as carbon monoxide level, downstream of the catalyst and providing a warning to an operator when the second exhaust flow characteristic reaches a threshold level. In some instances the method includes controlling the air/fuel ratio with electronic fuel injection. Some examples also include flowing coolant through a jacket about an exhaust manifold of the engine.

The details of one or more embodiments of the invention are set forth in the accompanying drawings and the description below. Other features, objects, and advantages of the invention will be apparent from the description and drawings, and from the claims.

## DESCRIPTION OF DRAWINGS

FIG. 1 is a perspective view of a marine engine-generator set.

FIG. 2 is a schematic cross-section illustrating flow through the exhaust manifold and elbow of the engine-generator set of FIG. 1.

FIG. 3 illustrates an alternative second exhaust manifold construction and catalyst arrangement.

FIG. 4 is a perspective view of an engine exhaust manifold.

FIG. 5 is a partial cross-sectional view of the manifold of FIG. 4.

FIG. 6 shows a schematic view of a marine exhaust system according to the invention.

FIG. 7 is a detail view of a float valve and water level indicator contained within the marine exhaust system.

Like reference symbols in the various drawings indicate like elements.

## DETAILED DESCRIPTION

Referring first to FIG. 1, an engine-generator set 10 includes an internal combustion engine 12 driving an electrical generator 14. Engine 10 has an exhaust manifold 16 that receives and combines exhaust gasses from each cylinder of the engine and directs the combined exhaust gasses through a catalyst contained within the manifold, as is discussed in more detail below. Secured to the outlet of the manifold 16 is an exhaust elbow 18. In a marine application, water, such as cold seawater, is supplied to manifold 16

**A104**

US 7,314,044 B2

3

through hose 30. The water is directed through cooling passages in manifold 16 and elbow 18 to keep the outer surfaces of the exhaust system at or below a desired temperature, and is then injected into the exhaust stream in elbow 18, downstream of the catalysts, to cool the exhaust.

In one embodiment, a variable is monitored with a feedback sensor 19 located upstream of the catalyst which provides a control signal to electronic controller 24. In one embodiment, controller 24 provides controls the air fuel ratio of the engine 12 to correspond to a 1.0 stoichiometric ratio. In other embodiments, the air fuel ratio of the engine 12 is slightly lean. In one embodiment, the variable monitored by the feedback sensor is 19 is oxygen and the feedback sensor 19 is a narrow-band oxygen sensor.

In one embodiment, an exhaust sensor 23 is mounted downstream of the catalyst. In one embodiment, the exhaust sensor 23 measures oxygen as a proxy for indirectly determining the level of carbon monoxide. In this application, a wide-band oxygen sensor can be used. In other applications, the exhaust sensor 23 directly measures carbon monoxide. The signal output from the exhaust sensor 23 can provide an anticipatory alarm apprising an operator when the catalyst 32 is functioning with reduced effectiveness. Accordingly, the exhaust sensor can inform the operator if the catalyst 32 has been damaged by seawater and requires replacement. The exhaust sensor 23 can be a MEMS device in some embodiments.

With continued reference to FIG. 1 and in an alternative embodiment, air is delivered to manifold 16, through a controllable dump valve 20, from belt-driven air pump 22. A fixed speed, electric air pump may also be employed. Valve 20 is controlled by an electronic controller 24 to moderate the flow of air into manifold 16 as a function of the load placed on engine 12, such as by controllably dividing the output of the air pump between manifold 16 and exhaust elbow 18. Controller 24 varies a signal to valve 20 as a function of engine load, or as a function of a sensible parameter that changes with engine load. In the illustrated embodiment, controller 24 senses an output voltage and/or current of generator 14, such as at generator output 26, and controls valve 20 accordingly. Controller 24 also senses engine speed, such as by receiving a signal from flywheel magnetic reluctance sensor 28, and controls engine inputs (such as fuel and/or air flow) to maintain engine speed at or near a desired set point, so as to maintain the frequency of generator 14. As an alternative to controlling a dump valve 20 splitting pump air flow between manifold 16 and either atmosphere or a lower point in the exhaust stream, a variable speed electric air pump 22a is employed in some instances, with controller 24 varying the operating speed of pump 22a as a function of engine load. In such cases, the entire output of pump 22a is perfectly ported directly to manifold 16.

Referring to now FIG. 2, a cylindrical catalyst 32 containing a catalyst bed is shown disposed within the exhaust manifold 16. The catalyst 32 is wrapped in an insulating blanket 96, such as a ⅛ (3.2 millimeter) thick sheet of cotton binding containing mica, for example, that helps reduce heat transfer from the catalyst into the housing and also helps to isolate the delicate catalyst bed from shocks and vibrations. In one embodiment, controlled air flow is injected either just forward of the catalyst at port 38a, or at the far end of the manifold at port 38b so as to preheat the injected air flow. Single catalyst 32 may be of any preferred composition, such as a palladium-platinum catalyst, for example. In other embodiments, no air flow injection is required.

4

With continued reference to FIG. 2 and in one embodiment, catalyst 32 is configured and dimensioned for fitting within a marine exhaust manifold 16. In one presently preferred embodiment, the catalyst 32 has a diameter of 3.66 inch (9.30 cm) and a length of 6.0 inch (15.24 cm). The catalyst 32 can include a round ceramic having a diameter of 3.0 inch (7.62 cm) and a length of 6.0 inch (15.24 cm) and a 400-cells per inch with 95-grams per cubic foot of a 3-to-1 ratio of platinum to rhodium. The catalyst 32 can also include a specialized wash coat designed to be the most effective at a 1.0 stoichiometric air fuel ratio. The catalyst 32 is configured to simultaneously reduce oxides of nitrogen, carbon monoxide and hydrocarbons. In one preferred embodiment, the catalyst 32 is configured to reduce carbon monoxides levels to below 50 part per million, preferably to below 35 parts per million, and most preferably to below ambient levels, i.e., 9 part per million.

Other catalyst configurations are contemplated within the exhaust manifold 16. For example as illustrated in FIG. 3, the catalyst 32 in an alternative embodiment can include a first catalyst 33 an second catalyst 36 contained within a second bore of the manifold, parallel to and offset from the first bore. The manifold can be equipped with a removable cover 44 through which the air is injected, enabling loading of both of the catalysts into their respective bores. As in the first illustrated embodiment, after flowing through both catalyst beds the exhaust flow is combined with cooling water in elbow 18a.

The exhaust is combined and directed through a first catalyst bed 33, through a space 34, and then through a second catalyst bed 36. The air is injected into the manifold in space 34, through air inlet 38. Cooling water flows around both catalyst beds, through appropriate channels cast into manifold 16a and elbow 18, and is then injected into the exhaust flow. In marine applications where the cooling seawater can have a high salt content, the water injection outlets 40 in elbow 18 are preferably at least about six inches (15 centimeters) below the lowest edge of the catalysts or the upper edge of any internal elbow baffles 42 positioned to avoid salt water splash on the hot catalysts. Also, it is preferred that for such marine applications manifold 16a and elbow 18 be cast of a corrosion-resistant material, such as an aluminum-magnesium alloy. It will be apparent from FIG. 2 that the connection between manifold 16a and elbow 18 can be readily positioned between the two catalyst beds, such that second catalyst 36 is carried within elbow 18.

The construction of the catalyst 32 according to this embodiment can include a first catalyst bed 33 which preferably includes a catalyst such as one containing rhodium as the precious metal, selected to reduce hydrocarbon and NO$_x$ emissions. For example, one preferred catalyst bed is in the form of a cylinder 3.0 inches (76 millimeters) in diameter and 2.6 inches (6.7 centimeters) long. The ceramic substrate has a cross-sectional area of about 7 square inches (45 square centimeters) and has about 400 cells per square inch (62 per square centimeter), and is washed with 6.1 grams per cubic foot (0.06 grams per cubic centimeter) of rhodium. Such a catalyst bed is available from ASEC/Delphi Exhaust and Engine Management of Flint, Mich. Catalysis efficiency within first catalysis bed 33 may be accomplished by various methods known in the art, either in carbureted or fuel-injection systems with oxygen sensors, to remove as much of the overall emissions components as possible.

The second catalyst bed 36 contains a catalyst selected to further reduce CO emissions. In one arrangement, second catalyst bed 36 contains a three to one ratio of palladium and

A105

US 7,314,044 B2

<table>
<tr><td>5</td><td>6</td></tr>
</table>

platinum, carried on a honey-combed substrate of ceramic or metal. The active precious metals are washed onto the substrate and then heated to set the metals onto the surface as known in the art. An example of a preferred second catalyst bed is a metal substrate in the form of a cylinder of 5.0 inch (12.7 centimeter) diameter and 6.3 inch (16 centimeter) length, with 19.6 square inches (126 square centimeters) of cross-sectional area, washed with 40 grams per cubic foot (0.4 grams per cubic centimeter) each of palladium and platinum. Such a catalyst is available from Miratech of Tulsa, Okla., for example. Second catalyst **36** will tend to run hotter, such as perhaps about 400 degrees Fahrenheit (220 degrees Celsius) hotter than the rhodium catalyst. Preferably, the temperature of the combined air and exhaust entering the second catalyst is about 1000 degrees Fahrenheit (540 degrees Celsius).

FIGS. **4** and **5** show another example of a catalyst exhaust manifold **16***b*. The catalyst **32** is loaded as a cylinder from the large end of the manifold, with the NO$_x$ catalyst loaded into bore **46** (FIG. **5**) and the CO catalyst loaded into bore **48** (FIG. **5**). In this example, coolant enters the manifold at inlet **50** and leaves the manifold at outlet **52**, without joining the exhaust stream. The cooling channels **54** cast into the manifold are partially shown in FIG. **5**, providing a closed flow path between inlet **50** and outlet **52**.

Various control techniques may be employed to vary air injection rate for good CO reduction. In one embodiment, the air injection rate is varied as a function of approximate engine load. In one test using a Westerbeke 4-cylinder, 1.5 liter gasoine engine and the palladium-platinum second catalyst bed described above, the lowest CO emissions were provided by varying the rate of air flow into the manifold ahead of the second catalyst (at 100 liter per minute graduations) according to the following table:

| Engine Load (Percent Full Load) | Air Flow Rate (liters per minute) |
|---|---|
| 100 | 500 |
| 75 | 500 |
| 50 | 500 |
| 25 | 400 |
| 10 | 300 |
| 0 | 300 |

Of course, optimal air flow rates will be different for different applications. The air flow controller can be configured to interpolate between adjacent entries in the load-air correlation table to provide finer control sensitivity.

There are various ways to determine approximate engine load, such that a table like that shown above can be used to determine an optimal air injection rate. For example, if substantially all of the engine load is provided by an electrical generator (as shown in FIG. **1**), monitoring the electrical output of the generator can provide a good estimate of engine load. Current can be monitored as a most direct measure of electrical load, such as providing a current transformer about the output of the generator. In some cases in which generator voltage is known to predictably decrease a measurable amount with load, voltage may alternately be monitored. In most cases, however, current monitoring is preferred for systems with proper generator voltage regulation. Other options include measuring engine output driveshaft torque (or some measurable parameter that varies predictably with torque), or measuring the pressure within the manifold, such as upstream of the catalyst beds, or exhaust backpressure below the catalysts and above a muf-

fler or other exhaust restriction. Because the engine speed is substantially fixed in the primary embodiments, other parameters may also be found to vary predictably with engine load, such as throttle position and fuel flow rate, for example.

As an alternative to controlling the air injection rate as a function of load, the air injection rate can be controlled as a function of other measured parameters that signify catalysis efficiency. For example, a CO sensor may be provided downstream of the catalyst as described above.

With renewed reference to FIG. **2** an in one embodiment, an exhaust pressure sensor **62** can be placed in the manifold **16**, to measure exhaust manifold pressure, or downstream of the catalyst **32** to measure exhaust backpressure developed upstream of a muffler or other exhaust restriction (not shown). If the air pump delivering air to inlet **38** is not a fixed displacement pump, changes in exhaust backpressure with engine load can cause a significant fluctuation in the injected air rate. This fluctuation will tend to work against the desired variation of air flow rate with engine load, as backpressure, which rises with engine load, will cause a reduction in air injection rate that should be accounted for in the control of the pump or valve. It will be understood that sensors **62** are shown in optional and alternative locations, and are not necessary in some embodiments, such as when air flow rate is controlled as a function of generator current or some other primary control parameter.

Referring now to FIG. **6**, an exhaust system **60** for the engine **12** mounted in a boat **67** is shown. The exhaust manifold **16** directs exhaust gases through the catalyst **32** and exhaust elbow **18** and past a water injected exhaust elbow **65**. To reduce the operating temperature of the exhaust components, cooling seawater is injected at the inlet to the exhaust elbow **70**. The exhaust gases and cooling water then pass through an exhaust valve and water level indicator **75** (discussed in more detail below). The exhaust gasses and cooling water enter a water lift marine muffler **80** before proceeding to a high point at the U-bend **85** and out of the boat through the through-hull fitting **90** above the water line **97**. In one embodiment, the muffler **80** includes a drain **95**.

In marine applications, it is desirable to prevent cooling seawater from contacting the catalyst **32** disposed within the exhaust manifold **16**. It is also desirable to prevent cooling seawater from reaching the engine **12**, which can result in catastrophic failure. Referring to FIG. **7**, an exhaust valve and water level indicator **75** are shown and disposed within the marine exhaust manifold **16** between the water injected exhaust elbow **65** and the water lift muffler **80** (FIG. **6**). The valve/indicator **75** can include a float valve **105**, such as a ball valve and a water level indicator **110** combined in a housing **116**. The ball valve **105** translates along the housing **115** between ball valve guides **120***a*, **120***b* and is supported by ball valve supports **130***a*, **130***b* when the ball valve is disposed in an open position **135** (shown in phantom). When the ball valve **105** ascends upward to the closed position (as shown) the surface of the ball valve **105** contacts the housing **115** along valve sealing areas **140***a*, **140***b* thereby closing the valve. The rising water level within the housing **115** floats the water level indicator **110** upward to an alarm level which provides a signal **145** to warn an operator that the muffler **80** is overfilled.

A number of embodiments of the invention have been described. For example, the engine **12** as described above can be used for propulsion in marine applications. Nevertheless, it will be understood that various modifications may be made without departing from the spirit and scope of the

**A106**

US 7,314,044 B2

7

invention. Accordingly, other embodiments are within the scope of the following claims.

What is claimed is:

**1**. A marine engine comprising:

an exhaust system including

a catalyst cooled by a flow of coolant, the catalyst arranged to intercept a flow of exhaust;

a coolant injector that injects coolant into the flow of exhaust at a point downstream of the catalyst; and

a sensor arranged to sense a characteristic of the flow of exhaust; and

an engine controller configured to control an air/fuel ratio of the engine as a function of the sensed exhaust flow characteristic;

wherein the engine controller is also configured to govern engine speed with respect to a constant speed while maintaining the air/fuel ratio.

**2**. The marine engine of claim **1**, wherein the sensor is an oxygen sensor.

**3**. The marine engine of claim **2**, wherein the sensor is a narrow-band oxygen sensor.

**4**. The marine engine of claim **1**, further comprising a second sensor.

**5**. The marine engine of claim **4**, wherein the second sensor is a carbon monoxide sensor.

**6**. The marine engine of claim **1**, wherein the engine controller maintains the air/fuel ratio at a stoichiometric level.

**7**. The marine engine of claim **1**, wherein the engine controller controls an electronic fuel injection system.

**8**. The marine engine of claim **1**, wherein the catalyst is configured to simultaneously reduce oxides of nitrogen, carbon monoxide and hydrocarbons.

**9**. The marine engine of claim **1**, wherein the catalyst is configured to reduce carbon monoxide to between about 9 parts per million and 30 parts per million.

**10**. The marine engine of claim **1**, wherein the exhaust system further comprises a water-jacketed exhaust manifold.

8

**11**. The marine engine of claim **1**, coupled to drive an electric generator.

**12**. A method of controlling emissions from an internal combustion engine configured for marine application, the method comprising:

flowing a flow of coolant through an exhaust system of the engine to cool a catalyst positioned to intercept a flow of exhaust flowing along the exhaust system;

injecting coolant into the flow of exhaust at a point downstream of the catalyst;

sensing a characteristic of the flow of exhaust;

controlling an air/fuel ratio of the engine as a function of the sensed exhaust flow characteristic; and

governing engine speed with respect to a constant speed while maintaining the air/fuel ratio.

**13**. The method of claim **12** further comprising monitoring a second exhaust flow characteristic downstream of the catalyst and providing a warning to an operator when the second exhaust flow characteristic reaches a threshold level.

**14**. The method of claim **13**, wherein the second exhaust flow characteristic is carbon monoxide level.

**15**. The method of claim **12**, wherein the first exhaust flow characteristic is oxygen level.

**16**. The method of claim **12** further comprising controlling the air/fuel ratio with electronic fuel injection.

**17**. The method of claim **12** wherein the catalyst is configured to simultaneously reduce oxides of nitrogen, carbon monoxide and hydrocarbons.

**18**. The method of claim **12** wherein the catalyst is configured to reduce carbon monoxide to between about 9 parts per million and about 30 parts per million.

**19**. The method of claim **12** further comprising flowing coolant through a jacket about an exhaust manifold of the engine.

* * * * *

Patent No. 7,832,196

US007832196B2

(12) **United States Patent** (10) **Patent No.:** US 7,832,196 B2
Westerbeke, Jr. (45) **Date of Patent:** Nov. 16, 2010

(54) **ELECTRONIC EMISSIONS CONTROL**

(75) Inventor: **John H. Westerbeke, Jr.**, Milton, MA (US)

(73) Assignee: **WBIP, LLC**, Taunton, MA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 170 days.

(21) Appl. No.: **10/974,380**

(22) Filed: **Oct. 27, 2004**

(65) **Prior Publication Data**

US 2005/0120705 A1 Jun. 9, 2005

**Related U.S. Application Data**

(60) Provisional application No. 60/515,166, filed on Oct. 27, 2003.

(51) **Int. Cl.**
*F01N 3/00* (2006.01)

(52) **U.S. Cl.** ............................ **60/285**; 60/274; 60/276; 60/310

(58) **Field of Classification Search** .................. 60/274, 60/276, 285, 299, 310; 440/88 G, 88 J, 89 B, 440/89 C, 89 H, 89 R
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,791,146 A | 2/1974 | Hayashi | |
| 3,967,941 A | 7/1976 | Terao | |
| 4,707,984 A * | 11/1987 | Katsuno et al. | ................ 60/274 |
| 4,884,066 A * | 11/1989 | Miyata et al. | ............... 340/633 |
| 4,900,282 A | 2/1990 | Takahashi et al. | |
| 4,997,399 A | 3/1991 | Nakayasu et al. | |
| 5,125,231 A | 6/1992 | Patil et al. | |
| 5,203,167 A | 4/1993 | Lassanske et al. | |
| 5,359,853 A | 11/1994 | Shimizu | |
| 5,364,322 A | 11/1994 | Fukui | |
| 5,408,827 A | 4/1995 | Holtermann et al. | |

| | | | |
|---|---|---|---|
| 5,536,477 A | 7/1996 | Cha et al. | |
| 5,554,057 A | 9/1996 | Abe et al. | |
| 5,609,023 A | 3/1997 | Katoh et al. | |
| 5,619,852 A * | 4/1997 | Uchikawa | .................... 60/276 |
| 5,715,794 A * | 2/1998 | Nakamura et al. | .......... 123/305 |
| 5,787,847 A | 8/1998 | Ozawa et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

WO WO 97/47863 12/1997

(Continued)

OTHER PUBLICATIONS

Caroll, J.N., "Marine Gasoline Engine and Boat Testing," Final Report Prepared for the Environmental Protection Agency, EPA Contract 68-C-98-158, Sep. 2002.

(Continued)

*Primary Examiner*—Thomas E. Denion
*Assistant Examiner*—Diem Tran
(74) *Attorney, Agent, or Firm*—Fish & Richardson P.C.

(57) **ABSTRACT**

A method of controlling emissions from an internal combustion engine including governing engine speed with respect to a constant speed, maintaining an air/fuel ratio of the engine, flowing exhaust from the engine through an exhaust system containing a catalyst, monitoring a variable with a feedback sensor located upstream of the catalyst, and controlling the air/fuel ratio of the engine as a function of the variable. In one application, the engine is configured for marine applications, including electric power generation and propulsion.

**39 Claims, 5 Drawing Sheets**



US 7,832,196 B2

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,788,547 | A | 8/1998 | Ozawa et al. |
| 5,797,775 | A | 8/1998 | Ozawa et al. |
| 5,808,245 | A | 9/1998 | Wiese et al. |
| 5,809,773 | A | 9/1998 | Gottberg |
| 5,813,222 | A | 9/1998 | Appleby |
| 5,902,158 | A * | 5/1999 | Nakase et al. ............. 440/88 R |
| 5,911,609 | A * | 6/1999 | Fujimoto et al. .......... 440/89 R |
| 5,911,610 | A | 6/1999 | Fujimoto |
| 5,921,076 | A | 7/1999 | Krutzsch et al. |
| 5,937,637 | A | 8/1999 | Fujishita et al. |
| 6,044,643 | A | 4/2000 | Ittner et al. |
| 6,047,542 | A | 4/2000 | Kinugasa et al. |
| 6,053,785 | A | 4/2000 | Kato et al. |
| 6,120,335 | A | 9/2000 | Nakase et al. |
| 6,122,909 | A | 9/2000 | Murphy et al. |
| 6,122,910 | A | 9/2000 | Hoshi et al. |
| 6,212,879 | B1 * | 4/2001 | Nishimura et al. ............ 60/274 |
| 6,309,268 | B1 | 10/2001 | Mabru |
| 6,321,530 | B1 * | 11/2001 | Hoshi et al. .................... 60/274 |
| 6,432,368 | B1 | 8/2002 | Feitelberg et al. |
| 6,435,925 | B1 | 8/2002 | Mabru |
| 6,446,431 | B1 | 9/2002 | Bruck |
| 6,461,208 | B2 | 10/2002 | Suzuki et al. |
| 6,511,355 | B1 | 1/2003 | Woodward |
| 6,524,150 | B2 | 2/2003 | Ozawa |
| 6,551,155 | B2 | 4/2003 | Lecours et al. |
| 6,579,137 | B2 | 6/2003 | Mabru |
| 6,591,183 | B2 | 7/2003 | Ishikawa et al. |
| 6,655,341 | B2 | 12/2003 | Westerbeke, Jr. |
| 6,662,555 | B1 * | 12/2003 | Ishii ............................ 60/302 |
| 6,752,672 | B2 * | 6/2004 | Kanno ......................... 440/84 |
| 6,799,422 | B2 | 10/2004 | Westerbeke, Jr. et al. |
| 6,818,120 | B2 | 11/2004 | Nakamichi et al. |
| 6,820,419 | B2 | 11/2004 | Ford et al. |
| 2002/0038177 | A1 | 3/2002 | Ishikawa et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 0245189 | 6/2002 |

OTHER PUBLICATIONS

Graham, C.R. et al., "General Motors High Performance 4.3L V6 Engine," SAE Technical Paper Series No. 920676, Feb. 1992.

Rashid, Ishtiaque I., "Office Action", Application No. 2,543,780, Apr. 2, 2009 (3 pages).

USPTO Non-Final Office Action in U.S. Appl. No. 11/624,536, mailed Apr. 23, 2007, 7 pages.

Fish & Richardson P.C., Amendment in Reply to Action dated Apr. 23, 2007 in U.S. Appl. No. 11/624,536, filed Jun. 21, 2007, 10 pages.

USPTO Final Office Action in U.S. Appl. No. 11/624,536, mailed Jul. 17, 2007, 7 pages.

Fish & Richardson P.C., Amendment in Reply to Action dated Jul. 17, 2007 in U.S. Appl. No. 11/624,536, filed Sep. 6, 2007, 6 pages.

USPTO Non-Final Office Action in U.S. Appl. No. 11/624,577, mailed Jun. 12, 2009, 7 pages.

Fish & Richardson P.C., Amendment in Reply to Action dated Jun. 12, 2009 in U.S. Appl. No. 11/624,577, filed Sep. 11, 2009, 5 pages.

USPTO Final Office Action in U.S. Appl. No. 11/624,577, mailed Jan. 8, 2010, 8 pages.

* cited by examiner

Case: 15-1038    Document: 26    Page: 143    Filed: 02/09/2015



**FIG. 1**



**FIG. 2**



FIG. 3

FIG. 4



FIG. 5



FIG. 6



FIG. 7

US 7,832,196 B2

1

**ELECTRONIC EMISSIONS CONTROL**

CLAIM OF PRIORITY

This application claims priority under 35 U.S.C. §119(e) to U.S. Provisional Patent Application Ser. No. 60/515,166, filed on Oct. 27, 2003, the entire contents of which are hereby incorporated by reference.

TECHNICAL FIELD

This invention relates to controlling emissions from internal combustion engines.

BACKGROUND

Reducing combustion engine exhaust emissions is a continual object of research and development, driven both by awareness of environmental effects and increased government regulation. Some of the most effective and cost-efficient emissions controls involve the use of downstream chemical catalysts that further oxygenate incompletely combusted compounds. Sometimes exhaust is directed sequentially through multiple catalyst beds. It is generally understood that higher catalyst temperatures provide more effective emissions control. Much exhaust catalysis development has been focused on developing catalytic converters for automotive applications, in which engine speed varies substantially with vehicle speed and gear selection.

In several other applications, such as in powering fixed-frequency electrical generators, engine speed is held as constant as possible during use, even while generator and engine loads fluctuate. Some engine-generator sets are designed for installation on-board moving vehicles, either on land or in water.

Marine generators are subjected to specific regulations, both for emissions and for safety concerns. For example, exposed engine surface temperatures (including exhaust system surface temperatures) must be kept low to avoid increased risk of fire hazard. Seawater is injected into many marine engine exhaust flows so as to cool exiting exhaust gases, and seawater is also frequently circulated through exhaust system components so as to maintain low surface temperatures.

Further improvements in exhaust emissions controls for constant and variable speed engine applications are desired, particularly improvements suitable for marine use.

SUMMARY

Many aspects of the invention feature methods of controlling emissions from an internal combustion engine.

In one aspect, the method includes governing engine speed with respect to a constant speed, maintaining an air/fuel ratio of the engine, flowing exhaust from the engine through an exhaust system containing a catalyst, monitoring a first variable with a feedback sensor located upstream of the catalyst, and controlling the air/fuel ratio of the engine as a function of the variable.

In some cases the first variable is oxygen and/or the feedback sensor is a narrow-band oxygen sensor. In some cases, the first variable is monitored with a MEMS device. In some embodiment, the method further includes monitoring a second variable with an exhaust sensor located downstream of the catalyst. In some embodiments, the second variable is

2

carbon monoxide. In some other embodiments, the second variable is oxygen and/or the exhaust sensor is a wide-band oxygen sensor.

In a preferred embodiment, the air/fuel ratio is stoichiometric. In other embodiments, the air/fuel ratio is slightly lean. In some embodiments, the air/fuel ratio with is controlled with electronic fuel injection. In one embodiment, the electronic fuel injection is throttle-body fuel injection. In other embodiments, the electronic fuel injection is multipoint fuel injection. The the electronic fuel injection can be synchronized external fuel injection. Alternatively, the the electronic fuel injection can be nonsynchronized external fuel injection. In still other embodiments, the electronic fuel injection is direct fuel injection.

In one embodiment, the catalyst is configured to simultaneously reduce oxides of nitrogen, carbon monoxide and hydrocarbons. In some preferred embodiments, the catalyst is configured to reduce carbon monoxide to between about 9 parts per million and between about 30 parts per million. In one presently preferred embodiment, the catalyst is configured to reduce carbon monoxide to ambient levels.

In one embodiment, the engine is configured for marine applications and the exhaust system further comprises a water-jacketed manifold. In some cases, the engine is driving an electric generator. In one application, the generator is a multi-pole permanent magnet generator. In some embodiments, the generator is configured to operate at variable speeds. In some embodiments, the generator modulates between a high speed and a low speed having a ratio of 3 to 1. In other embodiments, the generator modulates between a high speed and a low speed having a ratio of 2 to 1.

In another aspect, the method includes driving an electric generator with the engine configured for marine applications, governing engine speed with respect to a selected constant speed, maintaining an air/fuel ratio of the engine, flowing exhaust from the engine through an exhaust system containing a catalyst, monitoring a first variable with a feedback sensor located upstream of the catalyst, the catalyst being configured to simultaneously reduce oxides of nitrogen, carbon monoxide and hydrocarbons, and controlling the air/fuel ratio of the engine as a function of the variable with electronic fuel injection.

In some embodiments, the method also includes monitoring a second variable downstream of the catalyst with an exhaust sensor downstream of the catalyst and providing a warning to an operator when the second variable reaches a threshold level. In some cases, the second variable is carbon monoxide. In other applications, the second variable is oxygen.

In some embodiments, the exhaust sensor is a wide-band oxygen sensor. In some embodiments, the generator is a permanent magnet generator. In some cases, the second variable is carbon monoxide. The other cases, the second variable is oxygen.

In a preferred embodiment, the air/fuel ratio is stoichiometric. In other embodiments, the air/fuel ratio is slightly lean.

The details of one or more embodiments of the invention are set forth in the accompanying drawings and the description below. Other features, objects, and advantages of the invention will be apparent from the description and drawings, and from the claims.

US 7,832,196 B2

3

DESCRIPTION OF DRAWINGS

FIG. **1** is a perspective view of a marine engine-generator set.

FIG. **2** is a schematic cross-section illustrating flow through the exhaust manifold and elbow of the engine-generator set of FIG. **1**.

FIG. **3** illustrates an alternative second exhaust manifold construction and catalyst arrangement.

FIG. **4** is a perspective view of an engine exhaust manifold.

FIG. **5** is a partial cross-sectional view of the manifold of FIG. **4**.

FIG. **6** shows a schematic view of a marine exhaust system according to the invention.

FIG. **7** is a detail view of a float valve and water level indicator contained within the marine exhaust system.

Like reference symbols in the various drawings indicate like elements.

DETAILED DESCRIPTION

Referring first to FIG. **1**, an engine-generator set **10** includes an internal combustion engine **12** driving an electrical generator **14**. Engine **10** has an exhaust manifold **16** that receives and combines exhaust gasses from each cylinder of the engine and directs the combined exhaust gasses through a catalyst contained within the manifold, as is discussed in more detail below. Secured to the outlet of the manifold **16** is an exhaust elbow **18**. In a marine application, water, such as cold seawater, is supplied to manifold **16** through hose **30**. The water is directed through cooling passages in manifold **16** and elbow **18** to keep the outer surfaces of the exhaust system at or below a desired temperature, and is then injected into the exhaust stream in elbow **18**, downstream of the catalysts, to cool the exhaust.

In one embodiment, a variable is monitored with a feedback sensor **19** located upstream of the catalyst which provides a control signal to electronic controller **24**. In one embodiment, controller **24** provides controls the air fuel ratio of the engine **12** to correspond to a 1.0 stoichiometric ratio. In other embodiments, the air fuel ratio of the engine **12** is slightly lean. In one embodiment, the variable monitored by the feedback sensor **19** is oxygen and the feedback sensor **19** is a narrow-band oxygen sensor.

In one embodiment, an exhaust sensor **23** is mounted downstream of the catalyst. In one embodiment, the exhaust sensor **23** measures oxygen as a proxy for indirectly determining the level of carbon monoxide. In this application, a wide-band oxygen sensor can be used. In other applications, the exhaust sensor **23** directly measures carbon monoxide. The signal output from the exhaust sensor **23** can provide an anticipatory alarm apprising an operator when the catalyst **32** is functioning with reduced effectiveness. Accordingly, the exhaust sensor can inform the operator if the catalyst **32** has been damaged by seawater and requires replacement. The exhaust sensor **23** can be a MEMS device in some embodiments.

With continued reference to FIG. **1** and in an alternative embodiment, air is delivered to manifold **16**, through a controllable dump valve **20**, from belt-driven air pump **22**. A fixed speed, electric air pump may also be employed. Valve **20** is controlled by an electronic controller **24** to moderate the flow of air into manifold **16** as a function of the load placed on engine **12**, such as by controllably dividing the output of the air pump between manifold **16** and exhaust elbow **18**. Controller **24** varies a signal to valve **20** as a function of engine load, or as a function of a sensible parameter that changes

4

with engine load. In the illustrated embodiment, controller **24** senses an output voltage and/or current of generator **14**, such as at generator output **26**, and controls valve **20** accordingly. Controller **24** also senses engine speed, such as by receiving a signal from flywheel magnetic reluctance sensor **28**, and controls engine inputs (such as fuel and/or air flow) to maintain engine speed at or near a desired set point, so as to maintain the frequency of generator **14**. As an alternative to controlling a dump valve **20** splitting pump air flow between manifold **16** and either atmosphere or a lower point in the exhaust stream, a variable speed electric air pump **22***a* is employed in some instances, with controller **24** varying the operating speed of pump **22***a* as a function of engine load. In such cases, the entire output of pump **22***a* is preferably ported directly to manifold **16**.

Referring to now FIG. **2**, a cylindrical catalyst **32** containing a catalyst bed is shown disposed within the exhaust manifold **16**. The catalyst **32** is wrapped in an insulating blanket **96**, such as a ⅛ inch (3.2 millimeter) thick sheet of cotton binding containing mica, for example, that helps reduce heat transfer from the catalyst into the housing and also helps to isolate the delicate catalyst bed from shocks and vibrations. In one embodiment, controlled air flow is injected either just forward of the catalyst at port **38***a*, or at the far end of the manifold at port **38***b* so as to preheat the injected air flow. Single catalyst **32** may be of any preferred composition, such as a palladium-platinum catalyst, for example. In other embodiments, no air flow injection is required.

With continued reference to FIG. **2** and in one embodiment, catalyst **32** is configured and dimensioned for fitting within a marine exhaust manifold **16**. In one presently preferred embodiment, the catalyst **32** has a diameter of 3.66 inch (9.30 cm) and a length of 6.0 inch (15.24 cm). The catalyst **32** can include a round ceramic having a diameter of 3.0 inch (7.62 cm) and a length of 6.0 inch (15.24 cm) and a 400-cells per inch with 95-grams per cubic foot of a 3-to-1 ratio of platinum to rhodium. The catalyst **32** can also include a specialized wash coat designed to be the most effective at a 1.0 stoichiometric air fuel ratio. The catalyst **32** is configured to simultaneously reduce oxides of nitrogen, carbon monoxide and hydrocarbons. In one preferred embodiment, the catalyst **32** is configured to reduce carbon monoxides levels to below 50 part per million, preferably to below 35 parts per million, and most preferably to below ambient levels, i.e., 9 part per million.

Other catalyst configuration are contemplated within the exhaust manifold **16**. For example as illustrated in FIG. **3**, the catalyst **32** in an alternative embodiment can include a first catalyst **33** and second catalyst **36** contained within a second bore of the manifold, parallel to and offset from the first bore. The manifold can be equipped with a removable cover **44** through which the air is injected, enabling loading of both of the catalysts into their respective bores. As in the first illustrated embodiment, after flowing through both catalyst beds the exhaust flow is combined with cooling water in elbow **18***a*.

The exhaust is combined and directed through a first catalyst bed **32**, through a space **34**, and then through a second catalyst bed **36**. The air is injected into the manifold in space **34**, through air inlet **38**. Cooling water flows around both catalyst beds, through appropriate channels cast into manifold **16***a* and elbow **18**, and is then injected into the exhaust flow. In marine applications where the cooling seawater can have a high salt content, the water injection outlets **40** in elbow **18** are preferably at least about six inches (15 centimeters) below the lowest edge of the catalysts or the upper edge of any internal elbow baffles **42** positioned to avoid salt water

US 7,832,196 B2

5

splash on the hot catalysts. Also, it is preferred that for such marine applications manifold 16*a* and elbow 18 be cast of a corrosion-resistant material, such as an aluminum-magnesium alloy. It will be apparent from FIG. 2 that the connection between manifold 16*a* and elbow 18 can be readily positioned between the two catalyst beds, such that second catalyst 36 is carried within elbow 18.

The construction of the catalyst 32 according to this embodiment can include a first catalyst bed 33 which preferably includes a catalyst such as one containing rhodium as the precious metal, selected to reduce hydrocarbon and $NO_x$ emissions. For example, one preferred catalyst bed is in the form of a cylinder 3.0 inches (76 millimeters) in diameter and 2.6 inches (6.7 centimeters) long. The ceramic substrate has a cross-sectional area of about 7 square inches (45 square centimeters) and has about 400 cells per square inch (62 per square centimeter), and is washed with 6.1 grams per cubic foot (0.06 grams per cubic centimeter) of rhodium. Such a catalyst bed is available from ASEC/Delphi Exhaust and Engine Management of Flint, Mich. Catalysis efficiency within first catalysis bed 33 may be accomplished by various methods known in the art, either in carbureted or fuel-injected systems with oxygen sensors, to remove as much of the overall emissions components as possible.

The second catalyst bed 36 contains a catalyst selected to further reduce CO emissions. In one arrangement, second catalyst bed 36 contains a three to one ratio of palladium and platinum, carried on a honey-combed substrate of ceramic or metal. The active precious metals are washed onto the substrate and then heated to set the metals onto the surface as known in the art. An example of a preferred second catalyst bed is a metal substrate in the form of a cylinder of 5.0 inch (12.7 centimeter) diameter and 6.3 inch (16 centimeter) length, with 19.6 square inches (126 square centimeters) of cross-sectional area, washed with 40 grams per cubic foot (0.4 grams per cubic centimeter) each of palladium and platinum. Such a catalyst is available from Miratech of Tulsa, Okla., for example. Second catalyst 36 will tend to run hotter, such as perhaps about 400 degrees Fahrenheit (220 degrees Celsius) hotter than the rhodium catalyst. Preferably, the temperature of the combined air and exhaust entering the second catalyst is about 1000 degrees Fahrenheit (540 degrees Celsius).

FIGS. 4 and 5 show another example of a catalyst exhaust manifold 16*b*. The catalyst 32 is loaded as a cylinder from the large end of the manifold, with the $NO_x$ catalyst loaded into bore 46 (FIG. 5) and the CO catalyst loaded into bore 48 (FIG. 5). In this example, coolant enters the manifold at inlet 50 and leaves the manifold at outlet 52, without joining the exhaust stream. The cooling channels 54 cast into the manifold are partially shown in FIG. 5, providing a closed flow path between inlet 50 and outlet 52.

Various control techniques may be employed to vary air injection rate for good CO reduction. In one embodiment, the air injection rate is varied as a function of approximate engine load. In one test using a Westerbeke 4-cylinder, 1.5 liter gasoline engine and the palladium-platinum second catalyst bed described above, the lowest CO emissions were provided by varying the rate of air flow into the manifold ahead of the second catalyst (at 100 liter per minute graduations) according to the following table:

6

| Engine Load (Percent Full Load) | Air Flow Rate (liters per minute) |
| --- | --- |
| 100 | 500 |
| 75 | 500 |
| 50 | 500 |
| 25 | 400 |
| 10 | 300 |
| 0 | 300 |

Of course, optimal air flow rates will be different for different applications. The air flow controller can be configured to interpolate between adjacent entries in the load-air correlation table to provide finer control sensitivity.

There are various ways to determine approximate engine load, such that a table like that shown above can be used to determine an optimal air injection rate. For example, if substantially all of the engine load is provided by an electrical generator (as shown in FIG. 1), monitoring the electrical output of the generator can provide a good estimate of engine load. Current can be monitored as a most direct measure of electrical load, such as by providing a current transformer about the output of the generator. In some cases in which generator voltage is known to predictably decrease a measurable amount with load, voltage may alternately be monitored. In most cases, however, current monitoring is preferred for systems with proper generator voltage regulation. Other options include measuring engine output driveshaft torque (or some measurable parameter that varies predictably with torque), or measuring the pressure within the manifold, such as upstream of the catalyst beds, or exhaust backpressure below the catalysts and above a muffler or other exhaust restriction. Because the engine speed is substantially fixed in the primary embodiments, other parameters may also be found to vary predictably with engine load, such as throttle position and fuel flow rate, for example.

As an alternative to controlling the air injection rate as a function of load, the air injection rate can be controlled as a function of other measured parameters that signify catalysis efficiency. For example, a CO sensor may be provided downstream of the catalyst as described above.

With renewed reference to FIG. 2 an in one embodiment, an exhaust pressure sensor 62 can be placed in the manifold 16, to measure exhaust manifold pressure, or downstream of the catalyst 32 to measure exhaust backpressure developed upstream of a muffler or other exhaust restriction (not shown). If the air pump delivering air to inlet 38 is not a fixed displacement pump, changes in exhaust backpressure with engine load can cause a significant fluctuation in the injected air rate. This fluctuation will tend to work against the desired variation of air flow rate with engine load, as backpressure, which rises with engine load, will cause a reduction in air injection rate that should be accounted for in the control of the pump or valve. It will be understood that sensors 62 are shown in optional and alternative locations, and are not necessary in some embodiments, such as when air flow rate is controlled as a function of generator current or some other primary control parameter.

Referring now to FIG. 6, an exhaust system 60 for the engine 12 mounted in a boat 67 is shown. The exhaust manifold 16 directs exhaust gases through the catalyst 32 and exhaust elbow 18 and past a water injected exhaust elbow 65. To reduce the operating temperature of the exhaust components, cooling seawater is injected at the inlet to the exhaust elbow 70. The exhaust gases and cooling water then pass through an exhaust valve and water level indicator 75 (dis-

7      8

cussed in more detail below). The exhaust gasses and cooling water enter a water lift marine muffler **80** before proceeding to a high point at the U-bend **85** and out of the boat through the through-hull fitting **90** above the water line **97**. In one embodiment, the muffler **80** includes a drain **97**.

In marine applications, it is desirable to prevent cooling seawater from contacting the catalyst **32** disposed within the exhaust manifold **16**. It is also desirable to prevent cooling seawater from reaching the engine **12**, which can results in catastrophic failure. Referring to FIG. **7**, an exhaust valve and water level indicator **75** are shown and disposed within the marine exhaust manifold **16** between the water injected exhaust elbow **65** and the water lift muffler **80** (FIG. **6**). The valve/indicator **75** can include a float valve **105**, such as a ball valve and a water level indicator **110** combined in a housing **115**. The ball valve **105** translates along the housing **115** between ball valve guides **120***a*, **120***b* and is supported by ball valve supports **130***a*, **130***b* when the ball valve is disposed in an open position **135** (shown in phantom). When the ball valve **105** ascends upward to the closed position (as shown) the surface of the ball valve **105** contacts the housing **115** along valve sealing areas **140***a*, **140***b* thereby closing the valve. The rising water level within the housing **115** floats the water level indicator **110** upward to an alarm level which provides a signal **145** to warn an operator that the muffler **80** is overfilled.

A number of embodiments of the invention have been described. For example, the engine **12** as described above can be used for propulsion in marine applications. Nevertheless, it will be understood that various modifications may be made without departing from the spirit and scope of the invention. Accordingly, other embodiments are within the scope of the following claims.

What is claimed is:

**1**. A method of controlling emissions from an internal combustion engine, the method comprising:

governing engine speed with respect to a selected constant speed while maintaining an air/fuel ratio of the engine and driving a variable load on the engine;

flowing exhaust from the engine through an exhaust system containing a catalyst;

injecting liquid coolant into the exhaust;

monitoring a first exhaust variable with an exhaust feed-back sensor located upstream of the catalyst; and

controlling the air/fuel ratio of the engine as a function of the variable.

**2**. The method of claim **1** wherein the air/fuel ratio is stoichiometric.

**3**. The method of claim **1** wherein the air/fuel ratio is slightly lean.

**4**. The method of claim **1** wherein the second variable is monitored with a micro-electro-mechanical systems device.

**5**. The method of claim **1** wherein the first variable is oxygen.

**6**. The method of claim **5** wherein the sensor is a narrow-band oxygen sensor.

**7**. The method of claim **1** further comprising monitoring a second variable with an exhaust sensor located downstream of the catalyst and providing a warning to an operator when the second variable reaches a threshold level.

**8**. The method of claim **7** wherein the second variable is carbon monoxide.

**9**. The method of claim **7** wherein the second variable is oxygen.

**10**. The method of claim **9** wherein the exhaust sensor is a wide-band oxygen sensor.

**11**. The method of claim **1** further comprising controlling the air/fuel ratio with electronic fuel injection.

**12**. The method of claim **11** wherein the electronic fuel injection is throttle-body fuel injection.

**13**. The method of claim **11** wherein the electronic fuel injection is multi-point fuel injection.

**14**. The method of claim **13** wherein the electronic fuel injection is synchronized external fuel injection.

**15**. The method of claim **13** wherein the electronic fuel injection is nonsynchronized external fuel injection.

**16**. The method of claim **13** wherein the electronic fuel injection is direct fuel injection.

**17**. The method of claim **1** wherein the catalyst is configured to simultaneously reduce oxides of nitrogen, carbon monoxide and hydrocarbons.

**18**. The method of claim **17** wherein the catalyst is configured to reduce carbon monoxide to between about 9 parts per million and about 30 parts per million.

**19**. The method of claim **17** wherein the catalyst is configured to reduce carbon monoxide to ambient levels.

**20**. The method of claim **1** wherein the engine is configured for marine applications and the exhaust system further comprises a water-jacketed manifold.

**21**. The method of claim **20** wherein the engine is driving an electric generator.

**22**. The method of claim **21** wherein the generator is a multi-pole permanent magnet generator.

**23**. The method of claim **22** wherein the generator is configured to operate at variable speeds.

**24**. The method of claim **23** wherein the generator modulates between a high speed and a low speed having a 3 to 1 ratio.

**25**. The method of claim **23** wherein the generator modulates between a high speed and a low speed having a 2 to 1 ratio.

**26**. A method of controlling emissions from an internal combustion engine configured for marine application, the method comprising:

driving an electric generator with the engine;

governing engine speed with respect to a selected constant speed while maintaining an air/fuel ratio of the engine and driving a variable load on the engine;

flowing exhaust from the engine through an exhaust system containing a catalyst;

injecting liquid coolant into the exhaust;

monitoring a first exhaust variable with an exhaust feed-back sensor located upstream of the catalyst, the catalyst being configured to simultaneously reduce oxides of nitrogen, carbon monoxide and hydrocarbons; and

controlling the air/fuel ratio of the engine as a function of the variable with electronic fuel injection.

**27**. The method of claim **26** wherein the generator is a permanent magnet generator.

**28**. The method of claim **26** wherein the air/fuel ratio is stoichiometric.

**29**. The method of claim **26** wherein the air/fuel ratio is slightly lean.

**30**. The method of claim **26** further comprising monitoring a second variable downstream of the catalyst with an exhaust sensor downstream of the catalyst and providing a warning to an operator when the second variable reaches a threshold level.

**31**. The method of claim **30** wherein the second variable is carbon monoxide.

**32**. The method of claim **30** wherein the second variable is oxygen.

US 7,832,196 B2

9

**33**. The method of claim **32** wherein the exhaust sensor is a wide-band oxygen sensor.

**34**. The method of claim **30** wherein the second variable is carbon monoxide.

**35**. The method of claim **30** wherein the second variable is oxygen.

**36**. A method of controlling emissions from an internal combustion engine configured for marine application, the method comprising:

governing engine speed with respect to a selected constant speed while maintaining an air/fuel ratio of the engine and driving a variable load on the engine;

flowing exhaust from the engine through an exhaust system containing a catalyst;

injecting liquid coolant into the exhaust downstream of the catalyst;

10

monitoring a first exhaust variable with an exhaust feed-back sensor located upstream of the catalyst, the catalyst being configured to reduce oxides of nitrogen, carbon monoxide and hydrocarbons; and

controlling the air/fuel ratio of the engine as a function of the variable with electronic fuel injection.

**37**. The method of claim **36** wherein the air/fuel ratio is stoichiometric.

**38**. The method of claim **36** wherein the air/fuel ratio is slightly lean.

**39**. The method of claim **36** wherein injecting liquid coolant comprises injecting the liquid coolant at least about six inches below the lowest edge of the catalyst.

* * * * *

## CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2015 the foregoing Opening

Brief and Addendum of Defendant-Appellant Kohler Co. was

electronically filed with the Clerk of the Court for the United States

Court of Appeals for the Federal Circuit using the appellate CM/ECF

system.  All participants in the case are registered CM/ECF users and

service will be accomplished by the appellate CM/ECF system.


Dated:  February 9, 2015       /s/ E. Joshua Rosenkranz
                            E. Joshua Rosenkranz
                            Orrick, Herrington & Sutcliffe LLP
                            51 West 52nd Street
                            New York, NY  10019
                            Telephone:  (212) 506-5000
                            Facsimile:  (212) 506-5151
                            jrosenkranz@orrick.com

                            *Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE
## UNDER FEDERAL RULES OF APPELLATE PROCEDURE
## 32(a)(7) AND FEDERAL CIRCUIT RULE 32

Counsel for Kohler Co. certifies that the brief contained herein has a proportionally spaced 14-point typeface, and contains 13,925 words, based on the "Word Count" feature of Word 2010, including footnotes and endnotes.  Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b), this word count does not include the words contained in the Certificate of Interest, Table of Contents, Table of Authorities, Abbreviations, and Statement of Related Cases.


Dated:   February 9, 2015

/s/ E. Joshua Rosenkranz
E. Joshua Rosenkranz
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY  10019
Telephone:  (212) 506-5000
Facsimile:  (212) 506-5151
jrosenkranz@orrick.com

*Counsel for Defendant-Appellant*