**Nos. 15-1038, 15-1044**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

WBIP, LLC,

*Plaintiff-Cross-Appellant*,

*v.*

KOHLER CO.,

*Defendant-Appellant.*

On Appeal from the United States District Court for the
District of Massachusetts, Case No. 1:11-cv-10374-NMG
Hon. Nathaniel M. Gorton

## BRIEF OF PLAINTIFF-CROSS-APPELLANT WBIP, LLC

Michael E. Zeliger
David A. Simons
Andrea B. Reed
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA  02111-2950
Telephone (617) 261-3100
Facsimile (617) 261-3175
david.simons@klgates.com

*Attorneys for Plaintiff-Cross-Appellant*

April 9, 2015

# <u>CERTIFICATE OF INTEREST</u>

Counsel for Plaintiff-Cross-Appellant WBIP, LLC:

1. The full name of every party or amicus represented by me is:

   WBIP, LLC

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   N/A

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

   None

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court are:

   Michael E. Zeliger
   David A. Simons
   Andrea B. Reed
   K&L GATES LLP
   State Street Financial Center
   One Lincoln Street
   Boston, MA 02111

Date: April 9, 2015                /s/ *David A. Simons*
                                    Signature of counsel

                                    David A. Simons
                                    Printed name of counsel

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................................i

STATEMENT OF RELATED CASES ......................................................x

JURISDICTIONAL STATEMENT ........................................................1

INTRODUCTION ..................................................................................1

STATEMENT OF THE ISSUES............................................................3

STATEMENT OF THE CASE................................................................4

    I.    Marine Generators and the Carbon Monoxide Problem ......................4

    II.    The Westerbeke Invention ........................................................6

    III.    Reaction to the Westerbeke Low-CO Generator: Skepticism, then Praise ........................................................................................8

    IV.    Kohler Captures the Low-CO Market................................................10

    V.    The District Court Proceedings............................................11

    VI.    The Post-Trial Reexaminations........................................................13

SUMMARY OF THE ARGUMENT ......................................................14

STANDARD OF REVIEW ..................................................................17

ARGUMENT ......................................................................................19

    I.    THE CLAIMS WERE NOT OBVIOUS............................................19

        A.    Kohler Failed to Establish a *Prima Facie* Case of Obviousness ......................................................................20

        B.    Objective Evidence Strongly Supported the Non-Obviousness of the Claims........................................................33

    II.    THE CLAIMS SATISFY THE WRITTEN DESCRIPTION REQUIREMENT ......................................................................53

        A.    Kohler Did Not Argue Written Description to the Jury ..........55

        B.    The Amendment Adding "While" to the Claims Did Not Constitute New Matter............................................................57

        C.    The Specification Adequately Described the Claimed Controller ..............................................................................61

    III.    KOHLER'S INFRINGEMENT WAS WILLFUL ..............................64

     A.     Kohler Admitted It Was Aware of the '044 Patent ..................65

     B.     Kohler's Invalidity Defenses Were Not Reasonable ...............67

IV.    WBIP'S CROSS APPEAL: THE DISTRICT COURT ABUSED ITS
      DISCRETION BY DENYING THE REQUEST FOR A
      PERMANENT INJUNCTION WITHOUT PROPERLY
      CONSIDERING ALL THE RELEVANT FACTORS ......................68

     A.     Procedural Background ...........................................................69

     B.     Argument ...............................................................................70

CONCLUSION ...................................................................................73

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Abbott Labs. v. Syntron Bioresearch, Inc.*,
  334 F.3d 1343 (Fed. Cir. 2003) ...................................................................18, 19

*Alexsam, Inc. v. IDT Corp.*,
  715 F.3d 1336 (Fed. Cir. 2013) ...........................................................................25

*Ariad Pharms., Inc. v. Eli Lilly and Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) ...........................................................................62

*Asyst Techs., Inc. v. Emtrak, Inc.*,
  544 F.3d 1310 (Fed. Cir. 2008) ...................................................................49, 51

*Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*,
  682 F.3d 1003 (Fed. Cir. 2012) ...................................................................19, 67

*Broadcom Corp. v. Emulex Corp.*,
  732 F.3d 1325 (Fed. Cir. 2013) ...........................................................................25

*Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*,
  229 F.3d 1120 (Fed. Cir. 2000) ...........................................................................43

*Cadence Pharm. Inc. v. Exela Pharm. Sci., Inc.*,
  __ F.3d __, 2015 U.S. App. LEXIS 4700 (Fed. Cir. Mar. 23, 2015) .................18

*Celsis in Vitro, Inc. v. CellzDirect, Inc.*,
  664 F.3d 922 (Fed. Cir. 2012) .............................................................................72

*CFMT, Inc. v. Yieldup Int'l Corp.*,
  349 F.3d 1333 (Fed. Cir. 2003) ...................................................................28, 33

*Crocs, Inc. v. ITC*,
  598 F.3d 1294 (Fed. Cir. 2010) ...........................................................................45

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*,
  807 F.2d 955 (Fed. Cir. 1986) .............................................................................18

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
  717 F.3d 1336 (Fed. Cir. 2013) .........................................................................19

*eBay Inc. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)..............................................................................4, 68, 70

*Ecolab, Inc. v. FMC Corp.*,
  569 F.3d 1335 (Fed. Cir. 2009) .......................................................................71

*Falkner v. Inglis*,
  448 F.3d 1357 (Fed. Cir. 2006) .......................................................................62

*Fonar Corp. v. Gen. Elec. Co.*,
  107 F.3d 1543 (Fed. Cir. 1997) ..................................................................61, 62

*Freeman v. Package Mach. Co.*,
  865 F.2d 1331 (1st Cir. 1988)..........................................................................38

*Function Media, L.L.C. v. Google Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013) .......................................................................61

*Genetics Inst., LLC v. Novartis Vaccines and Diagnostics, Inc.*,
  655 F.3d 1291 (Fed. Cir. 2011) .......................................................................48

*Geo M. Martin Co. v. Alliance Mach. Sys. Int'l*,
  618 F.3d 1294 (Fed. Cir. 2010) .......................................................................24

*In re Glatt Air Techniques, Inc.*,
  630 F.3d 1026 (Fed. Cir. 2011) .......................................................................48

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966)............................................................................................34

*In re Hayes Microcomputer Prods., Inc. Patent Litigation*,
  982 F.2d 1527 (Fed. Cir. 1992) ............................................................61, 62, 63

*Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.*,
  21 F.3d 1068 (Fed. Cir. 1994) .........................................................................42

*Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*,
  134 S. Ct. 1744 (2014)....................................................................................19

*Hoodho v. Holder*,
    558 F.3d 184 (2d Cir. 2009) ............................................................... 65

*In re Huai-Hung Kao*,
    639 F.3d 1057 (Fed. Cir. 2011) ........................................... 49, 50, 51

*InTouch Tech., Inc. v. VGo Commc'ns, Inc.*,
    751 F.3d 1327 (Fed. Cir. 2014) ................................................ 23, 27

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
    688 F.3d 1342 (Fed. Cir. 2012) ................................................. 18, 25

*Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*,
    381 F.3d 1142 (Fed. Cir. 2004) ........................................... 16, 56, 57

*KSR Int'l Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007) .................................................................. 26, 27

*LizardTech, Inc. v. Earth Res. Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005) ................................................ 63, 64

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
    672 F.3d 1350 (Fed. Cir. 2012) ....................................................... 17

*McGinley v. Franklin Sports, Inc.*,
    262 F.3d 1339 (Fed. Cir. 2001) ....................................................... 27

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
    134 S. Ct. 1749 (2014) .................................................................... 13

*PIN/NIP, Inc. v. Platte Chem. Co.*,
    304 F.3d 1235 (Fed. Cir. 2002) ....................................................... 64

*Plantronics, Inc. v. Aliph, Inc.*,
    724 F.3d 1343 (Fed. Cir. 2013) ....................................................... 53

*Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*,
    2015 U.S. App. LEXIS 1456 (Fed. Cir. Jan. 27, 2015) ................... 26

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013) ....................................................... 40

*Power-One, Inc. v. Artesyn Techs., Inc.*,
   599 F.3d 1343 (Fed. Cir. 2010) ........................................................41

*Pozen Inc. v. Par Pharm., Inc.*,
   696 F.3d 1151 (Fed. Cir. 2012) ...............................................53, 58

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
   702 F.3d 1351 (Fed. Cir. 2012) ........................................................70

*Rambus Inc. v. Rea*,
   731 F.3d 1248 (Fed. Cir. 2013) ...............................................48, 53

*Read Corp. v. Portec, Inc.*,
   970 F.2d 816 (Fed. Cir. 1992) ........................................................12

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
   659 F.3d 1142 (Fed. Cir. 2011) ........................................................70

*In re Royka*,
   490 F.2d 981 (CCPA 1974) ........................................................28

*Sage Prods., Inc. v. Devon Indus., Inc.*,
   126 F.3d 1420 (Fed. Cir. 1997) ........................................................58

*Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.*,
   976 F.2d 58 (1st Cir. 1992).........................................................65

*In re Seagate Tech., LLC*,
   497 F.3d 1360 (Fed. Cir. 2007) ...............................................12, 67

*In re Sherwood*,
   613 F.2d 809 (CCPA 1980) ...............................................61, 62

*Spectralytics, Inc. v. Cordis Corp.*,
   649 F.3d 1336 (Fed. Cir. 2011) ...............................................18, 47

*Stratoflex, Inc. v. Aeroquip Corp.*,
   713 F.2d 1530 (Fed. Cir. 1983) ........................................................45

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
   699 F.3d 1340 (Fed. Cir. 2012) ...............................................33, 45, 47

*Tronzo v. Biomet*,
   156 F.3d 1154 (Fed. Cir. 1998) ......................................................... 64

*Typhoon Touch Techs., Inc. v. Dell, Inc.*,
   659 F.3d 1376 (Fed. Cir. 2011) ......................................................... 61

*United States v. Aubin*,
   961 F.2d 980 (1st Cir. 1992) .............................................................. 32

*United States v. Richardson*,
   421 F.3d 17 (1st Cir. 2005) ............................................................... 38

*United States v. Whitney*,
   524 F.3d 134 (1st Cir. 2008) .............................................................. 38

*Vas-Cath Inc. v. Mahurkar*,
   935 F.2d 1555 (Fed. Cir. 1991) ......................................................... 54

*Vasudevan Software, Inc. v. MicroStrategy, Inc.*,
   __ F.3d. __, 2015 U.S. App. LEXIS 5396 (Fed. Cir. Apr. 3, 2015)............. 58, 63

## FEDERAL STATUTES

35 U.S.C. § 112 ..................................................................................... 54, 61

35 U.S.C. § 284 ........................................................................................ 19

35 U.S.C. § 285 ..................................................................................... 13, 19

## RULES

Fed. R. Evid. 403 .................................................................................... 38

## OTHER AUTHORITIES

2 McCormick on Evid. § 254 (6th ed. 2006) ............................................ 65

"A Good Way to Die," in Coast Guard Boating Safety Circular 64 (1986),
pp. 30-32, available at http://uscgboating.org/regulations/
assets/builders-handbook/PART2_BSC64.pdf........................................ 5

Coast Guard Boating Safety Circular 74 (1992), p. 4, available at
http://www.uscgboating.org/library/boating-safety-circulars/BSC74.pdf .............. 36

Kohler Marine, Gas Generators - Low-CO,
http://www.kohlerpower.com/marine/category.htm?categoryNumber
=12561&sectionNumber=13461 ..........................................................................43

## STATEMENT OF RELATED CASES

Plaintiff-Cross-Appellant WBIP, LLC ("WBIP") is not aware of any Related Cases, as defined in Fed. Cir. R. 47.5.

## JURISDICTIONAL STATEMENT

An amended final judgment was entered on September 8, 2014, (A58), and WBIP filed its notice of cross-appeal on October 7, 2014 (A11019-21). This Court has jurisdiction over the cross appeal under 28 U.S.C. § 1292(a)(1),(c)(1).

## INTRODUCTION

Kohler's obviousness defense is a classic example of litigation-inspired hindsight reconstruction. The template for creating these defenses is familiar: (i) perform a keyword search to find a reference that discloses most of the claim limitations, (ii) hire an expert to offer conclusory testimony that one of skill in the art would have added the remaining limitations, and (iii) proclaim the invention obvious. Like most hindsight reconstructions, however, Kohler's obviousness defense falls apart in the face of real-world objective evidence and a closer examination of the prior art.

Jack Westerbeke's invention solved a problem that had plagued the marine generator industry for decades: carbon monoxide. In the twenty years prior to the invention, hundreds of boaters suffered carbon monoxide poisoning from marine generator exhaust, and dozens of those poisonings were fatal. The industry, *including Kohler's own engineers*, believed the problem was not solvable at the source, and could only be mitigated by directing exhaust to safer locations, warning boaters, and checking regularly for leaks. Mr. Westerbeke, however,

discovered a solution. His invention--a novel combination of a water-cooled catalyst and a compound control scheme using closed-loop feedback--reduced carbon monoxide to safe levels, at the source. The Westerbeke invention transformed the marine generator market. It received industry praise, was adopted by Kohler, and was commercially successful, completely replacing prior art generators. Expert testimony at trial linked all of these objective indicia directly to the invention recited in the claims.

The prior art reference that Kohler contends rendered all of this obvious, the Phipps patent, teaches a nonfunctional, backwards control scheme for a dry-exhaust land engine. Kohler argues that *if* one of skill were to convert Phipps to a marine engine, he or she would know to add certain claim limitations, like a wet exhaust and water jacket, to meet Coast Guard temperature requirements. What Kohler entirely failed to show, however, is *why* someone would undertake such a conversion. Substantial evidence at trial showed that one of skill would never have attempted to transform Phipps into a marine engine, and even if he or she had done so, the conversion would not have resulted in all the limitations of the claims.

It is no wonder, then, that Kohler's obviousness defense has been soundly rejected by jury, judge, and the patent office. The jury, after a six-day trial, rejected Kohler's obviousness and written description defenses and found its infringement to have been willful. The trial judge agreed, denying Kohler's JMOL

motions, ruling that its infringement was "objectively reckless," and that "obviousness was not a reasonable defense." And, finally, after trial, the patent office confirmed all the claims over Phipps in a pair of post-trial reexaminations initiated by Kohler. The examiner panel found both that the prior art did not establish a *prima facie* case of obviousness and that secondary considerations proved nonobviousness.

This Court should reach the same conclusion. The Westerbeke patents are valid, Kohler's infringement was willful, and the verdict should be affirmed.

## STATEMENT OF THE ISSUES

1.    Did the District Court err in refusing to grant judgment as a matter of law that the asserted claims are obvious, where Kohler failed to establish a *prima facie* case of obviousness at trial, and overwhelming objective evidence supports the non-obviousness of the invention?

2.    Did the District Court err in refusing to grant judgment as a matter of law that the claims were invalid for failure to satisfy the written description requirement, where the priority documents and expert testimony established possession of the invention, and the only evidence Kohler offered at trial on the issue was a single conclusory sentence from its expert?

3.    Did the District Court err in refusing to grant judgment as a matter of law that Kohler's infringement was not willful, where Kohler admitted prior

knowledge of the patent, the jury returned a verdict of willfulness, and the District Court concluded Kohler's defenses were not reasonable?

4.    <u>Cross Appeal</u>:    The District Court denied WBIP's motion for a permanent injunction after trial, but its ruling only addressed one of the four factors listed in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), and with respect to that one factor, the Court relied on a misstatement of fact in Kohler's Opposition brief.  Should this Court remand and require the District Court to consider whether a permanent injunction is warranted in light of all four *eBay* factors?

**STATEMENT OF THE CASE**

## I.    Marine Generators and the Carbon Monoxide Problem

The patents-in-suit concern marine generators, which provide electrical power to boats.  A typical marine generator will have an internal combustion engine coupled to drive an electric generator.  (The two components combined are sometimes called a "generator set" or "gen-set").  Electricity produced by the generator powers the boat's air conditioner and other appliances.  (A15186-87.)

For decades, marine generators posed a known danger: carbon monoxide poisoning.  (A15478.)  Carbon monoxide is an odorless, colorless gas produced by combustion.  When inhaled, it binds to hemoglobin, starving the body of oxygen.  (A17743; A15189-90; A15458).  Boaters could be exposed to carbon monoxide

4

from a generator's exhaust in at least three ways: (1) from leaks in exhaust piping; (2) from the "station wagon effect," in which exhaust gasses are drawn back into the boat when the boat is "underway or moving"; and (3) from swimming or congregating near the generator's exhaust pipe. (A15190; A15993-96; A15478-79.)[1] Between 1984 and 2004, there were nearly 600 reported boat-related carbon monoxide poisonings, dozens of them fatal. (A17742; A17204; A15371-72.)

The long-standing carbon monoxide problem created liability issues for marine generator manufacturers. In the 1990s, Kohler, the largest manufacturer, faced multiple wrongful death lawsuits from carbon monoxide poisonings resulting from leaks in generator pipes. (A15448-52; A15996-97.) Kohler paid $22 million to resolve these lawsuits. (A15451.)

Before the Westerbeke invention, the belief in the industry was that the carbon monoxide problem could not be solved at the source. (A15482.) Efforts to protect boaters, therefore, focused primarily on education, carefully sealing the exhaust piping, and directing exhaust gas to as safe a location as possible. (A15190.) In March 2003, Kohler's then Director of Engineering, James Sember, testified at one of the wrongful death lawsuits that it was impossible for generators to "be produced in a way that would not produce carbon monoxide," and it was

---

[1] *See generally*, "A Good Way to Die," in Coast Guard Boating Safety Circular 64 (1986), pp. 30-32, available at http://uscgboating.org/regulations/assets/builders-handbook/PART2_BSC64.pdf (describing carbon monoxide dangers in boats).

therefore "important that the exhaust system remain leakproof." (A15455-56.) To prevent future carbon monoxide poisonings, Mr. Sember testified that Kohler would focus on educating customers on the dangers of carbon monoxide and instructing them to "[e]nsure the carbon monoxide detector is operational" and to regularly "inspect exhaust system components for cracks and corrosion." (A15461-63.)

That the industry believed carbon monoxide dangers to be a fact of life was understandable, given the science. Conventional marine generators pumped out carbon monoxide levels "anywhere from 10,000, 20,000, 30,000 and up parts per million." (A15208.) Exposure to just 800 ppm, however, causes "dizziness and nausea," and exposure to 1,200 ppm is "immediately dangerous to life and health." (A17204.) Thus, carbon monoxide would have to be reduced dramatically to have a meaningful impact on safety.

## II.    The Westerbeke Invention

Westerbeke Corporation is a family owned company, founded in 1937, that has been manufacturing and selling engine products for more than 50 years. The company has had two CEOs: John Westerbeke, Sr., and the current CEO and inventor of the patents-in-suit, John Westerbeke, Jr. ("Jack Westerbeke"). For nearly 30 years, Jack Westerbeke also acted as the company's chief engineer.

6

(A15470-73.)[2]

In late 2000, Jack Westerbeke decided to challenge the "conventional wisdom" that carbon monoxide risk was a fact of life in marine generators, and sought to design a marine generator that would emit carbon monoxide at "safe levels."  (A15479-82, A15486.)  Mr. Westerbeke's idea was to: (1) introduce a catalyst to the marine engine, while packaging it in a way that controlled its temperature; and (2) introduce a control scheme that both governed the engine speed with respect to a constant speed and maintained the air/fuel ratio, using closed-loop feedback from a sensor.  Mr. Westerbeke believed this unique combination might allow carbon monoxide reductions greater than previously thought possible.  (A15479-81.)

It worked.  By early 2003, Westerbeke had a prototype running in its lab that reduced carbon monoxide to very low levels, as low as single digit ppm.  (A15369-70.)  In October of 2003, Mr. Westerbeke filed the provisional patent application that ultimately led to the '044 and '196 patents-in-suit.  (A18053-74.)

---

[2] Jack Westerbeke owns the majority of shares of Westerbeke Corporation; the rest are owned by Westerbeke family trusts.  (A15495.)  The plaintiff in this lawsuit, WBIP (which stands for "Westerbeke Intellectual Property"), is an LLC wholly owned by Mr. Westerbeke, which holds some of Westerbeke's intellectual property, including the patents-in-suit.  (A15495.)

III.    **Reaction to the Westerbeke Low-CO Generator: Skepticism, then Praise**

In March 2003, Mr. Westerbeke and his then chief engineer, Eric Larson, attended a carbon monoxide workshop hosted by the Coast Guard.  The workshop gathered more than 200 participants from industry and government to discuss the marine carbon monoxide problem.  (A15369-70.)  The workshop began with presentations on the scope of the problem by a physician-activist and government researchers.  (A17204-05.)  Next, various industry representatives presented proposed "Mitigation Technologies," including systems that would redirect exhaust gas farther from boat occupants, improve ventilation, or improve alarm systems.  (A17205-07.)  Two presenters described experiments with catalysts to reduce emissions, but noted that the reductions achieved were modest (50%-70%-- nowhere near the levels needed), and that the catalysts had durability issues in the marine environment.  (A17210-12.)

After these presentations, the Coast Guard moderator asked "Are any of the generator manufacturers in the audience working on research and development to address this concern?"  (A17213; A15373.)  Mr. Westerbeke--who by this time had his prototype working in the lab--announced that Westerbeke would have generators "with substantially CO free exhaust" within a couple of years.  (A17213; A15373-75; A15488-90.)  "[T]he room was mostly shocked at his statement."  (A15374.)  After the session, two Kohler employees approached and

told Mr. Westerbeke that this was "impossible."  (A15374.)[3]

Roughly one year later, at a boat show in Miami, Westerbeke debuted its new line of low-CO generators.  (A15375.)  Westerbeke set up a trailer at the show, in which it ran two generators with a wet exhaust, as they would run in a marine environment, and allowed visitors to measure the carbon monoxide with a hand-held meter to demonstrate the low carbon monoxide levels.  Boat manufacturers, generator manufacturers, a Coast Guard official, and NIOSH researchers visited the trailer.  The response was "[e]xtremely positive." (A15375-76.)

Two employees of Kohler also visited the trailer and asked the Westerbeke engineer how they'd done it.  He responded that Westerbeke was using a catalyst and electronic fuel injection.  (A15376-77.)

The new Westerbeke Low-CO generators received extensive praise.  They won the prestigious National Marine Manufacturers Association Innovation Award at the 2004 IBEX boat show, (A15562-63), and the Ultimate Houseboat Accessory Award from an industry houseboating magazine (A15563-64; A17252).  The low CO feature was also praised by another houseboating magazine and in Popular

---

[3] Kohler contends that Mr. Westerbeke predicted his generators would emit "zero ppm" carbon monoxide, and argues that Kohler's engineers were only skeptical of the "zero" figure, but not skeptical that generators could emit CO-safe exhaust.  As discussed *infra*, substantial evidence shows that Mr. Westerbeke did not say "zero ppm."

9

Mechanics.  (A15564-66; A17254.)  Westerbeke also received letters and emails from government officials and other individuals praising the accomplishment, including one from an Industrial Hygienist at the U.S. Department of the Interior, praising Westerbeke for solving the carbon monoxide problem at the source, and stating that the products would "save lives."  (A15567-68; A17255.)

## IV.  Kohler Captures the Low-CO Market

After Westerbeke debuted its Low-CO generators at the 2004 Miami Boat Show, Kohler's generator division requested funding from management to develop its own Low-CO products.  (A17784-88, A17813.)  The division's proposal stated that the project "is required to retain current business," and that if Kohler failed to develop a Low-CO product, "market share decline would result."  (A17785, A17813.)  The funding request further stated that the Kohler product would seek to achieve Low-CO with an "electronically-controlled engine management system and exhaust after-treatment with a catalyst."  (A17785.)  These were the two features Westerbeke's engineer had identified to Kohler's engineers in the demonstration trailer at the Miami Boat Show.  (A15376-77.)

In the fall of 2005, roughly one year behind Westerbeke, Kohler launched its own Low-CO generators at the IBEX Boat Show.  (A17740.)  The PowerPoint Kohler presented at the show was an exhibit at trial.  The first slide, entitled "The need is clear!", presented data showing nearly 600 reported carbon monoxide

poisonings suffered by boaters between 1984 and 2004. (A17742.) The last three slides, entitled "The Technology," presented the solution: an engine control module that governed engine speed and provided closed-loop control, and a cooled catalyst. (A17744-46.)

By rapidly following Westerbeke to market with its own comparable Low-CO product, Kohler was able to convert its own customers to Low-CO, instead of losing them to Westerbeke, thereby maintaining its dominant market share in the gasoline generator market. (A17892.)  By 2008, Kohler had phased out its prior non-Low-CO generators and was selling only Low-CO. (A17899; A16003.)  All that was left for Westerbeke were the customers unwilling to pay extra for Low-CO technology, or otherwise unwilling to buy from Kohler. (A15493-94.)  In an internal "post audit" review of its Low-CO development, Kohler pronounced the project a success, "shutting the door" on Westerbeke and "allowing us [Kohler] to retain our major accounts." (A17892.)

## V.    The District Court Proceedings

The patents-in-suit issued on January 1, 2008 and November 16, 2010, and WBIP filed suit in early 2011.

After a six-day jury trial in May 2013, the jury ruled in favor of WBIP, finding all twelve asserted claims infringed and rejecting Kohler's obviousness and written description defenses. The jury also found Kohler's infringement to have

11

been willful and awarded damages of $9,641,206. (A8097-8100.)

Kohler moved for JMOL and a new trial. The District Court denied the JMOL motion and the new trial request, but remitted damages to $3,625,893. (A10653-75.)[4]

WBIP moved for enhanced damages and attorney fees, which the District Court granted in part. (A10661-71.) In analyzing the enhanced damages request, the District Court first assessed willfulness under the two-prong test of *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). The District Court held that "Kohler was objectively reckless under the first prong of the *Seagate* test." (A10664-65.)[5] Next, the District Court balanced the nine factors listed in *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992), and enhanced damages by 50%. (A10665-70.)

---

[4] The verdict form included a line for royalty rate and a line for royalty base. The rate awarded by the jury was within the range proposed by the damages experts, but the base was considerably higher than the infringing sales total. In post-trial briefing, WBIP argued that the jury intended to award an upfront payment as part of the reasonable royalty damages, and the only way to do so on the verdict form was to artificially inflate the "base." In support, WBIP cited to comparable licenses presented by Kohler's damages expert which included upfront payments, and to the additional revenue streams Kohler would receive from the hypothetical license, including replacement part sales and protection of collateral sales in its large boat-builder contracts. (A9830-9835.) The District Court, however, found "insufficient evidence to support WBIP's theory that the jury inflated the sales figure in order to add an 'upfront royalty.'" (A10657-58.) WBIP accepted the remittitur. (A10689.)

[5] The District Court similarly concluded that Kohler's noninfringement defenses were unreasonable. (A10665.)

With respect to attorney fees, the District Court found the case to be exceptional under 35 U.S.C. § 285, applying the clear and convincing evidence standard that controlled prior to *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014). (A10670-71.) The District Court ultimately awarded WBIP 75% of its requested fees. (A49-54.)

Finally, the District Court denied WBIP's request for a permanent injunction, awarding an ongoing royalty instead. (A10381-83, A10671-73.)

Kohler appeals the District Court's denial of its motion to grant judgment as a matter of law on obviousness, written description, and willfulness. WBIP cross-appeals the denial of the permanent injunction.

## VI.    The Post-Trial Reexaminations

After trial, but before the District Court's post-trial rulings, Kohler filed petitions for *ex parte* reexamination of both patents-in-suit. The petitions, which were each more than 100 pages long, raised the Phipps/Fujimoto obviousness arguments Kohler presented at trial, plus several other references and combinations.[6]

The Patent Office granted the reexamination requests and issued preliminary rejections, as is the norm. (*See* A10645, showing a reexamination grant rate of

---

[6] Kohler's reexamination petitions are viewable on the PTO website, at http://www.portal.uspto.gov/pair/PublicPair. (Search Reexamination Control Nos. 90/013,089 and 90/013,090, and select "image file wrapper.")

roughly 90% in FY2013.)  After receiving a single response from WBIP, however, the Patent Office confirmed all the claims.  (A11005-10, A11012-18.)  With respect to Phipps, the examiner panel found that it would not have been obvious to modify Phipps "to operate in a marine wet exhaust environment," as Kohler contended, pointing to details that would dissuade one of skill from attempting such a combination.  (A11008, A11016.)  The examiners also found that the secondary considerations were "sufficient to overcome the obviousness rejections," citing to evidence of long-felt need, skepticism, and commercial success. (A11009, A11017.)

## SUMMARY OF THE ARGUMENT

I.    To prevail on obviousness, Kohler must convince this Court that no reasonable juror could have found the claims valid over Phipps, even though the District Court held Kohler's obviousness defense to be not merely wrong, but unreasonable, and even though the patent office confirmed the validity of the claims over Phipps in a post-trial reexamination.  Kohler cannot meet this heavy burden.

In its Brief, Kohler argues that: (a) Phipps disclosed all the claim limitations except the "cooling" features; and (b) if one of skill decided to transform Phipps into a marine engine, it would have been obvious to add "conventional" cooling features to comply with Coast Guard temperature regulations.  There are two holes

in Kohler's *prima facie* obviousness case.   First, Kohler only offered expert testimony that one of skill *could* have adapted Phipps to marine "if asked to," but never presented any reason why one of skill *would* have done so.   By contrast, WBIP presented extensive expert testimony that one of skill would *not* have sought to modify Phipps to marine, because the backwards control scheme in Phipps would have failed to even run an engine, let alone achieve secondary control of emissions.   Second, even if one of skill were to convert Phipps' land generator to marine, this would not have resulted in the claimed invention.   Kohler's contention that the "cooling" elements of the claims were all "conventional" is incorrect.   One of the limitations--cooling a catalyst with a flow of coolant--was decidedly not conventional.   Thus, Kohler failed to present a *prima facie* case, let alone prove its case as a matter of law.

That the claims were not obvious over Phipps is confirmed by extensive objective evidence, including long-felt need, skepticism, praise, copying, and commercial success.   Kohler argues that all of this evidence is irrelevant for lack of nexus unless tied specifically to the cooling elements not disclosed in Phipps.   This misapplies the law.   The law requires a nexus connecting objective evidence to the merits of the claimed invention, not connecting objective evidence to a particular claim limitation missing from a particular prior art reference.   Here, the objective evidence was all based on the patented generators achieving low CO and solving

the marine carbon monoxide problem.  This was a novel *feature* of the invention not found in Phipps or any other prior art.  WBIP's expert testified extensively that this novel feature resulted from the claimed invention, thereby establishing nexus.

II.     Kohler also failed to prove the claims were invalid for lack of written description.  Kohler did not even argue this fact issue at trial.  Rather, it offered a single conclusory sentence from its expert ("There was not sufficient written description"), entered the file history into evidence, and then left it to the jury to divine the merits of its defense.  Applying *Koito Mfg. Co., Ltd. v. Turn-Key-Tech, LLC*, 381 F.3d 1142 (Fed. Cir. 2004), Kohler's presentation failed as a matter of law to meet the clear and convincing evidence burden, and certainly cannot provide a basis for JMOL overturning a jury verdict to the contrary.

In any event, even if Kohler had presented its written description arguments at trial, the defense fails.  The original provisional application described a controller that simultaneously governed engine speed and maintained the air/fuel ratio, demonstrating possession.  The law does not require disclosure of "flow charts" or algorithms to satisfy written description for a software limitation.

III.     The willfulness determination should be upheld.  As the District Court found, "obviousness was not a reasonable defense."  Nor was written description, since Kohler did not even run the defense at trial.  Kohler's argument that WBIP failed to prove it had knowledge of the patents before the complaint was filed

should be summarily dismissed. Kohler *admitted* in a summary judgment "statement of undisputed fact" that it had knowledge of the '044 patent no later than August 2010. Thus, pre-suit knowledge was judicially admitted, and no longer a contested fact issue for trial. In any event, as the District Court found, there was substantial evidence in the record to support an inference that Kohler was aware of the patent even earlier.

IV. Finally, WBIP cross-appeals the District Court's denial of a permanent injunction. The District Court did not balance the four *eBay* factors, as required by case law, instead basing its decision solely on a flawed assessment of public interest. The case should be remanded with instructions to make relevant factual findings and consider the merits of the injunction request in light of all four factors.

## STANDARD OF REVIEW

In reviewing denial of JMOL, this Court applies regional circuit law. *Marine Polymer Techs., Inc. v. HemCon, Inc.*, 672 F.3d 1350, 1357 (Fed. Cir. 2012). In the First Circuit, "a jury's verdict must be upheld unless the facts and inferences, viewed in the light most favorable to the verdict, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have reached the verdict." *Id.* at 1357-58 (internal quotation marks omitted). A district court's JMOL ruling is reviewed *de novo*. *Id.* at 1357.

"Obviousness is a question of law based on underlying factual findings: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of skill in the art; and (4) objective indicia of nonobviousness." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1360 (Fed. Cir. 2012). A defendant bears the burden of proving obviousness by clear and convincing evidence. *Id.* That burden is "made heavier" here, where a patent office reexamination proceeding has confirmed the claims over the prior art raised by Kohler in this appeal. *See Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 961 (Fed. Cir. 1986). *See also Cadence Pharm. Inc. v. Exela Pharm. Sci., Inc.*, __ F.3d __, 2015 U.S. App. LEXIS 4700, at *21 (Fed. Cir. Mar. 23, 2015) (defendant-appellant "bears a difficult burden" where both trial court and the patent office have rejected an obviousness theory). In reviewing denial of a motion for JMOL of obviousness, this Court "first presume[s] that the jury resolved the underlying factual disputes in favor of the verdict winner and leave[s] those presumed findings undisturbed if they are supported by substantial evidence. Then [the Court] examine[s] the legal conclusion *de novo* to see whether it is correct in light of the presumed jury fact findings." *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1342 (Fed. Cir. 2011) (internal quotations omitted).

"Compliance with the written description requirement is a question of fact, which is reviewed for substantial evidence." *Abbott Labs. v. Syntron Bioresearch,*

*Inc.*, 334 F.3d 1343, 1356 (Fed. Cir. 2003). At trial, the burden was on the party claiming invalidity (here, Kohler) to prove by clear and convincing evidence that the written description requirement was not met. *Id.*

This Court has held that the willfulness inquiry under 35 U.S.C. § 284 contains objective considerations that are "best decided by the judge as a question of law subject to de novo review," and subjective, factual considerations evaluated by the jury and then reviewed for substantial evidence. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Assocs., Inc.*, 682 F.3d 1003, 1007, 1008 (Fed. Cir. 2012). After *Highmark Inc. v. Allcare Health Mgmt. Sys., Inc.*, 134 S. Ct. 1744 (2014), however, WBIP submits that the proper standard of review is abuse of discretion, since the discretionary language in 35 U.S.C. § 284 is similar to that in § 285.

Denial of a permanent injunction is reviewed for abuse of discretion. *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1344 (Fed. Cir. 2013).

## ARGUMENT

## I.    THE CLAIMS WERE NOT OBVIOUS

At trial, Kohler primarily argued that the claims were obvious over Phipps in combination with a second reference, Fujimoto, which described a propulsion engine for a jet ski. (A19051-63.) In the post-trial reexaminations, Kohler again presented the Phipps-Fujimoto combination. It failed both times. The patent

office explicitly found that Phipps and Fujimoto were not combinable.  (A11008; A11016.)

So now, in this appeal, Kohler abandons the Phipps-Fujimoto combination, arguing instead that the claims were obvious over Phipps *alone*.  According to Kohler, the claim limitations missing from Phipps (but found in Fujimoto) were all "conventional" cooling elements that one of skill would have added to Phipps in converting Phipps to marine.

Kohler's Phipps-alone argument is even weaker than the combination.  The argument fails to set forth a *prima facie* case, because: (a) one of skill would not have attempted to convert Phipps into a marine engine; and (b) the limitations missing in Phipps were not all "conventional" cooling elements.  And even if Kohler could make out a *prima facie* case, the overwhelming objective evidence here strongly supports the nonobviousness of the claims.

### A.     Kohler Failed to Establish a *Prima Facie* Case of Obviousness

#### 1.  The Phipps Reference

The Phipps patent (A19040-50) teaches a novel reverse control scheme for electronic fuel injection.

In a traditional fuel injection system, a user's commands change the flow of air into the engine (e.g., pressing an accelerator to open a throttle), and a computer then calculates the amount of fuel to inject to obtain the desired air/fuel ratio.

(A16026-27.)  Phipps' Fig. 1, which it labels "prior art," depicts a variable speed

engine using this conventional air/fuel control scheme.  (A19041; A19045, at 1:15-

67; A19046, at 3:29-38.)  Phipps then teaches reversing this arrangement:

> In essence, the logical operation of the control system implemented in
> FIG. 2 is reversed from the exemplary conventional [prior art] control
> system depicted in FIG. 1; namely, an operator directly manipulates
> the pulse-width delivery of fuel into an engine intake manifold with a
> fuel injector, and a servo controls air flow into the intake manifold.

(A19047, at 5:19-24; A16027.)

In Figure 4--the figure used for Kohler's invalidity presentation at trial

(A15855-58)--Phipps describes using his reverse control scheme in an engine that

powers a generator.



Phipps' generator embodiment employs an emissions strategy known as exhaust

gas recirculation, or "EGR," shown by element 94 in the Figure, in which a portion of the exhaust gas is recirculated back into the engine. (A16026; A19049, at 9:42-54; A19043.)  According to Phipps**,** his reverse control scheme improves the stability of exhaust gas recirculation, because "the 'air' component of the air/fuel ratio to be disturbed is minimized." (A19047, at 6:53-65.)

Phipps does include a sentence saying that a catalyst can be used with his system, but offers no guidance on how or where in the system it would be incorporated. (A19049, at 9:67-10:5.)

### 2. <u>One of Skill Would Not Have Been Motivated to Convert Phipps into a Marine Engine</u>

Converting a land generator to marine is not simply a matter of slapping on a water jacket and directing water into the exhaust stream.  Marine engines are subject to different regulations and constraints than land generators, including different power and sizing requirements and more strenuous fire and ignition testing. (A16028-29.)  One of skill would need strong motivation to undertake such a conversion. (A16030.)

Here, Kohler offered *no expert testimony* that one of skill would have been motivated to transform Phipps into a marine engine.  At trial, Kohler's expert, Mr. Brooks, testified only that if one of skill "were asked to" convert Phipps into a marine engine, he or she would know to add a water jacket to keep surface

temperatures cool, and to inject water into the exhaust stream. (A15858.) This is a classic hindsight formulation. Mr. Brooks did not testify why one of skill *would* have converted Phipps into a marine engine, but only that one *could* have if "asked to." *See InTouch Tech., Inc. v. VGo Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014) ("VGo's expert also succumbed to hindsight bias in her obviousness analysis. Dr. Yanco's testimony primarily consisted of conclusory references to her belief that one of ordinary skill in the art *could* combine these references, not that they *would* have been motivated to do so.") (emphasis in original).

In contrast, WBIP's expert, Mr. Amber, testified at length that one of skill would *not* have sought to convert Phipps into a marine engine. First, as a threshold matter, Mr. Amber testified that one of skill would have doubted the viability of Phipps' reverse control scheme for any purpose, let alone marine. The Phipps scheme first adjusts "the very fast variable," fuel injection, and then has the computer try to "catch up" by adjusting "relatively slow-moving air." (A16026-27.) According to Mr. Amber, this scheme is "totally reverse from what -- any system that I've ever seen in practice or heard or read about it. This is the only time I've ever seen this type of strategy. It's very much backwards." (A16027.) When asked how one of skill in the art in 2002 would have reacted to the Phipps' disclosure, he testified that it was "totally backwards from what I believe one of skill in the art would even attempt to make an engine run." (A16027.) He

compared the Phipps reverse control scheme to hammering a nail into a piece of furniture by picking up the furniture and banging it into the hammer.  (A16027.)  This testimony *was not challenged or rebutted by Kohler*.  While an inoperable reference still qualifies as prior art "for all that it teaches," the reference "must teach a person of ordinary skill to make an apparatus that works for its intended purpose."  *Geo M. Martin Co. v. Alliance Mach. Sys. Int'l*, 618 F.3d 1294, 1302, 1303 (Fed. Cir. 2010) (internal quotation marks omitted).  Where the reference "did not do so on its own," the defendant "would have needed to establish that a person of ordinary skill would have nonetheless been able to make a working apparatus."  *Id.* at 1303.  Here, Mr. Amber testified that Phipps' reverse control scheme would not have worked for its intended purpose, and Kohler offered no rebuttal.

The "catch up" problem with Phipps' scheme would be particularly problematic in marine.  Mr. Amber testified that marine generators are necessarily small and compact, and therefore more susceptible to load changes than industrial land generators.  (A15197.)  Speed control, therefore, must be very tight to avoid "blowing up electronics and other devices on your boat."  (A15197.)

One of skill, therefore, would have concluded that Phipps control scheme would fail to properly run an engine, let alone tightly control a marine generator, and would have had no motivation to convert Phipps to marine.  (A16027.)  *See*

*Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1334-35 (Fed. Cir. 2013) (motivation to undertake a significant modification of a prior art reference requires a "reasonable expectation that this significant change would be successful"). Kohler's failure to rebut this evidence with expert testimony is fatal to its obviousness case. *See Alexsam, Inc. v. IDT Corp.*, 715 F.3d 1336, 1348 (Fed. Cir. 2013) (expert testimony on motivation required to satisfy clear and convincing evidence burden where technology is "complex" and the prior art is not "easily understandable" to lay jurors); *Kinetic Concepts*, 688 F.3d at 1368-69 (same).

Lacking expert testimony on motivation, Kohler relies instead on two pieces of fact testimony which had nothing to do with Phipps. First, Kohler cites to fact testimony from its expert that his previous employer required that any engine he designed had to work in cars, boats, and generators. (A15874.) Even if true, this says nothing about whether one of skill would have been motivated to transform Phipps from a land engine into a marine engine. Second, Kohler cites testimony from Mr. Larson, a former Westerbeke engineer, that the marine industry would sometimes adapt parts from automobiles to work in marine. (A15439-40.) Again, that some parts may be adaptable across platforms says nothing about whether one of skill would have been motivated to transform Phipps into a marine engine.

Since Kohler has no evidence that one of skill would have been motivated to transform Phipps, it does what all defendants do in such a predicament: it makes

conclusory citations to language in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007). Kohler first suggests that transforming Phipps into a marine engine is the "mere application of a known technique to a piece of prior art ready for the improvement." *Id.* at 417. Kohler offered no evidence, however, let alone clear and convincing proof, that Phipps was "ready" for addition of injection of water into the exhaust stream and inclusion of a water jacket. For example, Kohler failed to explain how one of skill would have reconciled a wet exhaust with Phipps' exhaust gas recirculation. EGR is central to Phipps disclosure--it is in the Abstract, in all of Phipps' claims, and a prominent component of Fig. 4, the generator embodiment Kohler relied upon at trial. (A19040, A19043-50.) *See also* A16026 (Amber testimony that Phipps' reverse control scheme was designed "to deal with" EGR.) The record shows that EGR and a wet exhaust stream are potentially in conflict. *See* A106, '044 Patent at 6:42-46 ("In marine applications, it is…desirable to prevent cooling seawater from reaching the engine 12, which can results [sic] in catastrophic failure."); A17743, Kohler PowerPoint introducing its infringing product, at slide 3 ("Sea water and Catalyst don't mix"). Mr. Brooks, however, ignored Phipps' EGR. It is not obvious to modify a prior art reference in a way that "change[s] the basic principles under which the prior art was designed to operate, or that render[s] the prior art inoperable for its intended purpose." *Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*, 2015 U.S. App. LEXIS 1456, at *5 (Fed.

Cir. Jan. 27, 2015) (quotation marks and citations omitted). *See also McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1353-56 (Fed. Cir. 2001) (no motivation to combine finger placements and multi-colored equatorial bands of prior art baseballs where the former would interfere with, and render inoperable, the latter).

Next, Kohler argues that adding a water jacket and a wet exhaust to Phipps "would get predictable results." (A15873-75.) Given Mr. Amber's testimony, the only "predictable" result from using Phipps' control scheme in marine is a non-functional generator, let alone a successful marine generator. Finally, Kohler argues that "market incentives" would have prompted one of skill to modify Phipps to "broaden the market to include marine applications," citing *KSR*, 550 U.S. at 417. (Kohler Brief at 34.) There were no "market incentives," however, to adapt Phipps, a paper patent describing an unworkable reverse control scheme designed to improve EGR, into a marine product. There was no market for Phipps at all, let alone a marine market.

Kohler's argument, therefore, reduces back to Mr. Brooks' hindsight testimony on the issue: that *if* one of skill "were asked to" convert Phipps into a marine engine, he or should would know to add a water jacket and wet the exhaust. (A15858.) Obviousness, however, requires more. *See InTouch*, 751 F.3d at 1352.

3. Adding "Conventional" Marine Elements to Phipps Would Not Have Resulted in the Claimed Invention

Even if Kohler established that one of skill in the art would have sought to convert Phipps into a marine engine, this would still not make out a *prima facie* case of obviousness.  To state a *prima facie* case, the defendant must show that *all* limitations of the claims are found in the proposed combination.  *See CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) ("obviousness requires a suggestion of all limitations in a claim") (citing *In re Royka*, 490 F.2d 981, 985 (CCPA 1974)).  Kohler's argument fails that test.

In its brief, Kohler contends that one of skill would have added "conventional" marine elements to Phipps, namely, "water-jacketing" and injection of water into the exhaust.  (Kohler Br., pp. 27-30.)  There is a third element in the claims of the '044 patent, however, that was *not* "conventional": cooling a catalyst with a flow of coolant.  At trial and in the reexaminations, Kohler addressed this limitation by combining Phipps with Fujimoto, one of the few references that did teach cooling a catalyst with a flow of coolant.  In this appeal, however, Kohler drops that combination, leaving a hole in its *prima facie* case.

In its effort to now show that cooling a catalyst was "conventional," Kohler's brief misleadingly blends two separate claim limitations:  the "water-jacketed exhaust manifold" (dependent claim 10) and the catalyst "cooled by a flow of coolant" (independent claims 1 and 12).  These are *not* the same limitation.

In Kohler's infringing products, for example, the water jacket surrounding the manifold is an antifreeze mixture, in an enclosed compartment, that communicates with a heat exchanger. (A15259; A17386-87.) The "flow of coolant" that cools Kohler's catalyst, however, is raw seawater pumped up from the sea body and around the catalyst's cylindrical housing. (A15211-13.)

Placing a water jacket around an exhaust manifold was indeed common and conventional in marine engines. Cooling a catalyst, however, was not. Indeed, Kohler argued throughout the case that catalysts should *not* be cooled, and should instead be kept as hot as possible. (A15687.)

There is substantial evidence in the record that "cooling a catalyst" was not a "conventional" marine feature that one of skill in the art would necessarily have added to Phipps.

First, during prosecution of the '044 patent, the inventor distinguished a prior art marine engine patent that included a water jacket, but not a water-cooled catalyst. The inventor pointed out that in this prior art patent, Kato, U.S. Pat. No. 6,053,785, the catalyst was "cantilevered off" the water jacketed areas and therefore was "not cooled by any coolant." (A18133.)

Second, the only two commercial marine generator products to experiment with catalysts prior to the invention did *not* cool their catalysts with a flow of coolant. A NIOSH-tested device raised by Kohler in the reexaminations had a

catalyst and a water-jacketed manifold, but as the patent office found, the catalyst was not cooled by a flow of coolant. (A11008.) Similarly, the Westerbeke prior art BCG generator included a water jacketed manifold and a catalyst, but did not cool the catalyst with a flow of coolant. (A15287-89; A19267-68.)[7]

Finally, until trial, Kohler argued that its accused Low-CO generators did not cool their catalysts with a flow of coolant and therefore did not infringe. In fact, Kohler argued vehemently that it was a *bad idea* to cool a catalyst. In a summary judgment exhibit, Kohler presented deposition testimony from Mr. Koehl, an engineer who also testified at trial, that Kohler sought to cool only the outer surfaces of the engine to comply with regulations, and to *avoid* cooling the catalyst:

> The goal never was to cool the catalyst, because that's not how a catalyst works. Hotter the temperature in the catalyst, the better it works.

(A3572-73.) Mr. Koehl repeated this point at trial. (A15687.)

---

[7] In its Brief, Kohler argues that the prior art BCG generator *did* cool its catalyst with a flow of coolant, citing to the same Amber testimony WBIP cites above (A15287-89). Mr. Amber's testimony makes clear, however, that the BCG product had a water-jacketed manifold, but did not flow water around the catalyst to cool it as described in the patent. The only "cooling" of the catalyst that Mr. Amber acknowledged was indirect cooling that might result from water-jacketing the manifold. This is similar to the Kato prior art distinguished during prosecution, discussed above. (*Supra*, p. 29.)

In fact, Kohler did cool its catalyst with a flow of coolant.  It flowed seawater directly around the catalyst housing, much like the '044 patent's preferred embodiment.  *Compare* A17739 *with* A99.  Kohler even branded its products as having a "cool catalyst."  (A17746; A17715; A17919.)  At trial, Mr. Amber presented data and mathematical calculations proving that Kohler's seawater flow cooled its catalyst, not just outer surfaces of the engine.  (A15212-20, A15362.) Kohler wisely chose not to pursue this frivolous noninfringement defense before the jury.

Nevertheless, that Kohler stated in summary judgment filings and at trial that catalysts should *not* be cooled, and that the "[h]otter the temperature in the catalyst, the better it works," is directly contrary to its position in this appeal that cooling a catalyst with a flow of coolant, in addition to cooling surface temperatures, was "conventional."

Against this substantial evidence, Kohler cites two testimony excerpts in support of its contention that cooling a catalyst with a flow of coolant was "conventional."  First, Kohler claims that "Mr. Westerbeke himself conceded that encasing catalysts in a water-jacketed manifold was just 'one fairly obvious thing that had to be accomplished."  (Kohler Brief, p. 30, citing A15479-80.)  Mr. Westerbeke conceded no such thing.  Rather, he testified that, as part of his conception of the invention, he believed a catalyst would need to be encased in a

manifold, that the manifold would need to have a surface temperature below 200 degrees to comply with regulations, and that the catalyst could not be overheated or overcooled.  He characterized "packaging of the catalyst and the manifold" as "one problem" that needed to be solved.  The only thing he described as "obvious" was that the surface temperature would have to be below 200 degrees.  (A15479-80.)  This passage says nothing about cooling a catalyst with a flow of coolant.

Second, Kohler leans on the following soundbite from Mr. Amber's cross-examination:  "Q. And you would agree that even in 1995 it was really well-known that if you wanted to put an engine in a boat, you needed to flow coolant around that catalyst?  A. That's correct."  (A16038-39.)  A review of the transcript makes clear, however, that when Mr. Amber answered that question, he did not realize that counsel had slyly substituted the word "catalyst" for "engine" in the second clause of the question.  This is demonstrated by the *previous* question and answer, which Kohler omits from its brief:  "Q. So now that focuses us on the difference, the difference between what was generally known in 1995 and the claim, is the idea of putting a flow of coolant around the catalyst?  A. Yup."  *See United States v. Aubin*, 961 F.2d 980, 983 (1st Cir. 1992) ("testimony should not be taken out of context").  Indeed, cooling a catalyst with a flow of coolant could not possibly have been "well known" in 1995.  The reason: there is no evidence in the record that catalysts were used in marine *at all* at that time.  The earliest reference in the

record to use of a catalyst in marine was the BCG generator in 1996, and that catalyst was *not* cooled by a flow of coolant.  (A15287-89; A19267-68.)  The only prior art references of record that mention cooling a catalyst with a flow of coolant were Fujimoto, a 1999 patent, and the SWRI experimental propulsion engine tested in 2001-2003.  Since Kohler makes no effort in this appeal to argue a combination of one of these references with Phipps, its *prima facie* case for the '044 claims is deficient.  *See CFMT*, 349 F.3d at 1342.[8]

## B. Objective Evidence Strongly Supported the Non-Obviousness of the Claims

Even if Kohler had established a *prima facie* case, it would be overwhelmed here by the objective evidence of nonobviousness.  Objective evidence "must always when present be considered," because such evidence "may often be the most probative and cogent evidence in the record."  *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1349 (Fed.

---

[8] The infringed claims of the '196 patent do not include the "catalyst cooled by a flow of coolant" limitation.  However, these claims do include an additional element not taught in Phipps:  that the exhaust feedback sensor be "located upstream of the catalyst."  (A118.)  Phipps says nothing about the location of a catalyst.  Kohler entirely ignores this limitation in its appeal brief, and therefore fails to present a *prima facie* case of obviousness on the '196 patent for this reason as well.  *See CFMT*, 349 F.3d at 1342.  In any event, if the Court affirms liability under the '044 patent, then the '196 patent becomes superfluous.  The '044 patent covers the entire damages period, and both damages experts agreed that infringement of the '196 patent, in addition to the '044, would not entitle WBIP to additional damages.  (A15621-24; A15789-90.)

Cir. 2012) (internal quotation marks omitted).  Objective indicia "guard against slipping into use of hindsight." *Graham v. John Deere Co.*, 383 U.S. 1, 36 (1966) (internal quotation marks omitted).

The full quintet of secondary considerations are present here: long-felt need, skepticism, industry praise for the invention, copying, and commercial success. And contrary to Kohler's arguments, the record shows a clear nexus between the objective evidence and the merits of the claimed invention.  As discussed in part 6, *infra*, the objective evidence was all based on the patented generators achieving safe CO emissions.  Expert testimony directly linked this feature--a feature not found in the prior art--to the patents' claims.

### 1. Long-Felt Need

The invention solved the decades-old problem of carbon monoxide poisonings from marine generators.  As Kohler's own documents show, carbon monoxide poisoning was a long-standing problem in the marine generator field.  In June 2005, an internal Kohler document stated that "[c]arbon monoxide-related fatalities associated with generators have impacted [generator manufacturers] over the past 20 years."  (A17915.)  A few months later, when introducing its Low-CO generators at a boat show, Kohler led with a slide entitled "The need is clear!" that showed 571 boat-related carbon monoxide poisonings between 1984 and 2004. (A17742.)  At the March 2003 carbon monoxide workshop, a physician presented

epidemiological data showing 477 reported poisonings in 26 states between 1990 and 2002, and case studies describing young boaters drowning while swimming near a generator exhaust stream.  (A17204; A15371-72.)  And finally, at trial, Mr. Westerbeke testified that carbon monoxide concerns were a known problem when his company first began selling gasoline marine generators in 1983.  (A15478; A15500-01.)

Carbon monoxide poisonings were a particularly acute problem for Kohler, which faced multiple wrongful death lawsuits in the 1990s relating to carbon monoxide poisonings from leaks in generator piping.  (A15448-52; A15996-97.)  Kohler paid $22 million to resolve these lawsuits.  (A15451.)

The invention solved the carbon monoxide problem.  The generators built according to the invention (both Westerbeke's and Kohler's) reduced carbon monoxide emissions by more than 99% compared to the prior art.  (A17253; A17718.)  Where prior art generators emitted tens of thousands ppm of carbon monoxide (A15208), generators practicing the invention emitted single or double digit ppm, or sometimes 100s ppm at high load.  (A15207-08; A17272; A15257-58; A17253.)  These are "safe" CO levels--all are below the level NIOSH

considers acceptable for short-term exposure (200 ppm). (A17204-05.)[9] By virtually eliminating CO at the source, the generators prevent poisonings from pipe leaks, from the "station wagon effect," and from swimming or standing near a generator exhaust.[10]

In the *Long-felt need* section of its Brief (pp. 39-45), Kohler does not contest that carbon monoxide poisoning was a long-standing problem for marine generators, or that the patented Low-CO generators solved the problem. Instead, Kohler focuses exclusively on the prior wrongful death lawsuits. Kohler argues that WBIP presented this evidence for an improper purpose, that the District Court erred admitting it, that this evidence was the reason the jury ruled against it, and that this Court should grant a new trial on that basis. Kohler's evidentiary arguments are spurious.

---

[9] *See also* Coast Guard Boating Safety Circular 74 (1992), p. 4, available at http://www.uscgboating.org/library/boating-safety-circulars/BSC74.pdf (chart showing effects of various levels of CO exposure. At exposure to 200 ppm, it would take an hour for a headache to begin, and an unspecified time beyond the chart for permanent injury. Below 100 ppm, the more typical operating level for the Low-CO generators practicing the patent, exposure of several hours leads to only minor symptoms.)

[10] At trial, Kohler's counsel tried to suggest that that the Westerbeke invention would not prevent poisonings from pipe leaks, suggesting the leak could occur before the catalyst, but Kohler's own expert shot down this theory. (A16012.)

Kohler's brief accuses WBIP of introducing the prior lawsuit evidence solely to "paint[] Kohler as a corporate killer responsible for killing 12 people," "all but transforming this case from a standard patent infringement suit into a morality tale about which company values life more."  (Kohler Brief, pp. 41, 44.)

Kohler's accusations are directly contradicted by the record.  WBIP *never* suggested that Kohler was unconcerned about carbon monoxide poisonings or the well-being of its customers.  Exactly the opposite.   WBIP repeatedly described Kohler as a safety-conscious company, desperate to solve the carbon monoxide problem.  From nearly every Kohler witness, WBIP actively solicited testimony that Kohler was safety conscious and cared about its customers.  *See* A15451-52 (Christiensen); A15455 (Sember); A16000-01 (Brooks).   The reason WBIP introduced the prior lawsuit evidence was not to paint Kohler as a "killer" or a "devil," but to show that Kohler was *highly motivated* to eliminate the risk of carbon monoxide poisoning anytime piping leaked.  That Kohler could not find such a solution until Jack Westerbeke demonstrated it could be done is highly probative evidence of nonobviousness.

Kohler's accusation that WBIP portrayed Kohler as a "corporate killer" (p. 41) and a "devil" (p. 2) simply has no basis in reality.  How can Kohler reconcile these accusations with the testimony solicitations above, or with the following statements by WBIP's counsel in opening and closing?:

Opening:  Now, by all accounts, Kohler is a very safety-conscious organization. Its witnesses have testified, and I expect they'll say here, that safety comes before cost at Kohler. They too were wrestling with this problem. You'll learn some of the particular circumstances that they were wrestling with. They had great moral and economic incentive to solve the problem, but they didn't; they couldn't, not until they saw Westerbeke's solution. (A15146.)

Closing:  And not only was there a problem, there was a conventional wisdom that you couldn't solve the problem, even though I think the evidence is pretty clear that both parties in this case, safety-conscious companies who really wanted to solve the problem, but the conventional wisdom was it couldn't be solved.  (16101.)

Needless to say, the District Court did not err admitting the prior lawsuit evidence.  The First Circuit reviews Fed. R. Evid. 403 rulings for "abuse of discretion only."  *United States v. Whitney*, 524 F.3d 134, 141 (1st Cir. 2008). "Only rarely--and in extraordinarily compelling circumstances--will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect."  *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1340 (1st Cir. 1988).  Here, the probative value of the evidence outweighs any fabricated argument of "prejudice."  In any event, any purported prejudice was dispelled by a limiting instruction given by the Court--and agreed to by Kohler--before the evidence was introduced.  (A15328-29; A15397-99; A15445-47; A15452-53.)  *See United States v. Richardson*, 421 F.3d 17, 41 (1st Cir. 2005) ("within wide margins, the potential for prejudice…can be satisfactorily dispelled by appropriate curative instructions") (internal quotation

marks omitted).

## 2. Skepticism

There are two examples of skepticism in the record. First, in March 2003, Kohler's then Director of Engineering, James Sember, testified in one of the wrongful death lawsuits that it was impossible for generators "to be produced in a way that would not produce carbon monoxide," and it was therefore "important that the exhaust system remain leakproof." (A15455-56.) This testimony occurred in *the same month* that Mr. Westerbeke first announced his plans to produce generators "with substantially CO free exhaust" at an industry carbon monoxide workshop. Both the District Court and the patent office cited this prior Kohler testimony as evidence of nonobviousness. (A10664-65; A11009, A11017.)

The second example of skepticism is the industry's--and Kohler's--reaction to Mr. Westerbeke's announcement at that workshop. When Mr. Westerbeke stated that his company would have generators "with substantially CO free exhaust" within a couple of years, "the room was mostly shocked at his statement." (A17213; A15373-75; A15488-90.) The group then returned to discussing carbon monoxide warning systems, vertical exhaust stacks, and education of boaters. (A17213-15.) Immediately after the session, two Kohler employees told Mr. Westerbeke that his solution was "impossible." (A15374.)

Kohler's only response to the skepticism evidence is to re-argue a fact

dispute from trial.  According to Kohler, Mr. Westerbeke did not say he would produce "substantially CO free exhaust," but actually claimed his generators would produce "zero ppm," citing Mr. Larson's testimony to that effect.  Kohler contends its employees and the industry were only skeptical of the "zero" prediction, not that carbon monoxide could be reduced to safe levels.

This argument was--and remains--contrary to the weight of the evidence. Mr. Westerbeke testified that he did not say "zero" ppm.  (A15489-90.)  And even more persuasive, the contemporary minutes from the workshop reflect that Mr. Westerbeke said "*substantially* CO free," not zero.  (A17213, emphasis added.) Moreover, the idea that the industry would be unsurprised by a claim that carbon monoxide could be reduced to safe levels, solving the long-standing problem, but "shocked" at a claim of zero ppm, is a strained interpretation of the record.  At the least, there is substantial evidence of skepticism.  *See Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1369 (Fed. Cir. 2013) (where a jury returns a general verdict of nonobviousness, the court is "bound to assume that the jury resolved the evidence of secondary considerations in favor of" the patent owner).

3. Praise

The Westerbeke Low-CO generators received extensive industry praise. The generators won the prestigious National Marine Manufacturers Association

Innovation Award, (A15562-63; A17915), and the Ultimate Houseboat Accessory Award from an industry magazine (A15563-64; A17252). The generators received additional praise from other magazines and from government officials working on the carbon monoxide problem. (A15564-66; A17254; A15567-68; A17255.) All of this praise related to the generators' dramatic reduction of carbon monoxide emissions to safe levels, which, as discussed below in part 6, resulted from the claimed invention.

In addition, there was another form of relevant "praise": Kohler's touting of its own infringing product. When Kohler debuted its infringing Low-CO generators in the fall of 2005, it presented a PowerPoint describing the technology as a solution to the carbon monoxide problem. (A17741-47.) The PowerPoint concludes with a slide proclaiming "The future Is NOW!" (A17747.) This is further evidence of nonobviousness. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1352 (Fed. Cir. 2010) ("Artesyn's position that Power-One's invention was obvious is inconsistent with its position that its own infringing product was an advancement in the industry.")

### 4. Copying

Westerbeke demonstrated its new "Safe-CO" generators in a trailer at the 2004 Miami Boat Show. (A15375.) During that demonstration, two employees of Kohler visited the trailer and asked a Westerbeke engineer how they'd achieved

low CO. The Westerbeke engineer disclosed that it was using a catalyst and electronic fuel injection. (A15376-77.) Shortly thereafter, Kohler's generator division requested funding from management to develop its own Low-CO products. (A17784-88, A17813.) The funding request stated that the Kohler product would seek to achieve Low-CO with an "electronically-controlled engine management system and exhaust after-treatment with a catalyst"--the two features Kohler's engineers had learned of at the boat show. (A17785; A15376-77.)

As part of its analysis of the *Read* factors, the District Court found that "while there is no 'smoking gun' evidence of copying, evidence that Kohler developed its Low-CO generators with catalytic converters and electronic fuel injection components after learning about Westerbeke's product at a trade show supports the inference that Kohler was at least reckless as to whether it copied." (A10668.) Kohler's actions during and after the trade show, combined with its prior expressions of skepticism, are inconsistent with its litigation position that the invention was obvious. *See Heidelberger Druckmaschinen AG v. Hantscho Commercial Prods., Inc.*, 21 F.3d 1068, 1072 (Fed. Cir. 1994) ("the litigation argument that an innovation is really quite ordinary carries diminished weight when offered by those who had tried and failed to solve the same problem, and

42

then promptly adopted the solution that they are now denigrating").[11]

### 5. Commercial Success

The invention transformed the marine generator market. Immediately after launch, Kohler's Low-CO sales overtook its non Low-CO sales. In 2006, the first full year Kohler sold its Low-CO generators, 67% of Kohler's gasoline marine generator sales were Low-CO. In 2007, more than 94% of its sales were Low-CO. (A17899.) By 2008, Kohler had essentially stopped selling the prior art generators altogether. (A17899; A16003.) In total, Kohler sold more than $60M worth of Low-CO marine generators between launch and late 2012, (A16003; A15592-93), and continues to exclusively sell the infringing generators to this day.[12] These Kohler sales are objective evidence of nonobviousness. *See Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000) ("success of an infringing product is considered to be evidence of the commercial success of the claimed invention").

Substantial evidence establishes that the low carbon monoxide emissions--a feature resulting from the claimed invention--drove the market. This evidence

---

[11] At a post-trial hearing, Kohler argued that copying was irrelevant because the alleged copying occurred while the patent was pending, rather than after it had issued. The District Court dismissed this notion, pointing out that Kohler cited no authority in support of the proposition. (A10668.)

[12] *See* http://www.kohlerpower.com/marine/filterresults.htm?category Number=12561&sectionNumber=13461

includes Kohler's own documents, (A17785; A17915), and testimony from WBIP's damages expert (A15592-601). In short, Kohler needed to adopt Low-CO to protect its business from Westerbeke, and there was no alternative to achieve Low-CO besides infringing the patent. (A15600-01.) Kohler's damages expert admitted there was no non-infringing alternative--it had use the patented technology or leave the Low-CO market. (A15821-22.)

In its Brief, Kohler responds to commercial success by pointing out that Westerbeke continued selling its prior art generators after introducing Low-CO, and that Westerbeke's prior art generators outsold its Low-CO generators for a number of years. (Kohler Brief, pp. 50-51.) There are two flaws with this argument. First, Kohler was the dominant player in this two-player market. So in the overall gasoline generator market, Low-CO sales dominated non-Low-CO sales. (*Compare* A17780, A17782, and A17899.) Second, the reason Westerbeke's Low-CO sales remained small was Kohler's infringement. Kohler followed Westerbeke quickly to market, undercutting Westerbeke's Low-CO generators on price by 15%. (A15493-94; A15569-70.) Kohler did so because it recognized Westerbeke's Low-CO innovation posed a threat to its market share, and even threatened its OEM contracts with large boat builders, contracts which included more than just gasoline generators. (A15593-97.) As Kohler's documents show, its infringement succeeded, "shutting the door" on Westerbeke

44

and "allowing us [Kohler] to retain our major accounts." (A17892.) The customers remaining for Westerbeke were the minority unwilling to pay extra for Low-CO technology, and houseboat rental companies who initially did not want a mixed fleet. (A15493-94.)

In short, the invention transformed the market from non Low-CO to Low-CO, even though the Low-CO product was more expensive. *See Transocean*, 699 F.3d at 1350 (evidence that products covered by the patent "commanded a market premium" and became "the industry standard" shows commercial success). Kohler's own "Post Audit" review of its Low-CO launch concluded that "The product has been accepted in the market and is selling well." (A17892.) This is commercial success.

### 6. There Was a Nexus Between the Objective Evidence and the Claimed Invention

For objective evidence "to be given substantial weight," there must be a nexus "between the merits of the claimed invention and the evidence offered." *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1539 (Fed. Cir. 1983). Where, as here, a marketed product enjoys commercial success or receives praise, and that product practices the claimed invention (A15200-02, A8097-8100), a *prima facie* case of nexus has been made. *See Crocs, Inc. v. ITC*, 598 F.3d 1294, 1310-1311 (Fed. Cir. 2010).

At trial, testimony from WBIP's expert demonstrated the nexus between the claimed invention and the objective evidence. Claim 1 of the '044 patent recites as follows:

> 1. A marine engine comprising:
> an exhaust system including
> > a catalyst cooled by a flow of coolant, the catalyst arranged to intercept a flow of exhaust;
> > a coolant injector that injects coolant into the flow of exhaust at a point downstream of the catalyst; and
> > a sensor arranged to sense a characteristic of the flow of exhaust; and
> an engine controller configured to control an air/fuel ratio of the engine as a function of the sensed exhaust flow characteristic;
> > wherein the engine controller is also configured to govern engine speed with respect to a constant speed while maintaining the air/fuel ratio.

Mr. Amber testified that this novel combination of elements is what allowed the Westerbeke and Kohler generators to emit safe levels of CO, finally solving the marine generator carbon monoxide problem. Specifically, he testified that to achieve low CO, the generators needed the catalyst (A15191-92), needed the catalyst to be cooled by a flow of coolant to maintain proper temperature (A15192-93, A15195), needed the controller that both maintains air/fuel ratio and governs engine speed (A15195-97), and needed the sensor that provides closed-loop feedback (A15198-99.) Remove any of these claimed elements, and the generator would not emit safe levels of CO. (A15190-91; A15197-98; A15199-200.) Thus, substantial evidence links the claimed combination to the objective evidence of

46

non-obviousness.

Indeed, every commercial embodiment of the invention has achieved low CO, and has been marketed as "Safe-CO" or "Low-CO." (A17279, A17283, A17287, A17291, A17295, A17299, A17303, A17307; A17253.) By contrast, every prior art generator did not. At trial, Kohler's damages expert acknowledged that to achieve Low-CO, one must practice the claimed invention--there is no non-infringing alternative. (A15821-22.) Kohler's trial counsel made the same admission at a post-trial hearing. (A10897-98.)

Kohler raises three arguments against the presumption of nexus. First, Kohler argues that since the infringed claims do not recite a particular level of carbon monoxide reduction, the praise, commercial success, and other objective evidence based on low CO emissions are irrelevant. This is contrary to law. Nexus does not require that the claims recite the benefits achieved by the claimed invention, only that there is a nexus between those merits and the claims. In *Transocean*, for example, the praise and commercial success were due to a 20-40% "increase in drilling efficiency made possible using Transocean's patented dual-activity technology" and corresponding "cost savings." 699 F.3d at 1350-52. The claims in *Transocean* did not recite efficiency gains. *See Id.* at 1348. *See also Spectralytics*, 649 F.3d at 1344 (evidence that the infringing metal-cutting tool produced better stent products than the competition, and that the tool was described

as "superior" and "advanced technology," was sufficient to show nexus between the claimed invention and commercial success).

This Court's decision in *Rambus Inc. v. Rea*, 731 F.3d 1248 (Fed. Cir. 2013), is instructive.  In *Rambus*, the patent office held claims to be invalid as obvious in a reexamination.  *Id.* at 1250.  As part of its ruling, the Board rejected a patent owner's objective evidence of nonobviousness "relating to high-speed memory systems," because, it found, "the claims do not recite a specific clock speed and therefore embrace slow memory devices."  *Id.* (internal quotation marks omitted).  This Court reversed:

> Such a strict requirement was improper.  Objective evidence of nonobviousness need only be "reasonably commensurate with the scope of the claims," and we do not require a patentee to produce objective evidence of nonobviousness for every potential embodiment of the claim.  Moreover, Rambus's evidence shows beyond dispute that the claimed dual-edge data transfer functionality is what enabled the praised high-speed transfer of data.

*Id.* (citations omitted).

Here, similarly, the evidence at trial established that the claimed combination is what enabled low CO.  That the asserted claims do not explicitly recite "low CO," and that there may be theoretical embodiments which do not achieve low CO, does not defeat the presumption of nexus.  *See id.  See also Genetics Inst., LLC v. Novartis Vaccines and Diagnostics, Inc.*, 655 F.3d 1291, 1308 (Fed. Cir. 2011); *In re Glatt Air Techniques, Inc.*, 630 F.3d 1026, 1030 (Fed.

Cir. 2011).

Kohler next argues that the objective evidence only supports the nonobviousness of certain dependent claims which *do* recite a specific carbon monoxide output, an output of between 9 and 30 ppm. This argument is contrary to the evidence. Both Westerbeke and Kohler marketed their Low-CO products as reducing CO output by "more than 99%." (A17253; A17718.) Since prior art generators emitted 10,000-30,000 ppm or more (A15208), the "more than 99%" reduction corresponds to a CO output in the low hundreds or less, which is the level NIOSH deemed acceptable for short-term exposure. (A17204-05.) The 9-30 ppm dependent claims, however, require a CO reduction of about 99.85-99.95%. There is no evidence that the secondary considerations--praise, skepticism, commercial success, long-felt need--were tied to this specific, very narrow range.[13]

Finally, Kohler argues that to satisfy nexus, all of the objective evidence must be tied specifically to the "coolant" elements, since Phipps disclosed the remaining claim limitations. In support, Kohler cites *In re Huai-Hung Kao*, 639 F.3d 1057 (Fed. Cir. 2011), and *Asyst Techs., Inc. v. Emtrak, Inc.*, 544 F.3d 1310 (Fed. Cir. 2008). Kohler's argument misapplies the law.

*Kao* and *Asyst* do not stand for the proposition that where a defendant

---

[13] Testing data showed Kohler's infringing Low-CO generators emit CO at levels ranging from 14 ppm to 173 ppm, depending on the generator's load. (A17272; A15257-58.)

introduces a prior art reference that discloses all claim limitations but one, that objective evidence must then be tied solely to the missing limitation, or they lack nexus. Such a rule would create logical contradictions. For example, Kohler argued at trial that the Fujimoto patent disclosed all claim limitations except for governing engine speed with respect to a constant speed, and the Phipps patent disclosed all limitations except cooling the catalyst and injecting coolant into the exhaust. (A15846-47, A15865.) Under Kohler's reading of *Kao* and *Asyst*, a patent owner would have to prove that the objective evidence was tied specifically to the cooling elements *and*--simultaneously--tied specifically to speed control. An impossibility.

Rather, *Kao* and *Asyst* stand for the common sense principle that where the secondary considerations result from a *feature* known in the prior art, rather than something new to the claims, then there is no nexus. In *Kao*, the invention was a controlled-release form of the drug oxymorphone. The claims improved upon prior art by reciting an oxymorphone composition with a specific dissolution rate. *Kao*, 639 F.3d at 1061. In response to a patent office obviousness rejection, the applicant cited evidence that its controlled release product was commercially successful, and that it achieved unexpected multiple peaks in oxymorphone blood concentrations compared to immediate release formulations. *Id.* at 1068-70. In its opinion, this Court remanded with instructions to assess whether the proffered

commercial success and unexpected results were due to the newly-claimed dissolution rate, rather than dissolution rates and formulations known in the prior art. *Id.* at 1069-70.

Similarly, in *Asyst*, the patent disclosed a system for transporting articles through a manufacturing process in discrete containers ("pods"), while keeping track of the status of the articles in each pod. 544 F.3d at 1312. The only material difference between the claimed invention and the prior art reference was the means for communicating between the pods and a central controller--the prior art carried the communications over a bus, while the patent disclosed using a multiplexer. *Id.* at 1314. It was undisputed that "the two alternative means of connecting the transducer stations are buses and multiplexers and that those alternatives have long been known and understood by persons of ordinary skill in the art," and that replacing a bus with a multiplexer would be "familiar to anyone of skill in the art." *Id.* at 1315. Given these undisputed facts, the Court discounted the proffered objective evidence of nonobviousness because all of it was due to features found in the prior art, not the claimed invention. Specifically, the praise and long-felt need evidence concerned the use of non-static communication generally, as opposed to static bar codes. Non-static communication was a feature already disclosed in the prior art reference. *Id.* at 1316.

The nexus issue here is radically different from *Kao* or *Asyst*. The objective

evidence here all relates to the invention solving the carbon monoxide problem in marine generators. Phipps did not disclose or remotely suggest a solution to this problem. Phipps described industrial land generators using a reverse control scheme to better implement exhaust gas recirculation. (A19049, at 9:27-36; A19046, at 3:53-65.) Phipps' only indirect mention of carbon monoxide was a generic reference to incorporating a "three-way catalyst," a device long known to simultaneously reduce hydrocarbons, carbon monoxide, and oxides of nitrogen. (A19049, at 9:64-10:5, A19045, at 1:24-30.) As Mr. Amber testified, one of skill would not have considered Phipps a viable option to "even attempt to make an engine run, much less try to gain some secondary control like carbon monoxide." (A16027.) Nothing in Phipps suggested a potential solution to the carbon monoxide problem. (A16030.)

Recognizing this hole in its nexus argument, Kohler suggests that low CO was "inherent" in Phipps, "[b]ecause all the claim elements relevant to reducing emissions (the catalyst, air/fuel control, and oxygen sensor, *see* A15,195-200) are also present in Phipps." (Kohler Brief, p. 46.) This argument ignores the *unrebutted* testimony that Phipps' reverse control scheme would likely not even operate, "much less…gain some secondary control like carbon monoxide." (A16027.) It also ignores Mr. Amber's testimony that cooling the catalyst with a flow of coolant, a limitation not disclosed in Phipps, was part of the solution.

52

(A15192-93, A15195.)

Mr. Westerbeke's solution to the carbon monoxide problem was not simply adding coolant elements to Phipps, nor was it adding speed control to Fujimoto. The novelty lay in the claimed *combination*. It was this *novel combination* that solved the marine carbon monoxide problem. *See Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013) ("An invention may be a combination of old elements disclosed in multiple prior art references") (internal quotation marks omitted); *Rambus*, 731 F.3d at 1257-58 ("While objective evidence of nonobviousness lacks a nexus if it exclusively relates to a feature that was 'known in the prior art,' the obviousness inquiry centers on whether 'the claimed invention as a whole' would have been obvious.") (citations omitted). The claimed solution was not disclosed or suggested in any prior art, including Phipps. The objective evidence of long-felt need, skepticism, praise, copying, and commercial success, therefore, are highly probative evidence that Mr. Westerbeke's claimed invention was not obvious.

## II.    THE CLAIMS SATISFY THE WRITTEN DESCRIPTION REQUIREMENT

"A specification adequately describes an invention when it reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151, 1166 (Fed. Cir. 2012) (internal quotation marks omitted). "The invention is,

for purposes of the 'written description' inquiry, *whatever is now claimed*." *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1564 (Fed. Cir. 1991) (emphasis in original).

In its brief, Kohler argues that the District Court should have granted judgment as a matter of law that the claims are invalid for lack of written description because, Kohler contends, the provisional application did not adequately describe "governing engine speed with respect to a constant speed while maintaining the air/fuel ratio." Specifically, Kohler argues: (1) that the provisional application only disclosed governing engine speed and maintaining air/fuel ratio in "different embodiments," and (2) that the law requires the specification to describe *how* the controller's software accomplished simultaneous control to satisfy 35 U.S.C. § 112, ¶ 1. Neither argument has merit.

We begin, however, with a threshold issue: Kohler did not argue its written description case to the jury. Other than a single, cryptic sentence from its expert, it offered no testimony or argument explaining to the jury why the claims supposedly lacked adequate written description. According to precedent from this Court, such a record cannot support a verdict of invalidity.

## A.    Kohler Did Not Argue Written Description to the Jury

At trial, the entirety of the testimony that Kohler presented on written description was the following exchange between Kohler's counsel and Kohler's expert:

> Q. All right. Last couple questions. Within the patent, the patent itself, does the patent describe -- provide any description of how the engine controller works?
>
> A. It just described what I described on that first slide. That was the extent of it, that there's oxygen sensor feedback. Air/fuel ratio is kept at a target.
>
> Q. Was there any other technical description suggesting there was any technical innovation or improvement or anything not trivial in how the Westerbeke people were doing that?
>
> A. There was not.
>
> *        *        *
>
> Q. Was there any written description in the patent on how to do this?
>
> A. There was not sufficient written description.
>
> Q. All right.
>
> [Kohler's counsel]: Your Honor, that's all.

(A15890-91.)   Kohler then entered the '044 patent's prosecution history into evidence without further testimony, explanation, or argument on written description.  (A15891-92.)

The jury was entitled to find--indeed, was obliged to find--that such a conclusory, single-sentence opinion of invalidity failed to rise to the level of clear

and convincing evidence. *See Koito*, 381 F.3d at 1152. In *Koito*, the alleged infringer entered a prior art reference into evidence, "but otherwise failed to provide any testimony or other evidence that would demonstrate to the jury how that reference met the limitations of the claims…or how the reference enabled one of ordinary skill in the art to practice the claimed invention." 381 F.3d at 1151. Instead, the alleged infringer's expert offered a two-sentence conclusion of invalidity. *Id.* at 1151-52. The jury returned a verdict of invalidity, which the District Court confirmed, citing to the prior art in evidence. *Id.* at 1151. This Court reversed, holding that such general and conclusory testimony "does not suffice as substantial evidence of invalidity." *Id.* at 1152. "This is so even when the reference has been submitted into evidence before the jury." *Id.*

Here, as in *Koito*, Kohler entered the '044 patent's prosecution history into evidence without mentioning it again, and its expert offered a conclusory, single-sentence opinion of invalidity. Kohler otherwise failed to provide any testimony that would demonstrate to the jury how the prosecution history (or even the patents themselves) supported its written description defense, or why the priority documents would not have demonstrated possession of the invention to one of skill in the art. Indeed, Kohler admitted in closing "there hasn't been argument about it":

> Just a couple of other things that are going to pop up on the verdict form. You're going to see a question about written description. What

that issue is -- *because there hasn't been argument about it*. The evidence is in. The question is does the patent adequately describe in the -- does it describe what the invention was as it relates to the control, because, since we've heard, this is where they say the invention is now. This is where it's all different. And so there's a question to you, do you believe this patent adequately describes the written -- the inventor adequately describes the written invention.

(A16093, emphasis added.)

In sum, Kohler threw a file wrapper at the jury and left it up to them to divine the merits of its written description defense. Such a record could not support a jury verdict of invalidity, let alone provide a basis for overruling a verdict of no invalidity. *See Koito*, 381 F.3d at 1152. Under such circumstances, the district court's "cursory" denial of Kohler's JMOL motion on written description was appropriate, and should be affirmed.

### B. The Amendment Adding "While" to the Claims Did Not Constitute New Matter

Although not previously argued to the jury or the District Court, Kohler now contends that the provisional application did not disclose a controller that simultaneously governed engine speed and maintained air/fuel ratio, but only disclosed governing engine speed and maintaining air/fuel ratio in "different

embodiments." (Kohler Brief, pp. 54-55.) [14]  According to Kohler, the "compound control scheme" was not disclosed until the applicant added the word "while" to the claim in 2007.  This argument is without merit.

While the provisional application did not include the precise language of the final claims, such *in haec verba* support is not required.  *Pozen*, 696 F.3d at 1167; *Vasudevan Software, Inc. v. MicroStrategy, Inc.*, __ F.3d. __, 2015 U.S. App. LEXIS 5396, at *24-25 (Fed. Cir. Apr. 3, 2015).  The provisional application did, in fact, describe a controller that governed engine speed "while" maintaining air/fuel ratio.

In a "background" section, the provisional application described the difference between variable and constant speed engines.  (A18055, at ll. 9-16.)  In automotive applications, for example, "engine speed varies substantially with vehicle speed and gear selection."  (A18055, at ll. 11-12.)  In powering fixed-frequency electrical generators, however, "engine speed is held as constant as

---

[14] "No matter how independent an appellate court's review of an issue may be, it is still no more than that--a review.  With a few notable exceptions, such as some jurisdictional matters, appellate courts do not consider a party's new theories, lodged first on appeal.  If a litigant seeks to show error in a trial court's overlooking an argument, it must first present that argument to the trial court.  In short, this court does not 'review' that which was not presented to the district court."  *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1426 (Fed. Cir. 1997).

possible during use, even while generator and engine loads fluctuate." (A18055, at ll. 13-15.)

Why is the difference between variable and constant speed engines important? Because WBIP's provisional application disclosed and claimed an invention for constant speed engines. Indeed, it explicitly disclosed that "the engine speed is substantially fixed in the primary embodiments." (A18062, at ll.15-16.) Claim 26 of the provisional application disclosed a marine generator with both speed governing and air/fuel ratio maintenance:

> 26. A method of controlling emissions from an internal combustion engine configured for marine application, the method comprising:
> driving an electric generator with the engine;
> **governing engine speed with respect to a selected constant speed**;
> **maintaining an air/fuel ratio of the engine**;
> flowing exhaust from the engine through an exhaust system containing a catalyst;
> monitoring a first variable with a feedback sensor located upstream of the catalyst, the catalyst being configured to simultaneously reduce oxides of nitrogen, carbon monoxide and hydrocarbons; and
> controlling the air/fuel ratio of the engine as a function of the variable with electronic fuel injection. (A18066, emphasis added.)

Kohler's interpretation of the provisional--that it *only* disclosed governing engine speed and maintaining air/fuel ratio at different times--makes no sense. Basic logic dictates that where engine speed is "substantially fixed" (i.e., constant) to drive a generator, any secondary action such as maintaining air/fuel ratio must

be contemporaneous with governing engine speed. Kohler's interpretation would require the *constant* speed engine to periodically operate at *variable* speed when maintaining air/fuel ratio. That, in turn, would frustrate the purpose of using a constant speed engine for powering fixed-frequency electrical generators. (A18055.) Kohler offered no expert testimony or other evidence for this strained and illogical interpretation of the specification.

The prosecution history is not to the contrary. In response to rejections based on variable speed engines, WBIP reiterated what the specification already disclosed: "Applicant's claimed invention is directed to improvements to engines controlled with respect to a set engine speed, and to employing such engines to drive generators." (A18292.) WBIP pointed out that the claims required "controlling speed and air/fuel ratio simultaneously," and explained why this distinguished variable speed prior art. (A18293.) In response, the Examiner suggested in an interview that WBIP amend the claims to explicitly recite governing engine speed "while" maintaining air/fuel ratio. (A18323.) WBIP complied, citing support in its specification. (A18323.) Thus, if anything, the "while" amendment *narrowed* the claims to prevent WBIP from making the very argument that Kohler advances here--i.e., that the controller can govern engine speed sometimes, and maintain air/fuel ratio sometimes, but never both simultaneously. The "while" amendment did not add new matter.

## C.    The Specification Adequately Described the Claimed Controller

Kohler next argues that the compound control scheme (governing engine speed while maintaining air/fuel ratio) is a functional limitation whose corresponding structure (the claimed engine controller) is a "black box" that itself requires disclosure of even further structure, such as "flow chart." (Kohler Brief, pp. 57-59.) That is not the law.

This Court and its predecessor have repeatedly held that disclosing the general function of software--rather than a specific algorithm--is sufficient to satisfy 35 U.S.C. § 112, paragraph one. *See, e.g.*, *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1548-50 (Fed. Cir. 1997) (addressing paragraph one's best mode requirement); *In re Hayes Microcomputer Prods., Inc. Patent Litigation*, 982 F.2d 1527, 1533-39 (Fed. Cir. 1992) (addressing paragraph one's written description and best mode requirements); *In re Sherwood*, 613 F.2d 809, 816-19 (CCPA 1980) addressing paragraph one's best mode requirement).[15] For example, with respect to the written description requirement:

---

[15] There are cases that require disclosure of specific algorithms to avoid indefiniteness under 35 U.S.C. § 112 paragraph two where the claims recite a "special purpose computer-implemented means-plus-function limitation" under 35 U.S.C. § 112 paragraph six. *Function Media, L.L.C. v. Google Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013). Notably, even under those paragraphs, the algorithm requirement is interpreted "broad[ly]" and may be satisfied by a "description of the function in words." *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1384-86 (Fed. Cir. 2011). In any event, the claims here are *not* means-plus-function claims.

> Disclosing a microprocessor capable of performing certain functions is sufficient to satisfy the requirement of section 112, first paragraph, when one skilled in the relevant art would understand what is intended and know how to carry it out.

*Hayes*, 982 F.2d at 1534.  The reason for disclosing only the general function of software is that "normally, writing code for such software is within the skill of the art…once its functions have been disclosed."  *Fonar*, 107 F.3d at 1549; *accord Sherwood*, 613 F.2d at 816-17.  Similarly, flow charts, source code, mathematical formulas, and firmware programs are not required to satisfy 35 U.S.C. § 112, paragraph one.  *Fonar*, 107 F.3d at 1549 ("Thus, flow charts or source code listings are not a requirement for adequately disclosing the functions of software."); *Hayes*, 982 F.2d at 1537 ("While we agree that the [patent-in-suit] only discloses the general function of the firmware without teaching mathematical formulas, flow charts, or a firmware program listing, no more was needed here."); *Sherwood*, 613 F.2d at 813, 819 (reversing a rejection of a patent application where the specification lacked "adequately detailed algorithms and flow charts to an operative program").  The law requires that the specification demonstrate possession of *the invention*, not possession of a complete example or an actual reduction to practice.  *See Falkner v. Inglis*, 448 F.3d 1357, 1366 (Fed. Cir. 2006); *Ariad Pharms., Inc. v. Eli Lilly and Co.*, 598 F.3d 1336, 1352 (Fed. Cir. 2010).

Here, there was expert testimony from Mr. Amber that one of skill in the art, presented with the description of the controller in the patent specification, would

have known how to get it done. (A15362.) This is substantial evidence that the specification demonstrated possession. *See Vasudevan*, 2015 U.S. App. LEXIS 55396, at *24-25 (expert testimony that possession raised genuine issue of fact, precluding summary judgment of invalidity for lack of written description). No additional disclosure was needed to satisfy the written description requirement. *See Hayes*, 982 F.2d at 1534.

Kohler argues that the length of time required to program the controller shows lack of written description. But if that fact is relevant at all, it is relevant to enablement, not written description, and Kohler did not argue enablement to the jury or at any other time in this case. *See Vasudevan*, 2015 U.S. App. LEXIS 5396, at *26-30 (discussing length of time to reduce to practice in context of enablement). In any event, that it takes considerable time to create control code for a working, commercial generator does not show lack of enablement. *See id.* at *26-28 (that it took inventor three years "to build a functioning embodiment of the invention" does not prove lack of enablement). As Mr. Amber testified, control functions for a working engine can require "500 to 1000 pages of code." (A15349.) That this process takes considerable time, and may involve outsourcing to coding vendors, is hardly surprising.

The cases Kohler relies upon are readily distinguishable. In *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, the specification was "directed at describing a

particular method for creating a seamless DWT…and [taught] only that method of creating a seamless array." 424 F.3d 1336, 1345 (Fed. Cir. 2005). One of the claims, however, was "directed to creating a seamless array of DWT coefficients generally." *Id.* The Court concluded that "After reading the patent, a person of skill…would not understand LizardTech to have invented a method for making a seamless DWT, except by 'maintaining updating sums of DWT coefficients.'" *Id.* The Court therefore held that claims not limited to this particular method were not supported by the written description, citing *Tronzo v. Biomet*, 156 F.3d 1154 (Fed. Cir. 1998). *LizardTech*, 424 F.3d at 1345-46. This is a completely different written description theory than the one Kohler offers here. The other case discussed by Kohler, *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235 (Fed. Cir. 2002), is distinguishable for the same reason.

Kohler, therefore, has failed to prove lack of written description as a matter of law, and the District Court's JMOL ruling should be affirmed.

## III.    KOHLER'S INFRINGEMENT WAS WILLFUL

Kohler challenges the jury's and District Court's willfulness determinations on two grounds: (1) Kohler argues that WBIP failed to prove at trial that Kohler was aware of the patents before the complaint was filed; and (2) Kohler argues that its infringement was not objectively reckless. The District Court properly rejected both arguments.

## A.    Kohler Admitted It Was Aware of the '044 Patent

Kohler's first contention--that WBIP failed to prove pre-suit knowledge of the patents--is defeated by its own pre-trial admissions.  In a summary judgment "Statement of Undisputed Material Facts," Kohler admitted that it was aware of the '044 patent at least as early as August 2010.  (A2880.)  Kohler made the same admission in Rule 30(b)(6) testimony and in an interrogatory response.  (A3844-45; A3849.)  Nor could Kohler have denied it--the patent was all over Kohler's privilege log.  (A8284-85.)

Kohler's admission--made to the District Court in a pleading--is a judicial admission that was binding throughout the case.  *See Schott Motorcycle Supply, Inc. v. Am. Honda Motor Co., Inc.*, 976 F.2d 58, 61 (1st Cir. 1992) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.")  *See also Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009) ("Facts admitted by a party are judicial admissions that bind that party throughout the litigation.") (internal quotation marks omitted) (citing 2 McCormick on Evid. § 254 (6th ed. 2006) ("Judicial admissions are not evidence at all.  Rather, they are formal concessions in the pleadings in the case or stipulations by a party or counsel that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact....")).

The issue that remained for trial, therefore, was whether Kohler knew of the

'044 patent *earlier* than 2010, not whether it had pre-complaint knowledge at all. (*See* A10669.) That dispute was germane only to whether Kohler had a good faith basis for its infringement and to enhancement of damages. Since Kohler does not appeal either of those determinations, the judicial admission of pre-complaint knowledge is dispositive of the knowledge question for this appeal.

In any event, as the District Court found, it is reasonable to infer that Kohler knew of the '044 patent even "sooner than 2010." (A10669.) Westerbeke prominently marked its products with the '044 patent number beginning January 1, 2008, (A17192-98; A17261; A15495-96), and Westerbeke was Kohler's only competition in the gasoline marine generator market (A15569). Kohler made no effort to rebut this inference at trial. Instead, it took extraordinary steps to prevent its key witnesses on willfulness, Mr. Locke (its Rule 30(b)(6) witness on the topic) and Mr. Klompenhouwer (the long-tenured product manager for Kohler's marine products), from appearing before the jury. (A5647; A7265-72; A15002-03; A15714-15.) Indeed, Kohler did not call a single witness who worked in Kohler's marine division after 2006. Having actively prevented live testimony from any employees who worked at Kohler after the patent's issuance, it cannot object to a reasonable inference that it had knowledge of the patents.

## B.     Kohler's Invalidity Defenses Were Not Reasonable

Under the objective prong of *Seagate*, "a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent."  497 F.3d at 1371.  The objective prong question is "often posed" as "whether a defense or noninfringement theory was 'reasonable.'"  *Bard*, 682 F.3d at 1006.

Here, the District Court correctly determined that Kohler was "objectively reckless," and that "[o]bviousness was not a reasonable defense."  (A10664-65.) For the reasons discussed extensively above, Kohler's obviousness defense was a litigation-contrived, hindsight reconstruction.  It based its obviousness argument on a prior art patent that disclosed an unworkable backwards control scheme designed for industrial land generators.  Kohler offered *no expert testimony* that one of skill would have had motivation or rationale to transform Phipps into a marine generator, or that Phipps was "ready for improvement" to marine.  Moreover, the objective evidence of nonobviousness was unusually extensive and strong.

Kohler's written description arguments were similarly unreasonable.  Kohler presented only a single, conclusory sentence of testimony on the issue at trial.  Its appeal contentions--based purely on attorney argument--are factually and legally unsupported, for the reasons discussed above.  The enhanced damages and attorney

fees awards, therefore, should stand.[16]

## IV.   <u>WBIP'S CROSS APPEAL</u>: THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING THE REQUEST FOR A PERMANENT INJUNCTION WITHOUT PROPERLY CONSIDERING ALL THE RELEVANT FACTORS

The District Court denied WBIP's request for a permanent injunction, ultimately because it decided the public would be better served by two providers of the patented generator sets, rather than one. (A10671.) The District Court's analysis was legally incomplete, because it considered only one of the four factors listed in *eBay*, 547 U.S. at 391. Its analysis was also factually flawed, because its public interest analysis was based on a misapprehension of Westerbeke's manufacturing capacity, a misapprehension it later acknowledged. This Court should therefore vacate the denial of a permanent injunction and remand to the District Court with instructions to reassess the appropriateness of a permanent injunction.

---

[16] In the event this Court reverses the willfulness determination, it should remand to the District Court to re-assess attorney fees under 35 U.S.C. § 285. While the District Court's exceptional case finding was premised on willfulness, the District Court also found that Kohler committed litigation misconduct as part of its *Read* factor analysis. (A10668-69.) The District Court, therefore, should be given the opportunity to find the case exceptional on grounds other than willfulness, particularly given the intervening change in standard for awarding fees under § 285.

## A.    Procedural Background

After trial, WBIP timely moved for a permanent injunction. (A8110-12.)  Its supporting memorandum and reply included an extended discussion of the four-factor test under *eBay*. (A8117-27; A10321-28.)

The district court denied WBIP's injunction request under the fourth *eBay* factor without weighing it against the other three factors. (A10381-83.)  Its opinion reasoned as follows:

> In this case the Court finds that a permanent injunction would be contrary to the public interest.  Westerbeke Corp. and Kohler are the only two producers of low-CO marine gas generators.  If Kohler were permanently enjoined from producing or selling its generators Westerbeke would be left as the sole supplier of a product that is important to public health and safety.  *Particularly given that Kohler is a much larger producer, with a manufacturing capacity almost 14 times greater than that of Westerbeke, an injunction would deprive the consuming public of access to a potentially life saving product.*  Therefore, the permanent injunction will be denied and the Court need not address the remaining three factors.

(A10381-82 (emphasis added).)  WBIP timely moved for reconsideration because the district court's reasoning rested on a misapprehension of fact concerning Westerbeke's and Kohler's relative manufacturing capacities. (A10384-89.)

The district court denied WBIP's reconsideration request, this time acknowledging Westerbeke's "larger manufacturing capability," but deciding that the public interest would still be better served by two manufacturers of Low-CO generator sets:

> Even if the plaintiff has a larger manufacturing capability than previously estimated, the Court is persuaded that it is in the public interest to have more than one company manufacture low-carbon monoxide generators….

(A10671.)  *See also* A52, the Court's attorney fee order where it acknowledged "that it may have misapprehended the relevant facts" on manufacturing capacity.)

## B.    Argument

### 1.  The District Court Did Not Weigh the Four Equitable Factors

In assessing the four-factor equitable test of *eBay*, 547 U.S. at 391, the public interest factor is not dispositive, nor is any other factor dispositive.  *See, e.g.*, *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1362, 1364 (Fed. Cir. 2012) (vacating denial of permanent injunction and remanding "for a re-weighing of the four-factors" despite the district court's finding that "the public interest tipped in [the infringer's] favor"); *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1146 (Fed. Cir. 2011) (reversing district court for erroneously finding one factor "fatal" and denying injunction "without addressing the remaining equitable factors of the permanent injunction inquiry").

Here, as in *Robert Bosch*, the district court erroneously found one factor fatal to WBIP's injunction request (the public interest) and denied the request without addressing the remaining equitable factors.  (A10381-82.)  Failure to consider all four *eBay* factors and, in particular, failure to make factual findings

regarding those factors, constitutes an abuse of discretion. *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335, 1352 (Fed. Cir. 2009). Thus, the denial should be vacated and the inquiry remanded with instructions for the district court to make factual findings regarding the remaining equitable factors and then balance all equitable factors.

## 2. The Public Interest Favors an Injunction

The District Court's concern for public safety--while understandable and reassuring--was in fact misplaced. Contrary to the District Court's expressed concern, Westerbeke *does* have capacity to meet the demand for Low-CO generators. In its Order denying the injunction, the District Court relied on a factual assertion in Kohler's Opposition brief: that Kohler's manufacturing capacity was nearly fourteen times greater than Westerbeke's. (A10382; A9897.) This assertion was **false**. Kohler's "fourteen times" number was a comparison of the two companies' Low-CO *sales* in the year 2010, not a comparison of their manufacturing capacities.[17] (A9910; A9912.) As demonstrated at trial, Kohler dramatically outsold Westerbeke because Kohler charged 15% less for a comparable product, and because Kohler, by virtue of its infringement, was able to retain exclusive contracts with large boat builders. (A15569-70; A15596-97.)

---

[17] In addition to substituting sales for capacity, Kohler cherry-picked the year 2010 because that was the year in which the parties had the greatest sales gap.

Simply put, that Kohler has greater *sales* is irrelevant to whether Westerbeke has *manufacturing capacity* to supply the market.

In fact, Westerbeke's manufacturing plant in Taunton, Massachusetts has capacity to produce *10,000 units per year* running just a single, eight-hour shift. (A10390.)  That is far more than Kohler's sales volume.  (*See* A9912.)  Thus, Westerbeke has ample manufacturing capacity to supply the entire market-- including both its own and Kohler's customers--and the District Court's factual finding otherwise was clearly erroneous.  Indeed, the District Court acknowledged as much in subsequent orders.  (A10671; A52.)

In its order denying WBIP's motion to reconsider the injunction, the District Court appeared to recognize that public safety was not the issue, but nevertheless found that "it is in the public interest to have more than one company manufacture low-carbon monoxide generators."  (A10671.)  While indeed boat builders and boaters may prefer competition, there is also a strong public interest in upholding patent rights and promoting innovation.  *See Celsis in Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 931-32 (Fed. Cir. 2012).  Accordingly, the public interest favors an injunction.

## <u>CONCLUSION</u>

For the reasons discussed above, the Court's judgment should be affirmed, and the case remanded with instructions for the District Court to consider a renewed request for a permanent injunction.

Respectfully submitted,

  /s/ *David A. Simons*

Michael E. Zeliger
David A. Simons
Andrea B. Reed
K&L GATES LLP
State Street Financial Center
One Lincoln Street
Boston, MA  02111-2950
Telephone (617) 261-3100
Facsimile (617) 261-3175
michael.zeliger@klgates.com
david.simons@klgates.com
andrea.reed@klgates.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 9, 2015, true and correct copies of the foregoing **BRIEF OF PLAINTIFF-CROSS-APPELLANT WBIP, LLC** was electronically filed through the Court's ECF system.  All participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

<u>/s/ *David A. Simons*     </u>
David A. Simons

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief uses a proportionately spaced 14-point typeface, and, based on the word count function of Microsoft Word, contains 16,368 words, excluding the Table of Contents, Table of Authorities, Certificate of Interest, and Statement of Related Cases, and therefore complies with the length restrictions of Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i) and Federal Circuit Rule 28.1(e).

Dated: April 9, 2015

/s/ *David A. Simons*
David A. Simons